UNITED STATES of America et al., Plaintiffs,

v.

STATE OF WASHINGTON et al., Defendants.

Civ. No. 9213.

United States District Court, W.D. Washington.

Compilation of Major Post-Trial Substantive Orders (from July, 1978 through Dec. 31, 1985).

**1414**

Gene S. Anderson, John C. Merkel, U.S. Attys., Seattle, Wash., George D. Dysart, Sp. Asst. U.S. Atty., Portland, Or., for U.S.

Phillip E. Katzen, Alan C. Stay of Evergreen Legal Services, Seattle, Wash., for Jamestown Klallam, Lower Elwha Klallam, Muckleshoot, Nisqually, Nooksack, Port Gamble Klallam, Sauk-Suiattle, Skokomish, Squaxin Island, Stillaguamish, Suquamish, Swinomish ITC, and Upper Skagit Tribes.

Mason D. Morisset, Steven S. Anderson, Thomas P. Schlosser, Samuel J. Stiltner, Alvin J. Ziontz of Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for Makah, Tulalip, Quileute and Lummi Tribes.

Lewis A. Bell (now deceased), Bell & Ingram, Everett, Wash., for Tulalip Tribes.

Allen H. Sanders (formerly of Evergreen Legal Services) now with Bell & Ingram, Everett, Wash., Richard Baum, Bellingham, Wash., for Nooksack Tribe.

John Howard Bell, Law Office of Puyallup Tribe, Tacoma, Wash., for Puyallup Tribe.

Allan E. Olson, Donald S. Means, Peter J. Wilke, LaConner, Wash., for Swinomish Tribal Community.

Daniel A. Raas, Thomas Stuen of Raas, Johnsen, Garrett & Stuen, Bellingham, Wash., for Lummi Tribe.

Susan Kay Hvalsoe of Cullen & Hvalsoe, Olympia, Wash., for Hoh, Quileute, Nisqually and Squaxin Island Tribes.

Richard Reich, Carl V. Ullman, Michael Taylor, Quinault Tribal Office, Taholah, Wash., for Quinault Tribe.

James B. Hovis, Timothy Weaver of Hovis, Cockrill, Weaver & Bjur, Yakima, Wash., for Yakima Tribe.

Michael R. Thorp of Eisenhower, Carlson, Newlands, Rhea, Henriot & Quinn, Tacoma, Wash., for Port Gamble Klallam Tribe.

Jane Cantor Shefler, Of Point No Point Treaty Council, Kingston, Wash., for Port Gamble Klallam, Lower Elwha Klallam, Skokomish Tribes, Toby Thaler of Point No Point Treaty Council, Jamestown Klallam Tribe.

Stephen K. Strong of Bendich, Stobaugh & Strong, Seattle, Wash., for Jamestown Klallam Tribe.

Gregory O'Leary of Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., for Skokomish and Muckleshoot Tribes.

Steven V. Quesenberry, Ukiah, Cal., for Skokomish Tribe.

Sasha Harmon, Suquamish, Wash., for Suquamish Tribe.

Joanne Foster of Browne, Ressler & Foster, Seattle, Wash., for Suquamish and Quinault Tribe.

Cynthia Davenport, Seattle, Wash., for Stillaguamish Tribe.

Jeffrey Schuster of the Office of the Tribal Atty., Auburn, Wash., for Muckleshoot Tribe.

Craig A. Ritchie of Doherty, Doherty & Ritchie, Port Angeles, Wash., Mary Van Gemert, Seattle, Wash., for Lower Elwha Klallam Tribe.

Thomas F. Carr, James M. Johnson, Senior Asst. Attys. Gen., Dennis Reynolds, Asst. Atty. Gen., Olympia, Wash., for State of Wash.

## TABLE OF CONTENTS

ORDER PAGE

Summary of Memorandum Order and Preliminary Injunction Re Salmon Allocation for 1978 and Subsequent Seasons (8/11/78, as corrected 8/16/78 and amended 9/27/78 and 10/27/78) 1416

Additional Findings of Fact and Conclusions of Law Re Makah v. Lower Elwha Dispute Re Hoko River (11/28/78) 1418

Order Re Coastal Salmon Fisheries Management Schedule (5/23/79) 1419

Amendatory Order Re Fisheries Advisory Board (1/11/80) 1421

Order Re Puyallup River Steelhead (2/6/80) 1422

Order Re Notification and Effective Date of Emergency Regulations (8/26/80) 1422

Order Re Conference of September 16, 1980 (9/25/80) 1425

Preliminary Injunction Re minimum Size Troll Fishing Regulations (3/5/81) 1425

Order Regarding Attorneys' Fees (5/4/81) 1426

Order Re Allocation of Quinault River Steelhead (5/8/81) 1428

Final Decree and Order Re Treaty Status of Jamestown Clallam Tribe of Indians (5/8/81) 1432

Order Approving Magistrate's Report Re Treaty Status of Jamestown Clallam Tribe of Indians (5/8/81) 1432

Order Re Set-Net Fishing in Mukkaw Bay (9/2/81) 1434

Findings of Fact and Conclusions of Law Re Determination of Additional Usual and Accustomed Fishing Places of Nisqually, Puyallup, and Squaxin Island Indian Tribes (8/22/81) 1441

Corrected Order Re Request for Determination of Port Gamble and Lower Elwha Usual and Accustomed Fishing Places (10/23/81, as amended 3/8/83 and 5/24/83) 1442

Phase II Attorney Fees Memorandum Opinion and Order (12/15/81) 1443

Phase II Attorney Fees Memorandum Opinion and Order (9/16/82) 1454

Ruling Re Puget Sound Chinook (2/3/82) 1458

Order Approving Plan for Puget Sound Chinook Salmon (4/12/82) 1462

Order Re Quillayute River Steelhead (4/21/82) 1465

Order Re South Puget Sound Treaty Fisheries (11/5/82) 1466

Order Re Makah Tribe's Ocean Fishing Grounds (12/9/82) 1466

Order Re Hood Canal Agreement (3/8/83) 1468

Order Denying Makah Indian Tribe's Motion to Dismiss (5/25/83) 1470

Orders Approving Settlement Agreements Between the Tulalip Tribes and Various Other Puget Sound Tribes Re Tulalip Fishing Area Claims (7/21/83, 10/13/83, and 5/8/85) 1471

Order Confirming Magistrate's Order Re WDF Computer Model (12/15/83) [Not supplied for publication]

Order Re Puget Sound Equitable Adjustment (Amended Final Order) (1/19/84) 1484

**1416**

ORDER PAGE

Order Re Jamestown Klallam Request for Determination of Usual and Accustomed Fishing Places (3/14/84, as amended 2/21/85) 1486

Order Adopting the Special Master's Report and Recommendation Re Skokomish Indian Tribe's Request for Determination of Primary Right in Hood Canal Fishery (3/22/84) 1486

Order Denying Motion to Vacate Order Entered March 24, 1984 (4/25/84) 1491

Order on Chehalis River Contempt Petitions (5/10/84) 1492

Order Re Attorneys' Fees Proceedings (6/22/84) 1503

Order Awarding Attorneys' Fees and Costs (4/30/85) 1504

Management Plans Re Sac Roe Herring Fishery 1526

Order Adopting New Puget Sound Salmon Management Plan (10/15/85) 1527

Findings of Fact and Conclusions of Law—In Re Tulalip Tribes' Request for Determination of Usual and Accustomed Fishing Places (12/31/85) 1527

---

## COMPILATION OF MAJOR POST-TRIAL SUBSTANTIVE ORDERS

(From July, 1978 through December 31, 1985)

CRAIG, District Judge.

The initial decision in this case and related rulings are reported at 384 F.Supp. 312 (W.D.Wash.1974), 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976), *rehearing denied* 424 U.S. 978, 96 S.Ct. 1487, 47 L.Ed.2d 750 (1976). Subsequent decisions and orders of a substantive nature rendered through June 30, 1978 are reported at 459 F.Supp. 1020 (W.D.Wash.1978). Various appeals were affirmed *sub nom., Puget Sound Gillnetters' Association v. United States District Court,* 573 F.2d 1123 (9th Cir.1978), *aff'd in part, vacated in part,* and *remanded sub nom., Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), remanded to District Court for continuing jurisdiction, 605 F.2d 492 (9th Cir.1979).

Further decisions and orders of a substantive nature issued through December 31, 1985, except for those already published at 476 F.Supp. 1101 (1979) and 506 F.Supp. 187 (1980), are set forth or summarized below. Senior District Judge George H. Boldt presided over the case until late 1979. Thereafter, Senior District Judge Walter E.

Craig of the District of Arizona has presided. The following compilation was prepared for publication under the direction of and approved by Judge Craig.*

## SUMMARY OF MEMORANDUM ORDER AND PRELIMINARY INJUNCTION RE SALMON ALLOCATION FOR 1978 AND SUBSEQUENT SEASONS

BOLDT, District Judge.

(Order of August 11, 1978, as corrected August 16, 1978 and amended September 27, 1978 and October 27, 1978)

(On July 11, 1978 the United States filed a motion for a 1978 summer-fall chinook allocation order. The matter was referred to Magistrate Robert E. Cooper as Special Master for hearing and determination. Magistrate Cooper held a hearing and issued a Report, Proposed Findings, Conclusions and Recommendations. Objections were filed, and the court held a hearing on August 10, 1978.)

Based on all the evidence and the prior holdings and decrees in this case, the court FINDS, HOLDS and ORDERS as follows:

■ 1. Paragraphs numbered 1, 2, 3, 4, 5 and 6 of this court's Preliminary Injunction Re Allocation of 1977 Salmon Runs (459 F.Supp. at 1097) have continuing validity and are made a part of this Memorandum Order.

---

* The Court expresses its sincere appreciation to Shelley K. McIntyre, Esq., law clerk to the court, for her outstanding work in assembling, condensing and editing these orders for publication.

(The court then made rules for allocating the 1978 harvest for chinook, coho and chum salmon returning to the various Puget Sound and Grays Harbor salmon management areas.)

2. Non-treaty commercial fishermen regularly take home fish from their catch for personal use and for gifts. Such catches are not currently reported and the state has no data on the number of fish involved. No reliable evidence on the extent of this practice has been submitted and the court therefore makes no findings at this time. However, any party, within 15 days of the commencement of the first non-treaty terminal net fishery on the run in question, may request a hearing to show the extent of such catch and the Magistrate is granted continuing jurisdiction to revise the allocation of harvestable shares accordingly.

3. This court finds that the Tribes have adequate fishing power to take the allocations decreed by this court in Final Decision # 1, 384 F.Supp. 312.

4. The court finds the determination whether proposed fisheries will harvest in violation of the allocations made by this court is a technical matter which may appropriately be assigned to the Fisheries Advisory Board.[1]

(The court then enjoined the State from exercising any form of jurisdiction over the portions of the fish runs allocated to tribal treaty fisheries without obtaining the express approval of the court. The court also required the defendants to adopt and enforce appropriate regulations to prevent non-treaty fishermen from taking more than their allocated shares of the runs or from taking fish needed for propagation to perpetuate the runs.)

5. Non-treaty commercial salmon fisheries in the waters of Puget Sound and other marine waters easterly of the Bonilla

Point-Tatoosh Island line, their watersheds, all Olympic Peninsula watersheds, and all Grays Harbor and its watersheds, shall not be authorized, permitted or communicated by the defendants, State of Washington, Director of Fisheries, State Game Commission and Director, their officers, agents, servants, employees, attorneys or any persons in active concert or participation with them, unless prior approval of the specific fisheries is obtained from this court or the Fisheries Advisory Board (F.A.B.).[2]

6. When proposing any non-treaty commercial fishery, the defendants shall present to the Fisheries Advisory Board the most recent information regarding catches of the affected stocks, estimates of the expected harvest ability of the proposed fishery, and the method for determining that expected harvest. If there is disagreement within the Fisheries Advisory Board over whether the proposed regulations will interfere with achievement of the allocations made by this court, the court's Technical Advisor shall make a recommendation to the court. Pending determination by this court, the recommendations of the court's Technical Advisor shall be followed.

7. Notwithstanding the above, enforcement action by any party against identified treaty Indian fishermen shall not be taken except in strict compliance with the procedures and notice periods specified in this court's Injunction of March 22, 1974, 384 F.Supp. at 413–419; the Stipulation Re: Notice of Regulations dated October 15, 1975, 459 F.Supp. at 1060; the Order Re: Rules of Procedure for Fisheries Advisory Board dated December 17, 1976, 459 F.Supp. at 1061; the Memorandum Order and Preliminary Injunction dated August 31, 1977, 459 F.Supp. at 1097; and the Preliminary Injunction Re: Enforcement of Limitations on Non-Treaty Salmon Fisheries dated June 6, 1978, 459 F.Supp. at 1125.

---

1. The Fisheries Advisory Board was established to advise the court on technical aspects of the case and make recommendations on questions of management and regulation of the resource. *Infra* at p. 1421 and 459 F.Supp. at 1061.

2. This was modified during a September 16, 1980 conference to require notice to tribes of non-treaty openings. No F.A.B. action is necessary to open non-treaty commercial fisheries unless an objection to such opening is made by an affected tribe.

8. Copies of all State regulations governing the non-treaty harvest in the case area and Grays Harbor area shall be filed with the court's fisheries Technical Advisor, each plaintiff tribe, the United States Fish and Wildlife Service, the Northwest Indian Fisheries Commission and their respective counsel. The State shall carefully monitor any non-treaty fishery and immediately advise the court and the Fisheries Advisory Board when any non-treaty catch meets the quota which is specified in this court's allocation or hereafter determined by the Fisheries Advisory Board or this court, and also advise this court of any encroachment on spawning escapement goals and of the extent and effectiveness of State efforts to prevent such encroachment.

9. Nothing in this order shall diminish the immunity from State regulation or affect the jurisdiction of self-regulatory tribes as prescribed by prior orders of this court, except that such tribes shall be bound by the allocations made effective pursuant to provisions of this or subsequent orders.

10. The defendants shall not adopt, apply or enforce any regulations to regulate, limit or restrict any fishing by members of the treaty tribes that is authorized by regulations of the United States or any of its agencies without first obtaining the prior express approval of this court.

ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: MAKAH v. LOWER ELWHA DISPUTE RE: HOKO RIVER

(November 28, 1978) [3]

BOLDT, District Judge.

■ The court has considered all the evidence submitted in connection with the Makah Tribe's motion for reconsideration of its Order of March 10, 1976 (459 F.Supp. at 1066). The Makah Tribe's request for an additional hearing is denied. None of the evidence offered changes the court's prior

conclusion that the Hoko River was an area of joint occupation between the Makah and Lower Elwha. Accordingly, the court's prior ruling on this issue should not be modified.

The court also has fully considered all proposed findings of fact and conclusions of law and adopts the following additional findings and conclusions. Every finding of fact that may be a conclusions of law is adopted as such.

FINDINGS OF FACT

1. The Makah's Motion for Reconsideration was granted to allow the Makah Tribe to present newly discovered archeological evidence relating to the question of control of fishing on the Hoko River. The issues as defined by the Makah Tribe did not include a consideration of rivers other than the Hoko River (Tr. Nov. 29, 1976, p. 81; Makah Memorandum in Support of Relief from Final Order, August 17, 1976, pp. 1–3), and the Lower Elwha Tribe duly preserved its objections to evidence relating to other rivers east of the Hoko River. (Tr. Nov. 29, 1976, pp. 2, 75).

2. Anthropological evidence was presented by Dr. Barbara Lane for the Lower Elwha Tribe and Mr. Dale Croes for the Makah Tribe. The testimony of each has been thoroughly studied and considered by the court. In considering the credibility of each, the court took into consideration the fact that Mr. Croes has limited experience as an ethnohistorian, and has spent the previous five years emersed in archeological field work at the Hoko and Ozette Rivers. (Tr. Nov. 29, 1976, p. 7). Dr. Lane has had extensive contact and experience with ethnohistorical research and archeology. (Tr. Nov. 29, 1976, p. 126). The court finds that on the question at issue in this proceeding, namely control over treaty-time fishing on the Hoko River, the testimony of Dr. Lane is more credible and convincing than that of Mr. Croes.

3. Affirmed *United States v. Lower Elwha Tribe,* 642 F.2d 1141 (9th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981).

3. The archeological evidence presented related to basket remnants excavated from an archeological wet site located on the Hoko River. (Ex. MK 13; Tr. Nov. 29, 1976, p. 10). Mr. Croes attempted to correlate various basket weave techniques and other artifacts found, with occupancy and control of the Hoko River. (Tr. Nov. 29, 1976, pp. 88, 90–91, 117, 119).

4. Basket remnants found in archeological digs are not conclusive of what people were responsible for making the baskets. (Tr. Nov. 29, 1976, pp. 26, 88). Even if one can establish that a particular basket technology can be considered predominately of one Indian type or another, that fact does not demonstrate that a particular group was in fact the dominant resident of a particular area. (Tr. Nov. 29, 1976, p. 91; "An Early 'Wet' Site on the Mouth of the Hoko River Site" (48CA213) p. 224).

5. There is not a uniform basketry technology with all Salish people. Basket technology varied from the Fraser River to Puget Sound. (Tr. Nov. 29, 1976, pp. 144–145). There have been no wet site excavations done within Clallam territory and therefore it is difficult to compare the baskets found at the Hoko River with the baskets generally made by Clallam people. It is not appropriate to compare such baskets with such general Salish basketry given the difference between the baskets involved. (Id.)

6. At treaty times the Clallam Indians had a village, which may have been a permanent village, at the Hoko River (Ex. USA 91 (Lane Report on Lower Elwha), pp. 4–7; Aug. 6, 1975, p. 155). In 1854, a year prior to the treaty, Gibbs listed the Hoko as the site of the Clallam village. (Ex. USA 91, *supra* pp. 5–7). Waterman, writing on the Clallams indicated that the Clallams had a fishing site at the Hoko River. The Hoko River is named in the Treaty of Point No Point as the location of a Clallam village. There is evidence that the Makah people also utilized the Hoko River as a seasonal fishing village. (Tr. Nov. 29, 1976, p. 87).

7. The archeological evidence did not establish whether the Makah fished with Lower Elwha permission on rivers east of the Hoko River. (Tr. Nov. 29, 1976, p. 83). Similarly, the archeological evidence did not establish or assist in the determination of whether the Makah controlled the Hoko River fishing. (Tr. Nov. 29, 1976, p. 100). The archeological evidence showed that the Makah "occupied" the Hoko River in prehistoric times, (Id.) but did not necessarily show occupancy at treaty times. (Tr. Nov. 29, 1976, p. 122).

8. Ethnohistorical evidence presented was the same as that presented at the July 30, and August 6, 1975, hearings. A reevaluation of this extant evidence was undertaken by the Makah. (Tr. Nov. 29, 1976, pp. 76–78, 83). Dr. Lane provided an extensive examination of all the information presented. (Tr. Nov. 29, 1976, pp. 126–127, 129, 130, 152–157). Fishing on the Hoko River was exercised jointly by the Lower Elwha and Makah tribes. (Tr. Nov. 29, 1976, pp. 131–132). On the rivers east of the Hoko River fishing was controlled by the Lower Elwha. (Tr. Nov. 29, 1976, p. 152).

## CONCLUSIONS OF LAW

There having been no testimony or other evidence presented to this court which would support a modification of this court's March 10, 1976, order, that order is affirmed in all respects and particulars. The court's March 10, 1976, findings of fact and conclusions of law are hereby incorporated by reference and made a part of this order. The Makah's Motion for Relief from Judgment is denied.

## ORDER RE COASTAL SALMON FISHERIES MANAGEMENT SCHEDULE

(May 23, 1979)

McGOVERN, District Judge.

◼ The court, upon recommendation of its Fisheries Technical Advisor, finds that it is necessary and appropriate that a schedule be adopted for various activities for

management of summer and fall coastal salmon fisheries which are not covered by the Salmon Management Plan previously approved for Puget Sound Fisheries (459 F.Supp. at 1107). After discussions among the Washington Department of Fisheries, the Makah, Quileute and Hoh Tribes, and the Fisheries Advisory Board, the attached schedule has been agreed to by all of those parties. (See Fisheries Advisory Board (FAB) Reports 79–4, 79–5, and 79–6). In addition, the Quinault Tribe and the Washington Department of Fisheries have each agreed that they will coordinate their respective management activities in accordance with the relevant provisions of such schedule with appropriate modifications to fit the Quinault area fisheries and in accordance with the self-regulatory status of the Quinault Tribe.

Accordingly, it is ORDERED that the schedule attached as Attachment A is approved and adopted by the court subject to the understandings set out in Fisheries Advisory Board Reports Nos. 79–4, 79–5 and 79–6. This schedule shall be complied with by the State of Washington, the Makah Tribe, the Quileute Tribe and the Hoh Tribe except as may be otherwise agreed to from time to time by the Fisheries Advisory Board. This schedule shall continue in effect from year to year subject to the right of any affected party to request modification for subsequent seasons by written notification to the Fisheries Technical Advisor given on or before November 1 of any year for summer fisheries or March 1 for fall fisheries. If the Fisheries Advisory Board is unable to agree with respect to any such requested modification by December 1 or April 1, respectively, the requesting party may thereafter petition the court for relief from further compliance with such schedule.

ATTACHMENT A to Order re Coastal Salmon Management Schedule
Table of Scheduled Activities for Summer and Fall Fisheries
on Coastal Washington

| Activity | Deadline | |
| --- | --- | --- |
| | Summer fishery | Fall fishery |
| (1) State shall provide to all parties proposed escapement goals for natural and hatchery stocks. (These goals will not be annually modified without sound biological basis.) | December 15 | May 1 |
| (2) Parties shall reach agreement regarding appropriate escapement goals for natural and hatchery stocks. | January 5 | June 1 |
| (3) The State shall provide to all parties proposed draft reports prepared on a system, species by species basis. The reports will contain proposed pre-season run size forecasts and proposed methods for in-season run size adjustments. | January 15 | June 10 |
| (4) Parties shall reach agreement on pre-season forecasts and methods for in-season run size adjustments. | February 10 | July 1 |
| (5) Tribes shall provide written estimates to the State of the number of units of each type of gear and possible fishing areas, along with written estimates of projected on-reservation, subsistence, and ceremonial catches. | February 21 | July 10 |
| (6) The Tribes shall provide the State with draft regulations for any planned fisheries. | March 3 | July 20 |

ATTACHMENT A to Order re Coastal Salmon Management Schedule—Continued

Table of Scheduled Activities for Summer and Fall Fisheries
on Coastal Washington

| Activity | Deadline Summer fishery | Deadline Fall fishery |
|---|---|---|
| (7) The State shall provide the Tribes with comments on the draft regulations. | March 15 | August 1 |
| (8) Parties shall reach agreement regarding estimates of numbers of prior interceptions by troll and sport fisheries. | March 15 | August 1 |
| (9) Tribes shall file with the court and all parties, final tribal fishing regulations. | March 25 | August 10 |
| (10) Begin management of summer fisheries in all areas. | April 15 | |
| (11) Begin management of fall season fishery on Grays Harbor chinook stocks. | | August 15 |
| (12) Begin management of fall season fisheries in all other areas and stocks except for the Quillayute River fall run coho. | | September 1 |
| (13) Begin management of Quillayute River fall run coho. | | September 20 |

## AMENDATORY ORDER RE: FISHERIES ADVISORY BOARD

(January 11, 1980)

CRAIG, District Judge.

■ The court has considered the recommendation of the Fisheries Advisory Board and the written and oral submissions and recommendations of the parties.

IT IS ORDERED THAT,

The Order of October 28, 1975, as amended by the Order of December 17, 1976 (459 F.Supp. 1061) is hereby amended as follows:

Section 1 is amended to read:

"1. *Establishment and Composition of Fisheries Advisory Board.*

"1.1 There is established a Fisheries Advisory Board composed as follows:

"(a) One voting member representing the State of Washington and the defendant agencies.

"(b) One voting member representing the Treaty Indian Tribes.

"(c) The court's Fisheries Technical Advisor as a nonvoting chairman. During any time that the Technical Advisor, or any alternate advisor previously designated by the court is not available, the Magistrate is hereby authorized to designate an alternate to serve as chairman and exercise any authority of the chairman or the Technical Advisor.

"(d) The members and chairman shall serve at the pleasure of their appointing entity. All such appointments shall expire on February 28 of each even-numbered year after 1980. Any incumbent may be reappointed for succeeding terms.

"(e) The voting members representing the state and the tribes with respect to any matter submitted to the Board shall be determined as hereinafter provided.

"1.2 The chairman shall give notice of and convene meetings, act as moderator, and perform such other duties as are provided herein, or agreed to by all parties, or directed by the court.

"1.3 The tribes, acting through their coordinating body, (the Northwest Indian Fisheries Commission), and the state, acting through the Director of Fisheries or Game, shall each appoint a primary representative and such alternate representatives as they from time to time deem

necessary. They may designate specific alternates for specific types of matters. The primary representative for each side shall be responsible for keeping the chairman of the Board informed of the names, addresses and telephone numbers of themselves and all alternate representatives, together with the specific matters or types of matters for which a particular alternate will be the voting member. Any question concerning the designation of the appropriate voting representative will be decided by that side's primary representative, or in the case of the tribes, if the primary representative fails to act, by the Northwest Indian Fisheries Commission. Upon any further failure of such person or body to make a timely designation the chairman shall do so. The chairman shall give timely notice of each meeting of the Board to the primary representative, the appropriate alternate for each side, and as provided in section 3.1 of the Order of December 17, 1976.

### ORDER RE: PUYALLUP RIVER STEELHEAD

### (February 6, 1980)

CRAIG, District Judge.

■ This matter comes before the Court on the Puyallup Tribe of Indians' Request for Determination, dated January 31, 1980, that the Court exercise jurisdiction in this case over matters concerning Puyallup River steelhead. The Court finds that it would be in the interests of justice and more consistent resolution of fisheries disputes for this Court to exercise jurisdiction over ongoing issues raised concerning Puyallup River steelhead. Both the United States Supreme Court and the Washington state courts have indicated their belief that this Court should handle any ongoing issues concerning treaty fishing rights.

IT IS THEREFORE ORDERED

That this Court shall henceforth exercise jurisdiction over matters related to Puyallup River steelhead in the same manner as it does for all other rivers and for all other runs of salmon on the Puyallup River. The parties are directed to follow the procedures prescribed in orders of this Court for consideration of any ongoing issues related to fishing rights in Puyallup River steelhead.

### ORDER RE: NOTIFICATION AND EFFECTIVE DATE OF EMERGENCY REGULATIONS

### (August 26, 1980) [4]

CRAIG, District Judge.

■ Prior orders of this court, including section 19 of the Injunction of March 22, 1974 (384 F.Supp. at 417), section 1 of the Order of March 22, 1974, for an Interim Plan (384 F.Supp. at 420), section B.4. of the Order of October 8, 1974, to Implement the Interim Plan (459 F.Supp. at 1035), the Order of October 15, 1975, approving a Stipulation re Notice of Regulations (459 F.Supp. at 1060), Order of March 1, 1976, re Service of Documents, Order of December 11, 1976, Establishing Procedures for State Emergency Regulations (459 F.Supp. at 1061) (hereinafter the FAB Order), section 9.3 of the Memorandum of August 31, 1977, Adopting Salmon Management Plan (459 F.Supp. at 1107), and Order of January 31, 1978, as modified, Adopting Steelhead Management Plan (459 F.Supp. at 1118), have established requirements for filing, notification, and effective dates of emergency salmon and steelhead regulations. The FAB Order provides that the rules specified therein shall apply until further order of the court or until modified by agreement of all parties.

The parties agree that some of the existing requirements for filing, notification, and implementation of regulations are unnecessary and inappropriate under presently available means for faster and more

---

**4.** By Stipulation dated May 24, 1983, the parties agreed that the Western Union "Easylink" system shall be substituted for the Western Union TWX system for all notification and information transmitted pursuant to the order.

economical notification. These means include the establishment of the Western Union TWX System among most of the parties. That system provides a quick method of transmitting regulations without mailing or filing with the court, while preserving a permanent record of the transmittal. Because both the National Marine Fisheries Service and the United States Coast Guard have direct access to this system, it also provides a method for prompt notification to those agencies of regulations relevant to any enforcement responsibilities they may have in case area waters. It is thus appropriate and proper to implement the agreement of the parties to use the Western Union TWX System.

Therefore, it is ORDERED as follows:

1. This Order is concerned solely with the requirements for filing emergency regulations with the court and serving or otherwise giving notice to other parties or individual fishermen prior to such regulations becoming effective or enforceable. As to those matters, the provisions of this Order supersede all inconsistent provisions of prior orders of this court with respect to the emergency regulations of any entity to which this Order applies.

2. This Order shall apply to emergency regulations affecting the management of salmon, steelhead, and such other species as are agreed to in writing by the affected parties.

3. This Order shall apply to the Washington Department of Fisheries, the Washington Department of Game and all tribes (except the Quinault, Quileute, Hoh, and Yakima Tribes, who may subject themselves to the provisions of this Order by filing with the court and serving on all parties a statement indicating the effective date of their participation). Withdrawal from participation in the TWX system shall require approval of the court.

4. Service of all state and tribal emergency fishing regulations, and of other information as required by this Order, shall be by TWX transmission through the central Western Union Infomaster computer. Regulations and other information required by this Order to be served by TWX transmission shall be transmitted on normal business days only, from Monday through Thursday between the hours of 9:00 a.m. and 2:30 p.m., or on Fridays between the hours of 9:00 a.m. and 2:00 p.m. Regulations of participating entities need not be filed with the court, or mailed to any party pursuant to procedures heretofore required by this court's Order Re: Service of Documents dated March 1, 1976.

5. Whenever the TWX cannot be used to notify any party covered by the TWX procedures of regulations or other appropriate information, due to mechanical breakdowns, power failures, or for any other reason, all such regulations and information shall be served by telegram, mail or personal service, such notification to be effective from the time of receipt as if received by TWX transmission.

6. Service of all state and tribal emergency fishing regulations, and of other information as required by this Order, shall be made upon all affected tribes and defendant state agencies and, where their enforcement duties are affected, upon the National Marine Fisheries Service and the United States Coast Guard. Service also shall be made upon the Northwest Indian Fisheries Commission, the Chairman of the Fisheries Advisory Board, and all attorneys of record who request such service, by TWX transmission if possible, otherwise by mail.

7. A written record of all information and regulations transmitted pursuant to sections 4 or 5 of this Order shall be maintained by the transmitting party for at least 12 months from the date of transmittal.

8. As to any tribe not utilizing a Western Union TWX System as set out in this Order, regulations shall continue to be served and filed in accordance with the existing procedures of previous orders of this court; *provided,* that certification of service may be accomplished by including on each regulation the following statement:

I certify that copies of this document were mailed prepaid on ___(date)___ , to all persons required by the Order Re: Notification and Effective Date of Emergency Regulations.

Signed _____

Title _____

No separate list of the persons served need be attached.

9. All tribes participating in the TWX System pursuant to this Order shall be deemed to have met the requirements of section 4.4.1 of the FAB Order.

10. Section 4.5 and both of its subsections of the FAB Order are hereby vacated and replaced with the following:

Section 4.5. The state shall notify all affected tribes of possible impending emergency regulations, along with a brief statement of the basis for the alleged emergency and supporting data that would justify the proposed emergency regulation, at least 24 hours before (and within 7 days before) the adopted emergency regulation is transmitted to the tribes. Such notice, statement of basis, and supporting data shall be served by TWX transmission, but the supporting data may be made immediately available by telephone if the state believes that method would be more effective and expeditious under the circumstances. The brief statement of the basis for an alleged emergency shall include, but not be limited to, identification of the stock or stocks needing protection and the area or gear restrictions proposed to afford the needed protection. All relevant supporting data justifying proposed or adopted emergency regulations shall be made available to the affected tribes.

Section 4.5.1. If notice is given and data furnished in conformity with section 4.5, the state emergency regulation may become fully effective as to all treaty Indian fishing 24 hours after the adopted regulation is received by the tribes. If notice or data are not given in conformity with that section, the state emergency regulation may become fully effective as to all treaty Indian fishing 48 hours after the adopted regulation, with the statement and supporting data, is received by the tribes; *provided,* that during the first 60 hours following state receipt of notice of a tribal regulation authorizing a fishery, a state emergency closure necessary for conservation may be adopted and transmitted to the tribes without the prior notice required by 4.5 above; *and provided further* that if the emergency requires an earlier effective time than those specified above, enforcement action may be taken if and only if the tribe has been given notice of the adopted regulation by TWX or by physical delivery during tribal office business hours and the tribal fisherman has been given personal notice of the regulation and an opportunity to desist from further noncompliance after such notice.

11. No tribal emergency fishing regulation authorizing a fishery shall become effective until 24 hours from the time it is received or such later time as is specified in the regulation, *provided* that this provision shall not limit the authority of tribes to promulgate emergency regulations, in accordance with prior orders of this court, for fisheries managed by or in conjunction with the International Pacific Salmon Fisheries Commission.

12. This Order does not apply to self-regulating tribes except where made applicable to them by Final Decision No. I and previous orders of this court; *provided* that it may apply by the agreement of a self-regulating tribe and the state.

13. In the event that any tribe or tribes authorize any inter-tribal entity to adopt regulations applicable to their treaty fishing, the terms "tribe" or "tribal regulations" where used in this Order shall include such entity and its regulations.

14. Whenever this Order specifies communication by TWX, a different system may be substituted by written agreement of all of the parties.

ORDER RE: CONFERENCE OF
SEPTEMBER 16, 1980
(September 25, 1980) [5]

CRAIG, District Judge.

This court's Order, Findings of Fact, Conclusions of Law, and Preliminary Injunction Re: Enforcement of Limitations on Non-treaty Salmon Fisheries for 1978 and Subsequent Seasons, dated June 6, 1978, as amended June 15, 1978, was vacated by the United States Supreme Court. All other orders of this court in Phase I of this case remain in effect in accordance with their terms, except for those terms which were expressly modified by holdings of the Court of Appeals or the Supreme Court, unless and until vacated or modified by this court.

PRELIMINARY INJUNCTION RE:
MINIMUM SIZE TROLL FISHING
REGULATIONS
(March 5, 1981)

CRAIG, District Judge.

The Makah Indian Tribe moved for an injunction regarding State enforcement of Washington Department of Fisheries Emergency Order No. 7929 (WAC 220–28–04000A) which imposes a 28 inch minimum size troll catch limitation. The matter was referred to a magistrate for hearing, after which the Magistrate issued a report and proposed temporary restraining order. The Makah Tribe moved for confirmation of the Magistrate's report and issuance of a preliminary injunction.

After full review and careful consideration of the Magistrate's report and defendants' opposition, the Court FINDS, CONCLUDES, AND ORDERS

That the State of Washington and the Washington State Department of Fisheries and all officials and employees thereof are enjoined from enforcing Washington Department of Fisheries Emergency Order No. 79–29 (WAC 220–28–04000A) and all other subsequent orders which impose a 28″ minimum size troll catch limitation upon members of the Makah Indian Tribe when fishing at usual and accustomed

places in Washington coastal waters and Washington salmon catch reporting area 4B.

This Order is based upon the following findings of fact and conclusions of law.

FINDINGS OF FACT

1. On April 30, 1979, the Washington Department of Fisheries enacted Emergency Order No. 79–29 (WAC 220–28–04000A). This regulation imposed a 28″ minimum size limitation on troll fishing in Washington coastal waters and catch reporting area 4B. The justification for this minimum size limit was purportedly to "implement state regulations consistent with regulations adopted by the United States Department of Commerce" in the ocean and to assure the "wise use aspect" of resource conservation.

At the same time, non-treaty sports fishing was proceeding (and continues) in the same places under a 24″ minimum size limit. [WAC 220–56–013(5) and WAC 220–56–063(4)]

2. During the fishing period of June through September, 1979, five-year averages indicate that an estimated catch of 5,000 chinook salmon in the Neah Bay area sports fishery between 24″ and 28″ long would occur. At the same time, if allowed to fish during that period, Makah fishermen would catch approximately 1,450 fish in the same size range. Thus, non-treaty fishermen would catch about 77.5% and treaty fishermen would catch about 22.5% of the fish in that size range. Although actual numbers of fish caught will vary depending on run size and other factors, the percentage would remain about the same. (Testimony of Makah Biologist, Al Hartt; Makah Exhibit No. 2 attached to the Makah Indian Tribe's Memorandum in Support of Motion for Temporary Restraining Order, incorporated herein by reference.)

3. There is no conservation necessity for limiting Makah commercial fishermen to the minimum 28″ limitation. (Testimony

**5.** All items except the following were interlocutory in nature and are omitted here.

of Makah Biologist, Al Hartt; Report of the Court's Advisor, Dr. Richard Whitney.)

4. The estimated dollar loss to Makah trollers in 1979 from the prohibition on under-28″ fish is approximately $20,000.00. (Testimony of Makah Biologist, Al Hartt, Makah Exhibit No. 2, *supra*, at ¶ 3.)

5. The issuance of this injunction is necessary to prevent irreparable injury to the plaintiff Makah Indian Tribe and its fishermen.

## CONCLUSIONS OF LAW

1. Limiting Makah fishermen to a minimum 28″ size for troll caught salmon is not necessary for conservation as that term was defined in Final Decision No. 1, for the following reasons:

(a) such limitations are not "required to prevent demonstrable harm to the actual conservation of fish, *i.e.,* ... essential to the perpetuation of a particular run or species of fish." (*U.S. v. Washington,* 384 F.Supp. 312 at 415.)

(b) the state has not shown nor attempted to show that "existing tribal regulation or enforcement is inadequate to prevent demonstrable harm to the actual conservation of fish." *Id.*

■ 2. The actions of the State of Washington herein constitute illegal discrimination in that the State's regulations grant in effect the entire run of salmon in the 24″ to 28″ range to sports fishermen.

■ 3. State limitations on minimum size troll caught fish on the basis that such limitation will "assure the wise use aspect" of resource conservation are illegal under Final Decision No. 1 because State power to regulate fishing "does not include the power to determine for the Indian tribes what is the wisest and best use of their share of the common resource." (*U.S. v. Washington, supra,* at 401.)

4. Irreparable injury, loss, and damage will occur to the Makah Indian Tribe and fishing members thereof if the State is allowed to continue to limit Makah fishing to 28″ minimum size troll caught salmon.

THEREFORE, IT IS ORDERED that the State of Washington and the Washington State Department of Fisheries and all officials and employees thereof are enjoined from enforcing WDF Emergency Order No. 79–29 and all other regulations which seek to impose a 28″ minimum size troll catch limitation upon members of the Makah Indian Tribe when fishing at usual and accustomed places in Washington coastal waters and Washington salmon catch reporting area 4B.

This injunction shall remain in effect until further order of this Court.

## ORDER REGARDING ATTORNEY'S FEES

### (May 4, 1981)

CRAIG, District Judge.

This Court enters the following order with respect to the Tribes' Renewed Motion for Award of Attorney's Fees:

1. Judge Boldt in his pre-trial order and in Final Decision No. 1 found jurisdiction in Phase I of *United States v. Washington* under 28 U.S.C. § 1343(3) and (4). Pretrial Order paragraph 1(c); *United States v. Washington,* 384 F.Supp. 312, 399 (W.D. Wash.1974), Conclusion of Law 1c. Section 1343(3) and (4) provides for district court jurisdiction over (1) actions brought to redress any deprivation, under color of state law, of any right, privilege or immunity secured by the Constitution, and (2) actions brought under any Act of Congress providing for protection of civil rights. In *United States v. Washington* the Tribes alleged, and ultimately prevailed upon, a cause of action under 42 U.S.C. § 1983, one of the civil rights statutes referred to, in that they alleged and proved deprivations, under color of state law, of "rights, privileges and immunities secured by the Constitution and laws" within the meaning of § 1983. See *United States v. Washington,* Conclusions of Law 38, 39, 40, 41, 42, 43, 44 and 47, 384 F.Supp. at 403–04. Specific citation of 42 U.S.C. § 1983 in the complaint or pre-trial order is not necessary in order to bring the action under the Civil

Rights Acts. *Paynes v. Lee,* 377 F.2d 61, 63 (5th Cir.1967); *Holladay v. Roberts,* 425 F.Supp. 61, 64 (N.D.Miss.1977).

■ 2. Since claims under 42 U.S.C. § 1983 are specifically covered by The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act authorizes attorney fees in these proceedings. *United States v. Washington* was pending at the time that The Civil Rights Attorney's Fees Awards Act of 1976 was enacted and the plaintiff intervenor Tribes are entitled to an award of attorneys' fees for services rendered in *United States v. Washington.*

3. The application of the plaintiff intervenor Indian Tribes for attorneys' fees in Phase I was filed in a timely manner, and remains pending for decision.

■ 4. The 11th Amendment is not a bar to a prevailing party plaintiff recovering attorneys' fees from a state under The Civil Rights Attorney's Fees Awards Act. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

5. As this Court reads Judge Boldt's original decision on the Tribes' motion for attorneys' fees, Judge Boldt rejected the applicability of the "bad faith" rationale for awards of attorneys' fees in 1974. 66 F.R.D. 477 (W.D.Wash.1974). This Court does not disturb Judge Boldt's ruling in that regard.

■ 6. The plaintiff intervenor Tribes are the prevailing parties in *United States v. Washington* within the meaning of The Civil Rights Attorney's Fees Awards Act. Plaintiff intervenor Indian Tribes are not entitled to an award of attorneys' fees for participation in cases outside the framework of *United States v. Washington,* but are entitled to an attorney fee award for the services reasonably necessary to prepare for, try, prosecute and implement the *United States v. Washington* decision, including the related appeals to the Ninth Circuit Court of Appeals and the United States Supreme Court.

7. The entitlement of the plaintiff Tribes to attorneys' fees for services rendered in *United States v. Washington* includes all proceedings within the framework of that case, including appeals, through the remand to the District Court by the Ninth Circuit Court of Appeals pursuant to the United States Supreme Court's mandate in 1979. This Court finds that, prior to this proceeding, there have been no "prevailing parties" within the meaning of The Civil Rights Attorney's Fees Awards Act since the remand to the District Court in 1979.

8. This court finds it appropriate to appoint a special master pursuant to Federal Rule of Civil Procedure 53 to determine the specific attorney's fee to be awarded to the plaintiff intervenor Tribes under The Civil Rights Attorney's Fees Awards Act of 1976. Accordingly, Magistrate Weinberg, the full-time magistrate for the Western District of Washington at Seattle, is hereby appointed special master. This court, having determined that plaintiff intervenor Tribes are entitled to an award of a reasonable attorney's fees pursuant to 42 U.S.C. § 1988, therefore refers the matter of determining the specific fee to be awarded to Magistrate Weinberg. Magistrate Weinberg shall make a recommendation to this Court resolving all issues necessary for the determination of the appropriate award. The special master shall determine the total number of compensable hours reasonably spent by tribal attorneys in the preparation, trial, prosecution and implementation of the *United States v. Washington* decision and related appeals. The special master shall determine the proceedings for which the Tribes are entitled to recover fees. The special master is given specific instructions to consider the 12 factors adopted by the Ninth Circuit Court of Appeals in *Kerr v. Screen Extras Guild,* 526 F.2d 67, 70 (1975), and to consider the other appropriate variables utilized by the courts in setting awards under 42 U.S.C. § 1988. The special master is further directed to prepare a report recommending to this Court the specific attorney's fees to be awarded the Tribes. After Magistrate Weinberg's report is submitted, this Court

will set a time for hearing so that all parties will have an opportunity to discuss the validity or invalidity of the Magistrate's recommendation.[6]

### ORDER RE: ALLOCATION OF QUINAULT RIVER STEELHEAD

(May 8, 1981)[7]

CRAIG, District Judge.

The Report and Recommendations of Magistrate John L. Weinberg filed April 7, 1981, doc. #7464, are approved and adopted with modifications. The pertinent portion of the Report and Recommendations, as modified by the court, is as follows:

### FACTUAL SETTING

There appears to be no genuine dispute as to the basic facts relating to the State of Washington's motion for a temporary restraining order or preliminary injunction concerning steelhead trout that enter the Quinault River from the Pacific Ocean. The real dispute turns upon the proper application of the case law to this factual setting.

1. *Geography.* The Quinault Reservation comprises about 190,000 acres or almost 300 sq. miles. It is shaped roughly in the form of a triangle, with one edge consisting of about 24 miles of Pacific coastline. The reservation tapers to Lake Quinault about 21 miles inland, which is contained within the reservation and represents its easternmost portion. The mouth of the Quinault River is on the reservation, as is the entire portion of the river between the Pacific Coast and Lake Quinault. The river originates upstream of Lake Quinault, however, in lands entirely outside the reservation.

2. *Steelhead Run.* Returning steelhead enter the mouth of the Quinault and head upstream every year, between about mid-November and the end of April. Like salmon, steelhead generally return to their spawning grounds. They are not quite as dependable as salmon in this respect, however, and there is somewhat more "straying." Two hatcheries and a penned rearing facility on the reservation release a substantial number of steelhead. There are also wild steelhead, some of which originate in and below Lake Quinault (i.e. on the reservation), and others above the lake (off the reservation).

As a result, if no returning steelhead at all were taken from any portion of the Quinault River system, some would never leave the reservation, where their spawning grounds are located. These steelhead will be designated "reservation fish."[8] Others, however, would migrate up the river, through Lake Quinault, and then further upstream to areas off the reservation. These steelhead will be designated "through fish."

The Tribe and the United States estimate that, in 1980–1981, 85% of the fish entering the Quinault River are reservation fish. While the State disputes the precise accuracy of this number, there seems to be little dispute that, even if there were no fishing, only a small minority of the steelhead entering the Quinault River would ever pass through Lake Quinault and leave the reservation. The parties advise that the Fisheries Advisory Board can, if directed, make a reliable determination for a given year of the proportions of reservation and through fish.

3. *Fishing.* Based upon run predictions and various biological factors, a total harvestable number of steelhead can be set each year for the entire Quinault River run. For 1980–1981, that number will be

---

6. The Magistrate filed his First Report and Recommendation on Phase I Attorneys' Fees on September 24, 1984, *infra* at 1506. The court signed its Order Awarding Attorney's Fees and Costs on April 30, 1985, *infra* at 1503.

7. Affirmed 694 F.2d 188 (9th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983).

8. In their briefs and argument, counsel referred to these steelhead as "destination fish."

approximately 15,000 fish. The parties agree that, for conservation reasons, the total harvest must in no event exceed that amount and, if possible, should not be substantially less.

The Tribe and its members have the exclusive right to take steelhead on the reservation, subject to two minor exceptions discussed below. They do so, pursuant to Tribal fishing regulations, by net fishing, which is relatively efficient. Non-treaty fishermen take steelhead by "sport fishing" techniques—i.e. by hook and line. Even in a good year, this technique is not particularly "efficient," compared to net fishing. This year, weather conditions have caused so much turbidity of the river that the fish cannot see the lures. The harvest by sport fishermen is therefore of *de minimis* proportions.

While non-treaty fishermen on the Quinault River do most of their steelhead fishing above Lake Quinault, off the reservation, some hire Indian guides, and are therefore permitted to fish on the reservation.

As of January 19, 1981, the Quinault Tribal catch on the Quinault River from November 1, 1980 was 9,462 steelhead.[9] This represents approximately 63% of the projected maximum 1980–1981 harvest for all fishermen for all portions of the river.

## CONTENTIONS OF THE PARTIES

Reduced to simplest terms, the contentions of the parties are as follows:

The State asserts that treaty and non-treaty fishermen are each entitled to half of the harvestable steelhead that enter the Quinault River system, regardless of where the fish are destined or are taken.

The United States, together with the Tribe and other intervenor tribes, claim that treaty fishermen are entitled to the sum of: (a) 100% of the harvestable steelhead that are reservation fish; and (b) 50% of the harvestable steelhead that are through fish. They contend that the non-

9. Affidavit of Peter K.J. Hahn, January 19, 1981.

treaty fishermen are entitled only to the other 50% of the through fish.

While the issue is now essentially moot for the 1980–1981 steelhead run, all parties agree that the legal issue of the share to which each group is entitled is an important one for allocations of runs in future years.

## LEGAL PRINCIPLES ESTABLISHED IN PRIOR CASES

From the welter of decisions on the fishing rights of the treaty Indians in the State of Washington, several relevant basic principles emerge.

■ 1. *Apportionment.* The Stevens Treaties require apportionment, between treaty Indians and non-treaty fishermen, of the harvestable portion of each run that passes through a "usual and accustomed" fishing ground for treaty Indians. *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 685, 99 S.Ct. 3055, 3074, 61 L.Ed.2d 823 (1979) (*"Passenger Fishing Vessel "*).

2. *Size of Shares.* As to those runs that are subject to allocation at all, the *maximum* share of the treaty Indians is 50% of the harvestable portion of the run which passes through its customary fishing grounds. The treaty Indians are entitled only to a smaller portion, if such a portion is sufficient to provide the treaty Indians a moderate living. *Passenger Fishing Vessel,* 443 U.S. at 686–687, 99 S.Ct. at 3074–3075. The burden is on the State to show that some share less than 50% would be sufficient to provide the Indians a moderate living. *United States v. State of Washington (Phase II),* 506 F.Supp. 187, 208 (W.D.Wash.1980), *en banc* appeal pending (No. 81–3111 9th Cir.). [Appeal decided April 29, 1985, 759 F.2d 1353]

■ 3. *No Share If No Access.* The allocation rules apply only to those runs of fish which, in the course of their migration, are subject to harvest both by treaty and non-treaty fishermen. In other words,

treaty fishermen have no right to any portion of a run which at no point enters or passes through a usual and accustomed fishing ground.

4. *Fish Counting Rules.* Once a fish run has been identified as subject to allocation between treaty and non-treaty fishermen, the courts have developed a number of rules governing how fish catches are counted and applied against those allocations. Those rules include the following:

(a) On a run that passes through a reservation, then goes upstream to an area where non-treaty fishermen have access, fish caught by treaty fishermen on the reservation count toward the overall share of treaty fishermen. *Passenger Fishing Vessel,* 443 U.S. at 687 [99 S.Ct. at 3075].

(b) Hatchery-bred fish are to be treated in the same manner as "natural" or "wild" fish, for purposes of allocations and counting against shares. See *United ed States v. State of Washington (Phase II), supra.*

5. *Interference With Upstream Catch.* Where a fish run passes *through* an area in which either treaty or non-treaty fishermen have exclusive access, that group cannot take so many fish as to impair the rights of upstream fishermen to take their fair share. *Puyallup Tribe v. Washington Department of Game,* 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) (*"Puyallup III"*); and *U.S. v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

6. *Proper Harvest to Be Assured.* Allocations of fish should never be done in a manner which would result either in over-harvest or under-harvest. If a group of fishermen—be it the treaty fishermen or non-treaty fishermen—is not in a position to catch all the fish to which it would otherwise be entitled, the remainder should be re-allocated to the other group.

### APPLICATION TO THIS CASE

If all of the steelhead which enter the mouth of the Quinault River swam upstream only to points within the reservation (i.e., all were reservation fish), this case would pose no problem. The treaty Indians would be entitled to all of the harvestable steelhead.

Likewise, if *all* of the steelhead swam through the reservation and into the portion of the Quinault River above Lake Quinault (i.e., all were through fish), there would likewise be little problem. The case would therefore be identical in most respects to *Puyallup III.* The treaty and non-treaty fishermen would each be entitled to 50% of the harvestable run. Fish caught by the Indians on the reservation would count toward their allocation, by virtue of *Passenger Fishing vessel.* Hatchery fish would likewise count, by virtue of the Phase II decision. If non-treaty fishermen were able to show that the treaty Indians had taken, or were threatening to take on the reservation, more than their 50% share of the entire run, the non-treaty fishermen would be entitled to relief from this court, as they were in *Puyallup III.*

*Passenger Fishing Vessel* and *Puyallup III* both involved through fish. In this case, by contrast, only one-seventh of the steelhead are through fish. The other six-sevenths are reservation fish, which never reach a joint use area.

Allocating 50% of all of the steelhead entering the Quinault River respectively to treaty and non-treaty fishermen would work manifestly unfair results. The vast majority of the fish are reservation fish. Why should the fact that a few of them would swim beyond the reservation and therefore become accessible to non-treaty fishermen, entitle non-treaty fishermen to 50% of the entire number of fish entering the Quinault River? Indeed, even if allocated a 50% share, non-treaty fishermen could not begin to harvest these fish. Even if they were the only fishermen in the stream above Lake Quinault (and they are not), and even if they could catch every steelhead which swam above Lake Quinault (and they have difficulty catching any this year), the most they could take would be one-seventh of total number of fish enter-

ing the Quinault River. Furthermore, this does not allow for escapement of any of the fish that swim above Lake Quinault. The allocation of 50% of all of the steelhead to the non-treaty fishermen therefore could not possibly be justified.

By the same token, however, the treaty fishermen cannot be permitted to harvest steelhead at will, and without limitation, on the reservation. The portion of the river above Lake Quinault is a joint use area. Although the number of steelhead which would reach that area is relatively small, nevertheless the non-treaty fishermen are entitled to at least their share of the harvestable portion of those fish. The United States conceded as much in its memoranda before this court. If the treaty fishermen are permitted to harvest as many fish as they see fit on the reservation, a possible result is that no harvestable fish would be available to the non-treaty fishermen above the lake.

It is therefore my recommendation that the court regard the steelhead which enter the Quinault River as comprising two separate runs: those which have been designated reservation fish herein, and those which have been designated through fish. The court should find that treaty fishermen are entitled to take the entire harvestable number of reservation fish. The two groups are each entitled to 50%, however, of the through fish.

Steelhead taken by treaty fishermen would count toward their allocation, whether taken within or outside the reservation. *Passenger Fishing Vessel.* Hatchery bred fish would count toward their allocation in the same manner as other fish. *United States v. State of Washington (Phase II).*

Likewise, steelhead caught by non-treaty fishermen would count toward their allocation, whether taken above Lake Quinault or within the reservation (e.g., as part of the Indian guide fishery, or by owners of land within the reservation).

Counsel advised that, when a fish is taken on the reservation, it is not possible to identify whether it is a reservation fish or a through fish. This will not be necessary,

however, in giving effect to the foregoing allocation. As discussed above, it apparently is possible to predict the total number of steelhead which will enter the Quinault River in a given year, the proportions of those fish which are reservation fish and through fish, and the appropriate level for harvest. Using the legal conclusions recommended above, the Fisheries Advisory Board can then use this data to determine the share for each group for a given year. Steelhead can then be credited against those shares, wherever harvested.

It is respectfully submitted that the foregoing procedure would be fair to both groups, and fully consistent with prior court determinations in this area.

In addition, the foregoing would parallel one which has already been made for the Lower Columbia River. The United States and the Tribe assert that the Lower Columbia presents a highly analogous situation, with the positions of the parties reversed. They assert that non-treaty fishermen have exclusive fishing access to the Lower Columbia River. There are adjudicated treaty fishery rights, however, on the Columbia above Bonneville Dam. Some, but not all, of the fish available in the Lower Columbia River are destined for the area above Bonneville Dam. According to these parties, the State has contended, and the federal courts have agreed, that the non-treaty fishermen are entitled to harvest *all* of those fish in the Lower Columbia which are not destined to travel above Bonneville Dam. The treaty fishermen are entitled, however, to a 50% share of those fish headed to or through the joint use areas. Thus, they contend, the courts have already applied a "combined run" principle in another situation where fish enter an exclusive access area, and only some of the fish continue to a joint use area.

If the court accepts the conclusions recommended above, the motion for injunctive relief must be denied. The State has shown that the treaty fishermen have taken more than 50% of all of the harvestable steelhead. But it has not shown that the treaty fishermen have taken so many as to

impinge upon the proper share of the non-treaty fishermen: 50% of the through fish. The State has also failed to show that the non-treaty fishermen would be in a position to take appreciably more steelhead if the Indian fishery were enjoined. The court's strong policy of assuring a full harvest would require such a showing before injunctive relief could be granted.

## CONCLUSION

The Conclusions recommended by the Magistrate are modified and adopted as follows:

1. Defendant's Motion for a Temporary Restraining Order or Preliminary Injunction is DENIED.

■ 2. Of the steelhead trout which enter the Quinault River in any given annual run, non-treaty fishermen are entitled to a 50% share of the harvestable portion of those fish which, if not subjected to prior interception, would be expected to migrate above Lake Quinault. Treaty fishermen are entitled to the balance of the harvestable portion of steelhead which enter the Quinault River.

3. All steelhead taken by fishermen count toward their allocation, whether taken on or off the reservation.

4. Hatchery-bred fish shall be treated in the same manner as natural or wild fish.

5. The Fisheries Advisory Board, applying the foregoing principles and utilizing information as to run sizes and distribution, and other available data, should endeavor to determine escapement goals and the respective shares for treaty and non-treaty fishermen of steelhead trout entering the Quinault River.

## FINAL DECREE AND ORDER RE: TREATY STATUS OF JAMESTOWN CLALLAM TRIBE OF INDIANS

(May 8, 1981)

CRAIG, District Judge.

■ Based on the Findings of Fact and Conclusions of Law entered this date, it is ORDERED that .

1. the Jamestown Clallam Tribe of Indians is decreed to be a treaty tribe entitled to exercise on behalf of itself and its members treaty fishing rights under the Treaty of Point No Point (12 Stat. 933) pursuant to all the orders and rulings in this case when:

(1) It provides certification and identification of its tribal fishermen as specified in paragraph (f), 384 F.Supp. at 341; and

(2) It adopts and files with the court and all other parties tribal regulations for the fishing activities of its members and specifying the areas to be opened to fishing by tribal members; and

(3) It submits to the court, pursuant to paragraph 25(f) of the Injunction of March 22, 1974 (384 F.Supp. at 419), a request to determine its specific usual and accustomed fishing places, with prima facie evidence in support of its request.[10]

2. Nothing in this Order constitutes a determination as to the location of any specific usual and accustomed fishing places of the Jamestown Clallam Tribe. The absence of a determination that a specific fishing area is a usual and accustomed fishing place of the tribe shall not preclude the tribe or its members from exercising treaty fishing rights at such location if opened under a tribal regulation filed pursuant to paragraph 1 above and if the location has been identified in a request for determination submitted pursuant to said paragraph 1, subject to the authority of any other party to contest the location within seven days of service of such request consistent with the prior judgment and orders of this court.

## ORDER APPROVING MAGISTRATE'S REPORT RE: TREATY STATUS OF JAMESTOWN CLALLAM TRIBE OF INDIANS

(May 8, 1981)

CRAIG, District Judge.

The following Findings of Fact and Conclusions of Law recommended by the Magistrate are accepted and adopted.

10. *See* Order of March 14, 1984, as amended February 21, 1985, *infra* at 1486.

## SUPPLEMENTAL FINDINGS OF FACT [11]

326. The Jamestown Clallam Tribe of Indians is the present-day tribal entity which, with respect to the matters that are the subject of this litigation, is a political successor in interest to certain tribes, bands or groups of S'Klallam (or Clallam) Indians which were parties to the Treaty of Point No Point, 12 Stat. 933. This tribe is recognized by the United States Department of the Interior as a currently functioning Indian tribe of Clallam Indians who have not severed their tribal relations, which has continuously maintained a tribal government with limited political powers over its members, and with which the United States, through the Department of the Interior, acknowledges a government-to-government relationship, (45 Fed.Reg. 81890; Ex. USA–M–22, Attachments A and B.)

327. The tribe has a constitution and bylaws adopted on November 16, 1975, and operates as an identifiable and distinct entity on behalf of its members. (Ex. USA–M–22, p. C–2 and Attachment D.) Its organizational structure, governing documents, membership requirements and membership roll have been recognized by the Department of the Interior for purposes of its administration of Indian affairs. (Ex. USA–M–22, p. C–4.) The tribe does not have a current federally-approved tribal membership roll but does have a roll prepared by the tribe in November 1978. (Ex. USA–M–22, pp. C–4, C–38.) Fifty-nine percent of the members live in Jamestown or within 35 miles of that settlement. (Ex. USA–M–22, pp. C–3, C–78.)

328. The Clallam Indians lived in about a dozen largely autonomous villages which were closely linked by a common language and culture and by extensive patterns of marriage and societal obligation. The Clallams were highly dependent on the sea for their food, the abundance of which allowed them to develop a rich and complex culture.

(Ex. USA–M–21 at 23; USA–M–22, p. C–57.)

329. The only reservation specifically set aside by the Point No Point Treaty was located at the southern end of Hood Canal in Skokomish territory, far removed from the Clallam villages and fishing grounds. The treaty expressly preserved the Clallam's right to continue to fish at their usual and accustomed fishing grounds. Consequently the S'Klallam Tribe never took up residence on that reservation but instead remained basically in or near their aboriginal homeland and fishing grounds. (Ex. USA–M–21, Attachment A, pp. 2–4; Ex. USA–M–22, pp. C–1, C–51.)

330. The largest Clallam community lived in the area near the Dungeness River and Sequim Bay. The Jamestown Clallam Tribe has evolved directly and without a break from that community, although some Jamestown families came from Clallam Bay and from Port Discovery. (Ex. USA–M–21, Attachment A, p. 6.)

331. In 1874 a group of Clallam Indians, under the leadership of Lord Jim Balch, the son of Tuls-met-tum, one of the Point No Point Treaty signatories, purchased approximately 222 acres of land near Dungeness, Washington, which they subdivided to individual families. The settlement was named Jamestown in honor of Lord Jim. From the outset that group and their successors have continuously maintained a separate, distinct, and cohesive Indian community with a continuous informal governmental structure and political leadership. (Ex. USA–M–22, pp. C–3–4, C–6–7; USA–M–21.) The community has been considered a distinct group by local non-Indians in the area. (*Id.*, p. C–6.)

332. From the establishment of Jamestown in 1874 the Bureau of Indian Affairs, and in some instances the Indian Health Service, has provided this group with services and material aid in the form of agricultural tools, seed, and fruit trees, assistance in building and maintaining an Indian

---

**11.** The findings of fact and conclusions of law are numbered sequentially with those of the original decision of February 12, 1974, 384 F.Supp. at 348–405 and the Supplemental Orders, 459 F.Supp. at 1090.

school at Jamestown until 1926, assistance in constructing a community water system, and organization of an Indian police force. (*Id.*, p. C–53; Ex. USA–M–21, Attachment A, pp. 21–22.)

333. By 1912, the various bands of Clallam Indians had established themselves as distinct entities along the northern Olympic Peninsula. There were separate groupings in the Elwha area, at Jamestown, and at Port Gamble. Jamestown was their largest settlement. (Ex. USA–M–22, pp. C–11–12, C–53, C–54; Ex. USA–M–21, Attachment A, p. 11.) During the Indian Reorganization Act period (1935–39) the Bureau of Indian Affairs debated whether to try to reorganize the Clallam Tribe as a single entity with two or three separate districts, or as three separate entities. Because of the wide distance separating the groups, the BIA ultimately purchased separate tracts of land in trust along the Elwha River and at Port Gamble for western and eastern groups, respectively, which it thereafter allowed to organize as separate entities under the Indian Reorganization Act. (Act of June 18, 1934, 48 Stat. 987, 25 U.S.C. § 476.) Jamestown was not then organized as an IRA entity, although both the BIA and the Indian Health Service continued dealings with them as a group. Although the group's land was not held in trust or restricted fee status under direct BIA control, the settlement has remained predominantly a Clallam Indian Community. (Ex. USA–M–22, pp. C–25–26.)

334. In 1978 the Department of the Interior established formal procedures for determining and acknowledging whether particular entities claiming Indian tribal status are currently an "Indian tribe" having a government-to-government relationship with the United States. See 25 CFR (1984) p. 825 [now Part 83]. On February 10, 1981, the Department of the Interior's determination under those regulations that the intervenor Jamestown Clallam Tribe of Indians was such a tribe became final. (45 Fed.Reg. 81890; Ex. USA–M–22, Attachments A and B.) The Tribe is now entitled to the benefits of the IRA. (Ex. USA–M–22, Attachment B.) It will be entitled to organize pursuant to Section 16 of the IRA once it has acquired a tribal land base. *Id.*

## SUPPLEMENTAL CONCLUSIONS OF LAW

82. The intervenor Jamestown Clallam Tribe of Indians is a "treaty tribe" within the meaning of paragraph A8 of this court's Declaratory Judgment and Decree of March 22, 1974 (384 F.Supp. at 406) and holds for itself and its members a right under the Treaty of Point No Point, 12 Stat. 933, to fish at its usual and accustomed places outside of reservation boundaries. *United States v. Washington*, 520 F.2d 676, 693 (9th Cir.1975). The tribe is entitled to exercise this fishing right in the manner prescribed by the opinions and decrees of the court.

## ORDER RE: SET–NET FISHING IN MUKKAW BAY

(September 2, 1981)

CRAIG, District Judge.

█ The Court has reviewed the Motion to Hold the State of Washington ("State"), the Washington Department of Fisheries ("Fisheries"), and the Prosecuting Attorney for Clallam County ("Prosecutor") in Contempt.

IT IS THEREFORE ORDERED THAT:

(1) The Court approves and adopts Magistrate John L. Weinberg's Report and Recommendation on Makah Fishing at Mukkaw Bay, except as amended by Minute Order;

(2) The Court finds and declares that its previous orders and injunctions limit *all* state regulation of treaty fishing, without regard to whether the State relies upon a statute or regulation specifically listed in paragraph 6 of the Injunction entered March 22, 1974 (384 F.Supp. at 415);

(3) The Court finds that Fisheries and the Prosecutor have interfered with the treaty fishing rights of the Makah Indians, in violation of this

court's previous injunction and other orders; ·

(4) Under all the circumstances, however, the Court denies the motion to hold the State, Fisheries and the Prosecutor in contempt at this time;

(5) The Prosecutor is directed to take steps immediately to dismiss the pending prosecutions, with prejudice;

(6) All respondents are directed to return to the Makahs immediately all nets and related gear seized by Fisheries and not already returned;

(7) Fisheries and its officers and agents are enjoined from further interference with set-net fishing by Makah Indians in Mukkaw Bay, except as such regulation is specifically permitted by orders of this court;

(8) The request by the Makahs for compensatory and punitive damages is denied, without prejudice to the rights of all parties in Case No. C81–871M;

(9) The motion by Fisheries for reconsideration, for allowance of additional testimony or in the alternative for clarification, is denied.

MAGISTRATE'S REPORT AND RECOMMENDATION ON MAKAH FISHING AT MUKKAW BAY, AS AMENDED BY MINUTE ORDER OF SEPTEMBER 8, 1981.

JOHN L. WEINBERG, United States Magistrate.

### INTRODUCTION

This proceeding arises from a dispute as to whether Makah Indians may fish for salmon with marine set-nets in Mukkaw Bay, immediately off the Pacific Coast of their reservation and south of Cape Flattery.

The State of Washington Department of Fisheries ("Fisheries") asserts such fishing violates R.C.W. 75.12.210, which prohibits any person from fishing for salmon with nets in this area of the ocean. Fisheries seized the nets of, and has initiated crimi-

nal prosecutions against, five Makah fishermen who had set their nets in Mukkaw Bay. Defendant Meiner, as Prosecuting Attorney for Clallam County (the "Prosecutor"), is responsible for prosecuting the criminal action.

These five fishermen, and the Makah Tribe ("Makahs"), assert that this court specifically enjoined the State of Washington, Fisheries, and the Prosecutor from such interference and regulation in its 1974 "Injunction" and accompanying findings, conclusions and orders. According to the Makahs, Fisheries may do so only upon a prior showing of conservation necessity, which Fisheries has not made and, in any event, could not make. In their motion papers, the Makahs seek only an order holding the State of Washington, Fisheries, and the Prosecutor in contempt. At oral argument, however, the Makahs also requested the court:

(a) Declare enforcement of R.C.W. 75.-12.210 unlawful;

(b) Declare the seizure of the nets unlawful;

(c) Enter an order directing the Prosecutor to release the nets, dismiss the prosecutions, and pay plaintiffs' fishing losses; and

(d) Impose a fine of $1,000 per day until defendants fully comply.

One additional complication is that the Makahs have also filed an action in this court under the Civil Rights Act, seeking damages and other relief arising from the same facts. (Case No. C81–871M). Defendants in that action are Fisheries and three of its officials. This court's ruling in this case upon the legality of the seizures and prosecutions could have a significant impact upon the Civil Rights Act claims.

### FACTUAL BACKGROUND

Both sides apparently anticipated this confrontation over marine set-net fishing. Fisheries requested advice from the Attorney General of the State of Washington as to whether § .210 applied to Makah Indians. An Assistant Attorney General re-

plied in the affirmative in a memo dated June 19, 1981 (exh. MK–M–10). His rationale was that the federal court never specifically enjoined the application of this statute to Treaty Indians.

The Makah Tribe, however, issued a fishing regulation on July 2, 1981, opening all marine set-net areas to Makah Treaty fishing.

The Fisheries Advisory Board convened on July 8, 1981[12] apparently to consider this specific dispute. At that meeting, Morris Barker, a Fisheries biologist who serves as Assistant Chief of the Harvest Management Division for Fisheries, conceded there was no conservation necessity for prohibiting marine set-net fishing by Makah Indians in Mukkaw Bay.

Later that day, counsel for the Makahs sent a Telex (exh. MK–M–6) and a letter (exh. MK–M–5) to Fisheries and the State Attorney General. In those communications, counsel asserted the continuing right of Makahs to engage in treaty fishing in Mukkaw Bay, claiming that enforcement of § .210 was implicitly within this court's injunction. The State was put on notice that, if it interfered with those fishing rights, the Makahs would seek a contempt order and bring a civil rights action.

It happened just that way. Fisheries Officer John Cook seized the nets of these five fishermen in Mukkaw Bay on July 10, 1981. Based upon the identification on the nets, Cook issued criminal citations to the five fishermen for violation of § .210. Those prosecutions are pending in Clallam County. The Prosecutor has agreed to defer further prosecution pending the outcome of this proceeding.

## PROCEDURE IN THIS COURT

The Makahs filed their motion for a finding of contempt on July 24, 1981. The court referred it to the undersigned for a hearing and a report and recommendation.

Pursuant to an Order to Show Cause, the Makahs, Fisheries and the United States appeared at a hearing on July 29, 1981. The Makahs introduced exhs. MK–M–5 through MK–M–10, and brief testimony from Stephen Joner, Makah Fisheries Biologist. Fisheries filed two affidavits, but no memoranda, and offered no evidence at the hearing. All parties, including the United States, presented oral argument.

At the conclusion of the hearing, I indicated:

(a) I would recommend the court conclude that its previous orders covered § .210 and that they enjoined the actions taken by Fisheries in this case;

(b) the appropriate remedy—i.e., an order of contempt and/or some other form of relief—remained to be determined.

I further indicated, however that while this Report and Recommendation was being prepared, the parties could and should resolve the dispute by agreement. Specifically, I suggested both sides consider an agreed disposition where the State would immediately: (a) terminate the prosecutions; (b) provide reasonable assurance there would be no further interference of this type; (c) return the seized nets; (d) provide reasonable compensation to the five fishermen for lost fishing time. Counsel were reasonably optimistic they could work out such a disposition.

Since the hearing, however, it has become apparent that the prospects of any agreed disposition are remote. The criminal prosecutions remain pending, and the State will not dismiss them unless the Makahs agree to a bail forfeiture. Fisheries is willing to return the nets if the Makahs stipulate that they used the nets for salmon fishing in Mukkaw Bay. But Fisheries has not taken any definitive action to assure the Makahs they can safely fish Mukkaw Bay again. There has been no offer of compensation. Lurking in the background, and impeding any settlement, is the pending civil rights action brought by the Makahs.

12. The affidavit of Geoffrey J. Hottowe fixes the date of this meeting as *June* 8; but the balance of the record makes clear this is a typographical error.

Nine days after the hearing, Fisheries moved (a) for reconsideration, (b) for allowance of additional testimony; (c) or in the alternative, for "clarification" as to the validity of federal regulations prohibiting net fishing for salmon in the Pacific. Fisheries seeks to show the background of enactment of § .210, and the existence of similar federal regulations.

## ANALYSIS

1. *Preliminary Issues.* There is no dispute as to most relevant factual matters. The five fishermen were members of the Makah Tribe. They allege, and Fisheries has not denied, that Mukkaw Bay is an "usual and accustomed fishing place" for the Makahs. See *U.S. v. Washington*, 384 F.Supp. 312, 364. They were engaged in Treaty fishing for salmon, pursuant to a duly enacted tribal fishing regulation, and their nets were properly identified as those of Treaty fishermen. All of their nets were less than one mile from shore.

2. *Conservation Necessity.* There is no real dispute on this issue either. Prior to the seizures and citations, there certainly was no showing of any conservation necessity, to the satisfaction of either the Makah Tribe or of this court. Since the seizures, Fisheries has offered two affidavits suggesting that in the open ocean there is a significant "drop-out" rate from gill nets, resulting in high mortality and wastage. As shown by the testimony of Mr. Joner, however, this has no application to the protected and relatively calm waters of Mukkaw Bay. Fisheries' half-hearted attempt to suggest a conservation problem, after the fact, is entirely unpersuasive. Mr. Barker of Fisheries correctly characterized the issue on July 8, 1981 as a legal question, rather than a conservation question. (exh. MK–M–8).

3. *Parallel Federal Regulation.* In its post-hearing motion, Fisheries contends that federal regulations issued by the Department of Commerce likewise make it unlawful for any person to fish or take salmon by use of any type of net in the Pacific Ocean. Fisheries officers assist in enforcing the federal regulation, a copy of which is attached to the motion.

But the existence of this federal regulation has no significance in this proceeding, for at least two reasons. First, Fisheries was enforcing a state statute, not the federal regulation, when it seized the nets and cited the Makahs. But more significantly, the federal regulation applies in the Fishery Conservation Zone, from three to 200 miles off shore. It has no relevance to fishing within one mile from shore.

4. *R.C.W. 75.12.210 and the "Surfline Agreement."* Representatives of Canada, Washington, Oregon and California met in Seattle in 1957 (exh. MK–M–7), and devised a coordinated program to combat the "substantial depletion of salmon" resulting from ocean net fishing. R.C.W. 75.12.200. The agreement they reached at that conference is known as the "Surfline Agreement." There is, however, neither a formal treaty nor a written, signed agreement of any kind. Following the conference, the State of Washington enacted R.C.W. 75.12.-210:

"75.12.210—*Net fishing for salmon in certain Pacific Ocean waters unlawful.* It shall be unlawful for any person to fish for or take, by the use of any type of net, any salmon within the waters of the Pacific Ocean, over which the state has jurisdiction, lying westerly of the following described line: [area includes Mukkaw Bay]."

Thus, the Washington legislature perceived a conservation necessity for such regulation in 1957. At this time, however, no similar necessity has been shown, at least with respect to net fishing in Mukkaw Bay.

Fisheries suggest that, because § .210 was adopted as part of a coordinated program involving other states and Canada, it falls beyond the reach of this court's orders restricting state interference with treaty fishing rights. Fisheries cites no authority for this proposition, however, and I perceive none.

**1438**

5. *Did This Court Enjoin Enforcement of § .210?* On March 22, 1974, this court enjoined Fisheries and others from applying or enforcing against treaty tribes any of a list of specific state statutes and regulations. 384 F.Supp. at 415, paragraph 6. The list did not include R.C.W. 75.12.-210. Fisheries therefore argues it was free to enforce that statute against the Makahs. This is the crux of the defense Fisheries offers for its actions, and the principal issue presented by the contempt motion.

■■■ This contention is wholly unpersuasive. From the various findings, conclusions, orders, injunctions and other actions taken by this court in this case, two principles *inter alia* emerge with unmistakable clarity: (1) the State of Washington may not interfere in *any* way with treaty fishing, either by enforcement of *any* state statute or regulation, or by any other means, unless such action by the State is reasonable and necessary to prevent demonstrable harm to the actual conservation of fish; and (2) even where such conservation measures are necessary, the State must so establish to the satisfaction of all affected tribes or this court *prior* to taking any regulatory action.

The court has consistently so ruled on several different occasions, using slightly different language from time to time.

The first sentence of Conclusion of Law 23 is:

"23. The State's police power to regulate the off-reservation fishing activities of members of the treaty tribes exists only to the extent necessary to protect the fishery resource."

384 F.Supp. at 401. The U.S. Supreme Court has also so ruled in *Puyallup Tribe v. Washington Game Dept.,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968), and in *Washington v. Passenger Fishing Vessel Assn.,* 443 U.S. 658, 682, 99 S.Ct. 3055, 3072, 61 L.Ed.2d 823 (1979).

Paragraph 3 of this court's "Rulings on Major Issues in This Case" restates the limitation to conservation purposes, and adds the requirement that the State estab-lish the conservation necessity *before* imposing any regulation:

"Every regulation of treaty right fishing must be strictly limited to specific measures which before becoming effective have been established by the state, either to the satisfaction of all affected tribes or upon hearing by or under direction of this court, to be reasonable and necessary to prevent demonstrable harm to the actual conservation of fish."

384 F.Supp. at 342.

This was echoed by paragraph 21 of the Declaratory Judgment and Decree:

"21. If any person shows identification, as provided in the Decision of the Court, that he is exercising the fishing rights of a Treaty Tribe and if he is fishing in a usual and accustomed place, he is protected under federal law against any State action which affects the time, place, manner, purpose or volume of his harvest of anadromous fish, unless the State has previously established that such action is an appropriate exercise of its power."

384 F.Supp. at 408.

The court warned the State and its officers of the consequences of unlawful regulation in paragraph 5 of the "Ruling on Major Issues," and used the occasion once again to spell out the limits of permissible regulation:

"5. The state having the burden of proof as above indicated, no regulation applied to off reservation treaty fishing can be valid or enforceable unless and until it has been shown reasonable and necessary to conservation as above defined. The arrest of, or seizure of property owned or in permitted custody of, a treaty right fisherman under a regulation not previously established to be reasonable and necessary for conservation, is unlawful and may be actionable as to any official or private person authorizing or committing such unlawful arrest or seizure."

384 F.Supp. at 342.

Having defined repeatedly the limits of lawful regulation, the court then specifical-

ly enjoined Fisheries and other parties from violating those limits. The relevant portions of the "Injunction" provide:

"1. Defendants shall:

\* \* \* \* \* \*

c. conform their regulatory action and enforcement to each and all of the standards set forth in Final Decision # I;

\* \* \* \* \* \*

3. Defendants shall not interfere with or regulate or attempt to regulate the treaty right fishing of members of any treaty tribe during any period not covered by paragraph 2 above [not here relevant] as to such tribe unless the state first shows to the satisfaction of such tribe or this court that such regulation conforms to the requirements of Final Decision # I and this injunction.

\* \* \* \* \* \*

4. Except as otherwise provided in this injunction, defendants shall not enforce any state statute or regulation not conforming to the above against any individual fishing at his tribe's usual and accustomed fishing place who identifies himself by a tribal membership certification carried on his person.

\* \* \* \* \* \*

6. Except as otherwise provided in this injunction, defendants shall not apply or enforce any of the following statutes or regulations to regulate, limit or restrict the exercise of the fishing rights of a treaty tribe as declared in Final Decision # I: [list does not include R.C.W. 75.12.210]"

384 F.Supp. at 414–415.

Nowhere does the court suggest that the list of statutes in paragraph 6 is intended to be exclusive. On every occasion the court states its prohibitions against regulation of treaty fishing in broad, general terms. The court says *"every"* regulation (not just those listed in paragraph 6) must have passed the test of conservation necessity before becoming effective (Rulings, paragraph 3). Turning the coin over, the court says "no" regulation shall be valid and enforceable unless and until it passes muster. (Rulings, paragraph 5). The injunction prohibits enforcement of *"any"* state statute or regulation not conforming to Final Decision # I—not just the statutes and regulations listed in paragraph 6.

■ In summary, there is no possible way to read this court's previous rulings in a manner which would permit Fisheries to enforce § .210 against the Makahs, absent a prior showing of conservation necessity.

## RECOMMENDED ACTION

■ Despite all of the foregoing, the Attorney General of the State of Washington concluded that Fisheries had a free hand in enforcing § .210 against the Makahs, and advised Fisheries according. The frequency with which the court stated its prohibition of such regulation, and the unequivocal language the court used in doing so, raise some doubt as to whether Fisheries and the Attorney General reached this conclusion in good faith. But I recommend the court resolve those doubts in favor of Fisheries, and decline to hold the agency in contempt at this time, for several reasons.

First, the court can afford full protection and relief to the Makahs without holding Fisheries in contempt. Specific elements of recommended relief are discussed below.

Second, Fisheries sought and obtained the advice of their counsel before proceeding. This does not alter in any way the fact that the action taken by Fisheries, in reliance upon that erroneous advice, was directly contrary to this court's injunction and other orders. Nor does it deprive the Makahs of their right to full and vigorous enforcement of this court's orders. But these circumstances should temper the court's conclusion as to whether the action of Fisheries was contumacious, and should be punished as such.

Third, holding a party in contempt is a drastic sanction. The parties advise that, despite the extended and stormy history of

this litigation, the court has never been required to hold the State, Fisheries or any other agency or official in contempt.

Finally, the court can hold the contempt sanction in reserve. If there ever was a genuine question as to whether Fisheries can interfere with Makah fishing in Mukkaw Bay, there is no question now, should the court adopt these recommended conclusions. The contempt sanction remains available in the event of any further improper interference.

While the court should decline to hold Fisheries in contempt at this time, it should grant the following specific relief:

(a) Order the Prosecutor to take steps immediately to dismiss the pending prosecutions, with prejudice;

(b) Order whichever respondents have custody of the Makahs' nets and related gear to return them immediately, if such has not already been accomplished;

(c) Specifically enjoin Fisheries and its officers and agents from further interference with set-net fishing by Makahs in Mukkaw Bay, except as such regulation is specifically permitted by the orders of this court; and

(d) Declare that this court's previous orders and injunctions limit *all* state regulation of treaty fishing, without regard to whether the state relies upon a statute or regulation listed in paragraph 6 of the Injunction.

The court should not award any compensatory or punitive damages at this time. The Makahs have requested such relief in their Civil Rights Act complaint, and the court can adjudicate them in due course in that case.

One aspect of this recommended relief requires further discussion. At least since *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), federal courts have been extremely reluctant to interfere in any way with criminal prosecutions pending in state court. At first blush, an order directing the Clallam County Prosecutor to dismiss the prosecutions with prej-

udice would appear to contravene this policy.

But in fact, such an order would represent no new incursion by this court into the domain of state officials. This court enjoined Fisheries from this type of interference with treaty fishing over seven years ago. For better or for worse, the court at that time enjoined state criminal prosecutions of the kind now challenged. Where, as here, the state initiates a prosecution in violation of that order, a reluctance by this court to act would deprive its prior orders of meaning, force and credibility.

Consideration of 28 U.S.C. § 2283 reinforces this conclusion. While generally prohibiting federal court injunctions staying state court proceedings, the statute preserves the court's power to do so where such an order is necessary "to protect or effectuate its judgments." Such is the case here.

## POST–HEARING MOTIONS BY FISHERIES

The post-hearing motions by Fisheries should be denied. The reconsideration they seek can be achieved in the context of objections to this Report and Recommendation. As to further testimony, they have made no showing as to what the testimony would be, what relevance it might have, or why it was not available on the return date on the Order to Show Cause. Finally, the court should decline to give a "clarification" as to the validity of the federal regulations governing net fishing for salmon in the Fishery Conservation Zone. As discussed above, this dispute involves neither the federal regulations nor the Fishery Conservation Zone. There is no evidence the Makahs engage in set-net fishing more than three miles from shore; and if there are other fishermen who do, they are not before the court in this proceeding. This is therefore not an appropriate setting for issuing what would be an advisory opinion.

## CONCLUSION

The court should deny the motion to hold Fisheries in contempt, but should grant relief in the four respects described above.

FINDINGS OF FACT AND CONCLU-SIONS OF LAW RE: DETERMINA-TION OF ADDITIONAL USUAL AND ACCUSTOMED FISHING PLACES OF NISQUALLY, PUYALL-UP, AND SQUAXIN ISLAND INDI-AN TRIBES

(August 22, 1981)

CRAIG, District Judge.

■ The court, having reviewed the Requests for Determination of additional treaty fishing places for the Nisqually, Puyallup, and Squaxin Island Indian Tribes, respectively, and the Magistrate's hearing and reports thereon, makes the following Supplemental Findings of Fact and Conclusions of Law:

## SUPPLEMENTAL FINDINGS OF FACT

335. At the time of the Treaty of Medicine Creek, 10 Stat. 1132, the Nisqually Indian Tribe and its members regularly fished in the following described areas:

All saltwater areas of southern Puget Sound from the northernmost tip of the area generally known as Henderson Bay south to the Nisqually River bay area to a line drawn from Johnson Point to Devils Head; from a line drawn east from Point Fosdick on Kitsap Peninsula to Day's Island south to the Nisqually River bay area (to a line drawn from Johnson Point to Devils Head); and all waters between Henderson Bay and the Narrows (to a line drawn from Point Fosdick to Day's Island) including Carr Inlet and Hale Passage; as well as the freshwater rivers and streams which drain into that area.

336. At the time of the Treaty of Medicine Creek, 10 Stat. 1132, the Puyallup Indian Tribe and its members regularly fished in the following described areas:

1. Those salt waters north and west of a line drawn from Mahnckes Point on the Kitsap peninsula to the westernmost point of McNeil Island bordering on Pitt Passage, then extending from Hyde Point on McNeil Island to Gibson Point on Fox Island and then extending from Fox Point on Fox Island to Point Fosdick on the Kitsap peninsula, generally known as the Carr Inlet/Henderson Bay/Hale Passage area; as well as the freshwater rivers and streams which drain into that area;

2. Those salt waters north and east of a line drawn from Hyde Point on McNeil Island to Gordon Point on the mainland and south of those marine areas already adjudicated to be usual and accustomed fishing grounds and stations of the Puyallup Tribe in this case at 384 F.Supp. 312, 371, Finding of Fact # 99 [" * * * the marine areas around Vashon Island and adjacent portions of Puget Sound * * * "] generally known as the Narrows area.

337. At the time of the Treaty of Medicine Creek, 10 Stat. 1132, the Squaxin Island Indian Tribe and its members regularly fished in the following described areas:

1. Those salt waters north and west of a line drawn from Mahnckes Point on the Kitsap peninsula to the westernmost point of McNeil Island bordering on Pitt Passage, then extending from Hyde Point on McNeil Island to Gibson Point on Fox Island and then extending from Fox Point on Fox Island to Point Fosdick on the Kitsap peninsula, generally known as the Carr Inlet/Henderson Bay/Hale Passage area; as well as the freshwater rivers and streams which drain into that area;

2. Those salt waters north and east of a line drawn from Hyde Point on McNeil Island to Gordon Point on the mainland and south of the Tacoma Narrows Bridge.

338. The three foregoing Findings of Fact are made on the basis of a modification of the applicant tribes' original Request for Determination of additional treaty fishing areas in southern Puget Sound and are not intended to infer that areas not included in the Findings are not usual and accustomed fishing places of any of these tribes.

## CONCLUSIONS OF LAW

87. In addition to the areas previously determined by this court to be usual and accustomed fishing places of the Nisqually, Puyallup, or Squaxin Island Indian Tribes within which the fishing rights secured to those tribes by Article 3 of the Treaty of Medicine Creek may be exercised, the areas described in Findings of Fact Nos. 335, 336, and 337 are among the usual and accustomed fishing grounds and stations of the plaintiff Nisqually, Puyallup, and Squaxin Island Indian Tribes, respectively, and within which those tribes may respectively exercise their treaty-secured fishing rights. The orders and decrees of this court with respect to the protection and exercise of the treaty-secured fishing rights of those tribes apply with respect to tribal fishing within those areas.

88. This determination of additional usual and accustomed fishing grounds and stations shall in no way limit these or any other parties from seeking further determination of other usual and accustomed fishing grounds and stations including any other areas embraced within the Requests for Determination as originally filed in 1980.

This Order consolidates and replaces the two orders of July 24, 1981, on this subject which are hereby withdrawn.

CORRECTED ORDER RE: REQUEST FOR DETERMINATION OF PORT GAMBLE AND LOWER ELWHA USUAL AND ACCUSTOMED FISHING PLACES

(October 23, 1981, as amended March 8, 1983 and May 24, 1983)

CRAIG, District Judge.

■ Based on all the pleadings, testimony, evidence, memoranda and oral arguments submitted on the Requests for determination of the Lower Elwha and Port Gamble Bands of Klallam Indians regarding their usual and accustomed fishing places, this court makes the following Findings of Fact:

339. The present day Lower Elwha and Port Gamble Bands of Klallam Indians are descendents of the Klallam groups who, at treaty times, shared a common language and a common culture and inhabited a dozen or more villages along the northern shore of the Olympic Peninsula. The Port Gamble Indian community was established about 1853, when Klallams moved to the area because of employment opportunities. The Klallams who settled at Port Gamble continued to fish the waters of the Strait of Juan de Fuca and the streams draining into the Strait that were associated with their original homes, as well as the waters of Port Townsend, Port Ludlow, Port Gamble and adjacent marine areas.

340. At treaty times, the Klallams regularly visited Hood Canal for fishing, shellfish digging and berry picking. In addition, Klallams regularly fished the waters of northern Puget Sound around the San Juan Islands and Whidbey Island, and in the Haro and Rosario Straits.

341. The usual and accustomed fishing grounds of the Port Gamble Band of Klallam Indians include the waters of the Strait of Juan de Fuca, and all the streams draining into the Strait from the Hoko River east to the mouth of Hood Canal. In addition, the Port Gamble Klallam Band has usual and accustomed fishing rights on the Sekiu River, but the fishing on this river shall be subject to the control and regulation of the Makah Indian Tribe. Furthermore, the usual and accustomed fishing grounds of the Port Gamble Klallam Band include the waters of the San Juan Islands archipelago and the waters off the west coast of Whidbey Island. The usual and accustomed fishing grounds of the Port Gamble Klallam Band also include Hood Canal and all streams draining into Hood Canal except the Skokomish River and all of its tributaries. The usual and accustomed fishing area of the Port Gamble Klallam Band is presented graphically in the map attached as Appendix A.[13]

---

13. Appendix A as revised by the May 24, 1983 amendatory order is omitted here.

342. The usual and accustomed fishing grounds of the Lower Elwha Band of Klallam Indians include, in addition to those determined in the Order of April 18, 1975, 459 F.Supp. at 1049, and the Order of March 10, 1976, 459 F.Supp. at 1066, the waters of the San Juan Islands archipelago, the waters off the west coast of Whidbey Island, Hood Canal and all streams draining into Hood Canal except the Skokomish River and all of its tributaries. The usual and accustomed fishing area of the Lower Elwha Band is presented graphically in the map attached as Appendix A (omitted here, see fn. 13, *supra*).

This determination shall not preclude these or any other parties from seeking future determination, pursuant to subparagraph 25(f) of the Injunction of March 22, 1974 (384 F.Supp. 312, 419), of additional usual and accustomed fishing grounds and stations not affected by the Hood Canal Agreement, p. 1468 *infra.*

## PHASE II ATTORNEY FEES MEMORANDUM OPINION AND ORDER

(December 15, 1981)

ORRICK, District Judge.

Attorneys from six different legal service organizations and law firms, representing a total of twenty-three Indian tribes who have intervened in this action for declaratory and injunctive relief, have filed petitions and affidavits seeking fees and costs in excess of $450,000 for services rendered to date in Phase II of this litigation. Counsel for the intervening tribes also request that this "lodestar" figure be augmented by a multiplier based on the contingent circumstances under which the services were rendered and the quality of the services.

An award of attorneys' fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (the "Act"), is appropriate because the intervening tribes have succeeded in establishing rights secured by federal law in an action that is based in part on claims involving constitu-

tionally-secured rights. However, fees will not be awarded at this time for services rendered on issues on which the intervening tribes cannot yet be said to have prevailed. While this Memorandum Opinion sets forth the Court's findings with respect to the appropriateness of an award and the rate at which fees should be set for particular attorneys, the exact amount of the fees to be awarded cannot be calculated until counsel file supplemental affidavits indicating the hours spent on the issues on which intervenors have *not* prevailed at this time, namely, whether the right to have treaty fish protected from environmental degradation has been violated and, if so, what relief, if any, is warranted.

I

This complex case was commenced in 1970 by the United States on its own behalf and as trustee of seven Indian tribes to settle several disputed issues concerning the nature and scope of the Indian tribes' treaty-based fishing rights. The seven Indian tribes subsequently intervened in the action along with other tribes. The case has been litigated in two phases. Phase I culminated in a 1979 Supreme Court opinion which conclusively established the tribes' treaty-based right to a specific allocation of salmon and steelhead trout in the geographic area encompassed in this litigation. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 685–89, 99 S.Ct. 3055, 3074–76, 61 L.Ed.2d 823 (1979). Phase II, the subject of these applications for fees and costs, involved consideration of two issues reserved by the Phase I court, specifically: (1) whether hatchery-bred fish are included in the allocable fish population, and (2) whether the right of taking fish incorporates the right to have treaty fish protected from environmental degradation. In its Opinion filed September 26, 1980, this Court granted the plaintiffs' motions for partial summary judgment, finding that hatchery-bred fish were to be included in the allocation and that the fishing right did include the right to have treaty fish pro-

tected from environmental degradation. The Opinion specifically did not reach the questions whether the right to have treaty fish protected from environmental degradation has been violated and, if so, what relief, if any, may be warranted. *United States v. Washington,* 506 F.Supp. 187, 202 (1980). Although this Court entered judgment on the motions for partial summary judgment,[14] these questions remain for future resolution.

On May 8, 1981, Judge Craig awarded attorneys' fees to counsel for the intervening tribes pursuant to 42 U.S.C. § 1988 for services rendered in Phase I of this litigation. Counsel for the intervening tribes now seek fees and costs for services provided in Phase II of this litigation and seek a declaration that they will be entitled to additional fees for any subsequent services rendered in enforcing the Phase II decision or in defending it on appeal.

## II

Although the traditional rule in American courts has been to require each party to bear his own costs and attorneys' fees, *see Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975), Congress altered this rule in cases involving the vindication of civil rights by passing the Act. By its terms, the Act authorizes the payment of reasonable attorneys' fees in suits to enforce the provisions of 42 U.S.C. § 1983, and subsequent decisions have made it clear that such awards to prevailing parties are to be the norm rather than the exception. *E.g., Sethy v. Alameda County Water District,* 602 F.2d 894, 897 (9th Cir.1979).

Neither the United States nor the intervening tribes specifically alleged in their pleadings in Phases I and II of this action that they were seeking relief for deprivation of rights secured by laws of the United States as provided by § 1983, or alleged jurisdiction under its statutory authority. 28 U.S.C. § 1343. Judge Boldt nevertheless concluded that jurisdiction over the

allocation issue in Phase I under § 1343(3) and (4) was established by plaintiffs' allegations, *United States v. Washington,* 384 F.Supp. 312, 399 (W.D.Wash.1974) (conclusion of law 1c), and Judge Craig interpreted Judge Boldt's specific conclusions concerning violations of due process and discrimination as a determination of claims under § 1983. *See* Order of Judge Craig filed May 8, 1981. This Court also recognized the discriminatory nature of the violations found in Phase I of these proceedings *United States v. Washington, supra,* 506 F.Supp. 187, 192 & n. 18, 204 & n. 66. It is clearly the law of this case that Phase I considered claims for relief from deprivation of constitutionally-secured rights under § 1983 which were brought before the court within the jurisdiction established by 28 U.S.C. § 1343.

■ Although Phase II involves issues reserved by the Phase I court, it is not a different lawsuit. The constitutional nature and jurisdictional basis of the claims raised in Phase I remain an element of the proceedings in Phase II of this case. *See Richmond v. Weiner,* 353 F.2d 41, 44 (9th Cir.1965) (holding that the district court continued to exercise jurisdiction over a nonfederal claim following bifurcation of the claim from federal issues). The Supreme Court has recently recognized that Congress intended to authorize the award of attorneys' fees in cases in which a plaintiff prevails on a claim for which fees ordinarily could not be awarded under § 1988 if that claim were pendent to a substantial constitutional claim, and that this legislative action did not violate the Eleventh Amendment when such awards were sought against a state defendant. *Maher v. Gagne,* 448 U.S. 122, 132 and n. 15, 100 S.Ct. 2570, 2576 and n. 15, 65 L.Ed.2d 653 (1980). There can be no doubt of the substantial nature of the constitutional claims in Phase I in light of Judge Boldt's findings in favor of plaintiffs. Viewing the claims in Phase II as pendent to the constitutionally-based claims of Phase I, it is apparent

---

**14.** Amended Judgment filed January 16, 1981.

that Phase II is an appropriate case for considering requests for attorneys' fees authorized by 42 U.S.C. § 1988.

■ Wholly apart from this pendency theory, an award of attorneys' fees under § 1988 is appropriate in this action because the claims considered by this Court in Phase II are cognizable in their own right as § 1983 claims. State officials acting in their official capacities are among the defendants alleged to have violated the rights of the intervening tribes. They are "persons" within the meaning of § 1983 against whom attorneys' fees may be awarded. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). The actions allegedly undertaken by defendants that violated the rights of the intervening tribes were alleged to have been performed "under color of state law" in the form of regulations removing hatchery-reared fish from the share of intervening tribes and the issuance of permits for activities that damaged tribal fisheries.[15] The rights claimed by the intervening tribes and declared by this Court are found in treaties ratified by the Congress [16] and hence must be viewed as rights secured by "laws" of the United States. *See* C. Antieau, Federal Civil Rights Acts § 207 (1980). Thus, while neither the United States nor the intervening tribes pleaded these claims specifically under § 1983,[17] the allegations satisfy the requirements for pleading claims of deprivation of statutorily-secured rights under § 1983. Because attorneys' fees awards under § 1988 are not limited only to § 1983 claims based on violations of civil rights or equal protection laws but are applicable to *all* statutorily-based § 1983 claims heard by a court with jurisdiction over the claims, *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Maher, supra*, 448 U.S. at 128, 100 S.Ct. at 2574, the applications of tribal counsel for fees in Phase II are appropriately presented.

■ Under either of these theories, it is clear that the intervening tribes "prevailed" within the meaning of § 1988 at least with respect to the issues on which partial summary judgment was entered. While several issues remain to be tried concerning violations of the tribes' environmental right and the potential remedies that may be applied, the Supreme Court has recently noted that "[n]othing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated." *Id.* Both the Supreme Court and Congress have recognized that an interlocutory award of fees may be appropriate following an order that determines substantial rights of the parties. *See Hanrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980). Here, substantial rights to a valuable resource, hatchery-bred fish, and to the protection of a valuable natural resource, the fisheries, have been declared to exist in the intervening tribes.

Because the claims before this Court in Phase II come within the provisions for attorneys' fees under § 1988 either under a theory of pendency to constitutionally-based claims in Phase I or as statutorily-based § 1983 claims in their own right, and because the intervening tribes prevailed with respect to those aspects of the claims which have been presented to the Court thus far, reasonable attorneys' fees and costs will be awarded to tribal counsel.

### III

Section 1988 provides for the payment of a "reasonable attorney's fee as part of the

---

**15.** *See* Attachment B to opposition memorandum, amended and supplemental complaint for declaratory relief, page 3, lines 6–16, page 4, lines 1–20.

**16.** The treaties are listed in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 n. 2, 99 S.Ct. 3055, 3062 n. 2, 61 L.Ed.2d 823 (1979).

**17.** Courts have recognized that under modern rules of pleading it is not necessary to specifically cite § 1983 in a complaint in order to bring the action under the Civil Rights Acts. *See, e.g., Holladay v. Roberts*, 425 F.Supp. 61, 64 (N.D. Miss.1977); *Canty v. Board of Education, City of New York*, 312 F.Supp. 254, 255 (S.D.N.Y.1970).

costs." In determining what is a reasonable fee for the services rendered by tribal counsel in this action, the Court will apply the standards of review listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), within the framework first delineated in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir.1973).

The initial step under both the *Kerr* and *Lindy* approaches is to calculate the time and labor required by the litigation. The Court has carefully scrutinized the time records supplied by counsel for instances of duplicative effort, *see, e.g., In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1328 (C.D.Cal. 1977), and vagueness or inaccuracy in recordkeeping, *e.g., Lockheed Minority Solidarity Coalition v. Lockheed Missiles & Space Co.*, 406 F.Supp. 828, 831 (N.D.Cal. 1976). With the possible exception of a number of hours expended in research and drafting of the briefs concerning attorneys' fees, the Court's examination has revealed no significant evidence of duplication. The tribal counsel's services have been ably coordinated by lead counsel. The division of services among counsel most active in the case,[18] while not formal, constituted an efficient use of their time. Although the interaction between tribal counsel and counsel for the United States has not been detailed in these applications, it is apparent that the United States relied extensively on the discovery efforts of tribal counsel,[19] and that tribal counsel coordinated their efforts with those of the attorneys for the United States.[20] Participation by attorneys for individual tribes in this action was largely limited to work on discovery that pertained to the unique circumstances and interests of their particular clients and did not duplicate the efforts of lead counsel who represented the general interests of the tribes as a whole. Tribal counsel's affidavits and time records also indicate that counsel maintained contemporaneous time records. In limited instances in which hours requested were reconstructed, the sources used were reliable, the services performed were reasonably detailed, and the hours requested appear to have been conservatively estimated. Such reconstructions are a proper basis for awarding fees. *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1102–03 (2d Cir.1977).

The Court has also examined the fee applications for evidence of unnecessary expenditures of services by tribal counsel. Notwithstanding defendants' generalized allegations of such expenditures, the Court has found no specific instances in the time records submitted of work that was not reasonably undertaken by the tribal counsel. While tribal counsel are seeking compensation for a great many hours of work, the time requested must be assessed against another *Kerr* factor, the difficulty of the questions involved in Phase II. *Copeland v. Marshall*, 641 F.2d 880, 890 (D.C.Cir.1980). In this case, the hatchery issue was characterized by highly technical factual development, while defendants themselves have recognized the novelty of the environmental rights issue raised by plaintiffs.[21] In light of the difficulty of these issues, the number of hours requested is not, on its face, excessive.

There is, however, one category of services that should not be included in an award of services at this time. The Court

---

**18.** The affidavits of Messrs. Alan Stay and Steven Anderson, counsel seeking compensation for the most hours among the applicants, indicate that Mr. Stay handled overall coordination of the tribal counsel's services and guided most of the discovery activity in the case while Mr. Anderson concentrated on drafting and review of pleadings, briefs, and other written work in the case.

**19.** Affidavit of William A. White, attached to the amended response to interrogatories propounded to plaintiff United States, filed June 25, 1981.

**20.** *Id. See also* affidavit of Michael R. Thorp filed in support of applicant's initial memorandum seeking fees.

**21.** *See* second supplemental memorandum regarding plaintiffs' motion for an award of attorneys' fees, pages 2–3.

has yet to consider two issues expressly reserved from the partial summary judgment proceedings, namely, whether the right to have treaty fish protected from environmental degradation has been violated and, if so, what relief, if any, may be warranted. While the intervening tribes may be considered "prevailing parties" for attorney's fees purposes if they "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," the amount of fees received should be based on the work performed on issues on which they were successful. *Sethy, supra,* 602 F.2d at 897–98. *See also Copeland, supra,* 641 F.2d at 891–92 & n. 18; *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978). Because litigation of this case is not yet concluded, it is not analogous to cases in which fees have been awarded for services performed on issues that were necessarily prepared but not ultimately reached. *See, e.g., Seattle School District No. 1 v. Washington,* 633 F.2d 1338, 1349 (9th Cir.1980). Further proceedings in this action may result in a determination against the intervening tribes on the remaining issues. Alternatively, should the plaintiffs obtain a favorable settlement or succeed in litigating the issues, there will be ample time to consider requests for fees at that time.

Since the issues of environmental degradation and potential remedies have not yet been determined, the Court cannot award fees and costs expended exclusively or in large part on those issues. It appears from the affidavits and time records submitted that applicants for fees are seeking compensation for time expended on these issues, particularly on the question of envi-

ronmental degradation.[22] New affidavits must therefore be filed with the Court showing separately the hours that were expended on these undecided issues.

■ The second step of the *Lindy* formula for calculating the "lodestar" figure is to determine the reasonable hourly rate at which counsel should be compensated. In determining this rate for each attorney seeking compensation here, the Court has considered not only the obvious *Kerr* factor of "the customary fee in the community for similar work," but also the level of skill necessary to perform the services, whether the fee is fixed or contingent, time limitations imposed by the circumstances of the case or by the client, the reputation of the attorneys, and the undesirability of the case. *See Copeland, supra,* 641 F.2d at 890. The Court has also scrutinized the various types of tasks performed by individual counsel to ensure that counsel properly allocated difficult tasks to more experienced, and hence, more highly paid, counsel. With one exception,[23] the Court has not attempted to break down the hours spent by the types of tasks performed in order to award the same attorney different rates for different tasks. *See In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1330 (C.D.Cal. 1977) (recognizing the impossibility of such a task in complex litigation).

■ The Court does not consider the status of some tribal counsel as salaried legal services attorneys or the fact that any fees awarded will be paid from the public treasury to be relevant to a determination of a reasonable rate of compensation in this case. The Ninth Circuit has clearly

---

22. For example, the time records of Phillip Katzen indicate the expenditure of 10.25 hours on "preparation of biologists' affidavits regarding reports on the habitat" that were conceivably related solely to the issue of environmental degradation.

23. The Court will not compensate counsel at their full rate for hours expended in travel to hearings, meetings of counsel, and client meetings because these hours, while reasonably expended, did not involve any legal ability or experience which is the basis for counsel's lode-

star rate. *See In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1330, 1343 (C.D.Cal.1977). To the extent that counsel did perform legal services while in transit, the hourly rate should be reduced to reflect the lesser efficiency that necessarily accompanies such efforts. *See Keyes v. School District No. 1, Denver, Colorado,* 439 F.Supp. 393, 409 (D.Colo.1977). For these reasons, the Court will compensate all travel time at the rate of $40 per hour.

rejected past suggestions that fees awarded to legal services organizations should be less than those customarily paid private counsel in civil rights cases. *See Dennis v. Chang,* 611 F.2d 1302, 1309 (9th Cir.1980). Consideration of the source of the fees is not listed among the relevant factors in *Kerr,* and appears inconsistent with the factor of "fees customarily paid in the community for like services." Nor does the Court consider the amount of fees already paid to counsel by their clients to be an absolute limit on the rate at which they may be compensated pursuant to § 1988. While the rate charged by counsel offers some indication of the value they placed on their own services in the absence of special circumstances, the Court is free to set a rate equivalent to that charged in other complex federal litigation if it determines that such a rate is justified after considering all the factors for setting the rate of compensation. *See Keyes v. School District No. 1, Denver, Colorado,* 439 F.Supp. 393, 415 (D.Colo.1977) (setting rate at $35 per hour notwithstanding agreed-upon rate between counsel and client of $30 per hour). Finally, in setting the rate of compensation, the Court will use rates currently paid as a means of compensating for the serious decline in the value of the dollar due to inflation during the pendency of Phase II.

In addition to the basic "lodestar" of reasonable hours multiplied by an appropriate rate of compensation in today's dollars, tribal counsel have also sought a multiplier based on the contingent nature of success in this litigation and the quality of their representation. In considering the proposed contingency adjustment, the Court notes that it "is designed solely to compensate for the possibility at the outset that the litigation would be unsuccessful and that no fees would be obtained." *Copeland, supra,* 641 F.2d at 893. Factors appropriately considered in making an adjustment for contingency are the difficulty of the plaintiff's burden, the risks assumed in developing the case (including the number of hours risked and the out-of-pocket expenses advanced), and the delay in receipt of payment. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 117 (3d Cir. 1976). Because the Court has already considered the necessary level of skill and the degree to which services were rendered on a contingency basis in setting the reasonable hourly rate, a further adjustment based on these factors would be duplicative. *Copeland, supra,* 641 F.2d at 893. Similarly, because the lodestar figure will be calculated to reflect present hourly rates, no further adjustment should be made at this stage for delay in the receipt of payment. *Id.* at 893 n. 23. For these reasons, no multiplier will be awarded to reflect the contingent nature of success in this litigation.

Because the quality of tribal counsel's work in general is a component of the reasonable hourly rate, the Court considers tribal counsel's request for a multiplier based on quality of services to be in the nature of a bonus based on a determination that "the lawyer discharged the professional burden undertaken with a degree of skill above * * * that expected for lawyers of the caliber reflected in the hourly rates." *Lindy Bros., supra,* 540 F.2d at 118. In considering whether to award this "bonus," the Court has examined the benefit conferred on the intervening tribes as well as the quality of the professional methods utilized by tribal counsel in efficiently litigating this action. The Court recognizes that tribal counsel have obtained important and tangible benefits for their clients in the form of the rights declared to exist by this Court and that this result was obtained through motions for summary judgment rather than a full trial. The Court also recognizes, however, that obtaining these results required a great many hours of work, particularly when the additional hours of services by counsel for the United States are considered.[24] This, coupled with

---

**24.** Supplemental Exhibit 2 to defendants' second supplemental memorandum regarding plaintiffs' motion for an award of attorneys' fees indicates that counsel for the United States ex-

the fact that the rates of compensation for tribal counsel already reflect a high level of skill and sophistication in the specialized area of Indian rights, makes an adjustment based on exceptional quality inappropriate in this award of attorneys' fees.

The Court turns now to the task of fixing a reasonable hourly rate at which individual applicants should be compensated and to note any duplicative hours for which fees will not be awarded.

### A. *Evergreen Legal Services.*

Evergreen Legal Services is a publicly funded legal services organization which represented sixteen treaty tribes in Phase II.[25] Four staff attorneys employed by Evergreen during the course of the Phase II proceedings have filed applications for fees with the Court.

 Mr. Alan Stay has recorded the largest number of hours spent on this litigation. In addition to functioning as the primary representative of Evergreen's tribal clients in this litigation, a task which itself involved substantial skills in coordinating and harmonizing the divergent interests of the different tribes, Mr. Stay was selected by tribal counsel to serve as coordinating counsel for all the plaintiff tribes in this litigation and has carried out that central role since 1976. In this role, Mr. Stay was responsible for liaison with the United States and defendants, for developing tribal positions and presenting them to the Court, and for ensuring that all material directed to specific tribes was completed and filed with the Court. While hours claimed by Mr. Stay for 1975–76 have been reconstructed and are set forth in summary fashion, the sources used and the number of hours claimed in light of the tasks performed indicates that the reconstruction was conservative. Other hours are based on daily records.

In calculating the hourly rate at which Mr. Stay should be compensated, the Court has noted that Mr. Stay has worked exclusively in the area of Indian law for eight of the ten years since he graduated from law school, and has acquired special expertise in Indian treaty law and in the facts of this case by his representation of the same sixteen tribes in Phase I of this litigation. Numerous affidavits filed on behalf of Mr. Stay attest to the reputation which he and Evergreen Legal Services enjoy in the field of Indian treaty rights.[26] Mr. Stay's active role during the discovery phase of this case demonstrated substantial experience as a litigator in cases involving complex facts, and his role as coordinating counsel amply demonstrated his unusual administrative skills. In view of this necessary experience, the degree of uncertainty that existed with respect to both rights declared in this action, the preclusive effect of the many hours expended by Mr. Stay in this litigation, and the rate normally paid in the Seattle community for litigation of this complexity, the Court finds that $105 per hour is an appropriate rate of compensation for Mr. Stay's services, with the exception of those hours expended in travel. Seventy-nine hours of travel time will be compensated at the rate of $40 per hour.

Mr. Phillip Katzen has filed two affidavits seeking compensation for 256 hours of work since 1978 in assisting in the preparation of briefs and discovery materials on behalf of the individual tribes represented by Evergreen. In light of the large number of tribal clients and the diverse interests of the clients, Mr. Katzen's supporting role in this litigation appears to have been a necessary supplement to the efforts of Mr. Stay. Mr. Katzen was admitted to practice in the State of Washington in late 1977 and has worked in the area of Indian treaty rights as an attorney since 1978. In light of the prevailing rate paid in Mr.

---

pended a total of 5,198 hours of work on Phase II of this litigation between 1975 and 1981.

**25.** The tribes are the Jamestown Bank-Clallam, Lower Elwha, Muckleshoot, Nizqually, Nooksack, Port Gamble Bank-Clallam, Samish, Sauk-

Suiattle, Skokomish, Snohomish, Snoqualmie, Squaxin Island, Steilacoom, Stillaguamish, Suquamish, and Upper Skagit Tribes.

**26.** *See, e.g.,* affidavits of Ralph W. Johnson, Harold Chesnin, and Federick Noland.

Katzen's community for the services of an attorney with three years' experience in federal litigation, the Court finds that $70 per hour is an appropriate rate of compensation for Mr. Katzen's services, with the exception of 4 hours of travel time, which will be compensated at $40 per hour.

Mr. Thomas P. Schlosser seeks compensation for a total of 285 hours of work for Evergreen between 1976 and early 1979, when he left Evergreen to join the law firm of Ziontz, Pirtle, Morisset, Ernstoff & Chestnut. Mr. Schlosser supplemented the work of other Evergreen counsel by performing extensive client counseling, and played an important role in ascertaining and reconciling differing tribal positions to formulate a single plaintiffs' perspective, an important factor in the streamlining of this litigation. Mr. Schlosser appears to have carefully eliminated services in other aspects of this litigation from his application, and has not requested hours for time spent in travel. He has worked on behalf of the tribal clients in this case since his admission to the Washington Bar in 1975 and appeared extensively on behalf of the tribes in hearings in Phase I of this action. The Court finds that $75 per hour is an appropriate rate of compensation for Mr. Schlosser's services during his employment with Evergreen.

Ms. Cynthia Davenport seeks compensation for 65 hours of work between 1977 and 1981, chiefly for assisting in the preparation of discovery responses by two of the tribes represented by Evergreen. The Court notes that this type of work did not require the degree of skill and familiarity with Indian rights or environmental law that was necessary to plan and draft pleadings and briefs for this litigation. Ms. Davenport's affidavit does not provide the Court with any other indication of specialized skill or expertise. On the basis of her affidavit and the degree of expertise required by the tasks she performed, the Court finds that $65 per hour is an appro-

priate rate of compensation for Ms. Davenport's services.

B. *Ziontz, Pirtle, Morisset, Ernstoff & Chestnut.*

The Ziontz firm has represented four Indian tribes during the pendency of this litigation.[27] Mr. Steven Anderson has also assumed a major role in coordinating the efforts of all tribal counsel, particularly in researching, drafting, and reviewing written pleadings in Phase II since 1978, and in participating in the strategy and guidance of Phase II along with Mr. Stay. The 1,044 hours sought by Mr. Anderson, reflect careful daily record-keeping, and the time sheets demonstrate a conservative allocation of services to this phase of the litigation where issues in other phases were also involved. While working closely with Mr. Stay, Mr. Anderson's services were not duplicative of the large number of hours requested by Mr. Stay since Mr. Anderson concentrated on the drafting of written pleadings while Mr. Stay managed discovery and took an overall hand in coordinating the activities of counsel.

Mr. Anderson was admitted to the Washington Bar in 1971, and has focused primarily on Indian law since joining the *Ziontz* firm in 1974. Mr. Anderson has had substantial experience in preparing briefs in appellate matters both in Phase I of this litigation and in other Indian law cases since 1974, and has submitted a number of affidavits from other practitioners and scholars in the field of Indian environmental law which attest to his high standing in these specialized areas of practice.[28] Several factors mitigate against an award equal to that of Mr. Stay. Mr. Anderson came to Phase II of this litigation several years after Mr. Stay and did not exercise as prominent a role in the coordination of the litigation as did Mr. Stay and while the possibility of success on the merits was no greater for Mr. Anderson than for Mr. Stay, the Ziontz firm did receive regular payments from their clients and so did not

**27.** The tribes are the Lummi, Makah, Quileute, and Tulalip Tribes.

**28.** *See, e.g.,* affidavits of Reid Peyton Chambers and Charles A. Hobbs.

experience the same degree of risk as Evergreen, which was entirely dependent for payment on an award of attorneys' fees. For these reasons, the Court finds that $95 per hour is an appropriate rate of compensation for Mr. Anderson's services.

Two senior partners in the Ziontz firm, Messrs. Mason Morisset and Alvin Ziontz, request compensation for a total of 229 hours for services rendered primarily in 1975–77. While Mr. Morisset continued to participate in this litigation after Mr. Anderson became the primary counsel from the Ziontz firm, his contributions do not appear from the time sheets to have duplicated those of Mr. Anderson, but instead appear to represent a carryover from his extensive work in Phase I of this litigation. Both Messrs. Ziontz and Morisset have practiced extensively in the area of Indian rights since 1970. In light of this experience, tempered by the other factors described with respect to Mr. Anderson, the Court finds that $95 per hour is an appropriate rate of compensation for the services of Messrs. Ziontz and Morisset, with the exception of 24 hours of travel time, which will be compensated at $40 per hour.

Mr. Thomas Schlosser has also submitted two affidavits seeking a total of 40 hours for services performed that primarily relate to the application for attorneys' fees. While a limited number of these hours involved legal research on applicable factors in calculating fees (approximately 11 hours), the majority of the hours for which compensation is sought were expended in calculating time sheets and reviewing the affidavits of other tribal counsel. In light of the lesser degree of skill necessary to perform these tasks, and the small amount of time that Mr. Schlosser was required to devote to this case, the Court finds that notwithstanding his greater experience as a litigator during the years in which he has been employed by Ziontz, the $75 hourly rate at which he will be compensated for his work while with Evergreen Legal Services is an appropriate rate of compensation for his services.

The above rates are commensurate with the prevailing rate for work of similar complexity by attorneys with similar experience and expertise. While the Ziontz firm has entered into contracts with its tribal clients for compensation at lower hourly rates than the rates set above, the Court notes that the agreements between the Ziontz firm and the tribes are subject to approval of the federal government and that this artificial restriction does not accurately reflect the normal rate of compensation in the market for similar legal services in Seattle. The Court will, therefore, award the higher rates. The Ziontz firm will be required to refund the sums already received from their tribal clients.

C. *Native American Rights Fund.*

Four attorneys who were or are employed by the Native American Rights Fund, a legal services organization that represents five intervening tribes in Phase II, have applied for a total of 373 hours. The hours were principally expended in 1975–76 in the early stages of Phase II when Fund counsel functioned as co-lead counsel for the intervening tribes. Fund counsel were the first to raise the environmental issue reached by this Court, while serving as lead counsel in Phase I of this litigation, and so played an appropriate role in initially defining the issues to be litigated and strategy to be followed in Phase II. In September 1976, primary responsibility for representing the tribal interests shifted to local counsel in Seattle.

The largest number of hours requested were expended by Mr. Bruce Greene, who claims 192 hours while serving as lead counsel or co-lead counsel for the intervening tribes in Phase II from June 1975 to September 1976. Working with Mr. Greene was Mr. David Getches, who served as lead counsel in Phase I of this litigation through 1975 and who expended 82 hours in Phase II. While the breakdown in the responsibilities is not distinct in the time records supplied, it was appropriate that Mr. Getches continued to play a role in refining the environmental issues that he

had first raised in Phase I. With the exception of two trips to Seattle at the outset of the Phase II litigation, Mr. Getches did not accompany Mr. Greene to meetings with other counsel. There is no other evidence of duplication in their time records. Both Messrs. Getches and Greene had over five years of experience in Indian rights litigation when they took on their responsibilities in Phase II. Mr. Getches had the additional advantage of extensive work in the facts of this case in his role as lead counsel in Phase I. While the hours requested were not so extensive as to preclude other representation, services were performed on a contingency basis with as great a risk of failure on the merits as that of other tribal counsel. The Court must also consider that the fee for services in complex federal litigation in Boulder, Colorado, is undoubtedly lower than fees charged in Seattle, particularly in the absence of documentation to the contrary. On the basis of all these factors, the Court finds that $90 per hour is a reasonable rate of compensation for the services of Messrs. Getches and Greene, with the exception of 24 hours of travel time which will be compensated at the rate of $40 per hour.

Mr. Robert Pelcyger seeks compensation for 31 hours expended in coordinating the limited involvement of the Fund after 1977 in this litigation and in preparing the Fund's application for fees. While Mr. Pelcyger is as experienced as both Messrs. Getches and Greene in litigating Indian rights, the relatively routine types of work for which hours have been claimed did not require this level of expertise. The Court finds that $80 per hour is an appropriate rate of compensation for Mr. Pelcyger's services.

Finally, the Fund seeks compensation for 68 hours expended by Stephen Rios in researching several legal issues in the fall of 1975. Sixteen hours claimed for travel to and attendance at a meeting of Phase II counsel will not be compensated because Mr. Greene also attended this meeting and could easily have presented the issues on which Mr. Rios worked. Mr. Rios completed law school six months prior to performing this research. An appropriate rate for an attorney with this degree of experience in the Boulder community is $55 per hour.

The Fund also seeks compensation for travel expenses of $1,768.73. For the same reason that it subtracted hours from Mr. Rio's application, the Court also deducts the cost of his trip to Seattle, which it estimates at $200. The Fund will, therefore, receive $1,568.73 in expenses.

### D. *Daniel Raas.*

Mr. Daniel Raas is the Reservation Attorney for the Lummi Indian Tribe and has acted as local counsel for the Tribe in Phase II. Mr. Raas claims a total of 188.5 hours of time expended in Phase II, principally in responding to discovery requests and in preparing memoranda and applications for attorneys' fees. While the Court is unable to distinguish hours spent on the issue of environmental degradation in the time sheets presented by Mr. Raas, it appears that at least some of his discovery efforts may have been related to this issue. It is clear to the Court that unlike other applicants for fees, Mr. Raas has not carefully distinguished hours expended in Phase I from the services he rendered in Phase II, particularly with respect to his work on attorneys' fees. Instead of crediting hours spent in research to the specific phase in which he was working at the time, Mr. Raas has simply divided his work on attorneys' fees between Phase I and Phase II. While some of this research was doubtless beneficial to Phase II, the Court cannot award fees on the basis of so inexact a measurement of hours expended. Moreover, the hours expended by Mr. Raas in preparing his memorandum on attorneys' fees appear to duplicate the efforts of the Ziontz attorneys, who took the lead in preparing these applications. At best, the division of tasks with respect to legal research on attorneys' fees was inefficient. For this reason, the Court will not award fees to Mr. Raas for work spent relating to attorneys' fees other than the hours expended in justifying his own fee. Consequently, 56 hours will not be compensated.

In setting an appropriate rate for Mr. Raas' services, the Court notes that he has practiced in the area of Indian rights since 1973, and has served as the Lummi Reservation Attorney for the past four years. While this experience undoubtedly assisted Mr. Raas in efficiently preparing the discovery regarding his tribal client, the nature of his services did not demand as sophisticated a background in Indian treaty rights and environmental law as did the work of lead counsel for the tribes. These services did not preclude other work by Mr. Raas, and he appears to have received unspecified amounts of compensation for his work, thereby lessening the degree of risk involved in undertaking this litigation. In light of these considerations, the Court finds that $75 per hours is an appropriate rate of compensation for Mr. Raas's services.

### E. Peter Wilke.

Mr. Peter Wilke served as counsel for the Swinomish Indian Tribal Community in this litigation, and seeks compensation for a total of 145 hours of services to the Tribe in Phase II. The majority of these hours were expended in document review and advising the client as to the course of the litigation, or on discovery matters. Only a small amount (15 percent) of the hours claimed is said to have involved substantive strategizing or discussion of issues with lead counsel. Unlike other counsel, Mr. Wilke has not broken down his hours into daily segments but has provided only a monthly synopsis of vaguely described tasks. This presentation of time does not allow the Court to accurately assess Mr. Wilke's services for duplication or efficiency. Counsel bears the burden of establishing the reasonableness of his claims. See, e.g., Waters v. Heublein, Inc., 485 F.Supp. 110, 112–13 (N.D. Cal.1979). In this instance, the only possible method of dealing with the vagueness of Mr. Wilke's time sheets is to apply an across-the-board reduction of 20 percent of the hours claimed by Mr. Wilke. See Heigler v. Gatter, 463 F.Supp. 802, 803–04 (E.D. Pa.1978).

Mr. Wilke was admitted to practice in Washington in November 1977 and has represented this tribal client in several other matters in addition to this litigation. However, he does not appear to have the same level of expertise in Indian and environmental law as do lead counsel, and the tasks that he has described in his time records do not require such expertise. Nor did the relatively small number of hours claimed preclude any other representation. In light of these considerations, the Court finds that $65 per hour is an appropriate rate of compensation for Mr. Wilke's services.

### F. Joanne Eileen Foster.

Ms. Joanne Foster represented the Quinault Tribe from September 1978 to January 1981 in this litigation and seeks compensation for a total of 49.25 hours of work. The tasks performed by Ms. Foster principally involved preparation of discovery materials and review of pleadings and opinions entered in the case. The hours are conservatively reconstructed. Ms. Foster has worked with the Quinault Tribe since her graduation from law school in March 1977. Based on her experience and the nature of the tasks which she performed, the Court finds that $65 per hour is an appropriate rate of compensation for Ms. Foster's services.

### G. John Clinebell.

Mr. John Clinebell is a full-time staff attorney for the Puyallup Tribe and seeks compensation on behalf of the Tribe for 24 hours of work in preparing a memorandum on the issue of exclusion of Puyallup River steelhead from the order in Phase II. The applicant successfully opposed such exclusion. While much of the applicant's services in Phase II involved client counseling and review of documents filed by other counsel, he has only sought compensation for the more substantive work involved in contesting the Puyallup River steelhead issue. Mr. Clinebell has worked exclusively in the area of Indian law for the past six

years and has represented the Puyallup Tribe in a variety of federal court cases involving Indian rights. In view of his experience and the degree of expertise demanded by the tasks for which he seeks compensation, the Court finds that $75 per hour is an appropriate rate of compensation for Mr. Clinebell's services.

## IV

The applicants are entitled to an award of attorneys' fees as prevailing parties under the Act. The Court will not award fees at this time, however, for services rendered on issues which the intervening tribes cannot yet be said to have prevailed. This Memorandum Opinion has set forth findings regarding the reasonable rates of compensation for individual applicants, and has discussed the number of hours for which compensation should be awarded. Calculation of the exact amount of each award must await the delineation to the Court by the applicants of those hours expended in whole or in large part on the issues of whether the right to have treaty fish protected from environmental degradation has been violated and, if so, what relief, if any, is warranted.

To expeditiously complete this award of attorneys' fees,

IT IS ORDERED that applicants file with the Court on or before January 29, 1982, a complete list of those hours claimed in their original applications which were expended in whole or in large part on the issues of violations of the right to have treaty fish protected from environmental degradation and appropriate remedies for such violations.

### PHASE II ATTORNEY FEES MEMORANDUM OPINION AND ORDER

(September 16, 1982)

ORRICK, District Judge.

■ By Memorandum Opinion and Order filed December 18, 1981, this Court awarded attorneys' fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, to plaintiffs' attorneys from six different legal service organizations and law firms because the plaintiffs tribes had prevailed in a motion for partial summary judgment, establishing the right to have hatchery-bred fish included in their treaty-based allocation of salmon and steelhead trout, and to have such treaty fish protected from environmental degradation. The exact amount of the fees to be awarded was not calculated because a portion of the hours claimed by counsel had been spent in work on issues still pending before this Court, namely, whether the right to have treaty fish protected from environmental degradation has been violated and, if so, what relief, if any, is warranted. Thus, in order to determine the number of hours properly compensable, counsel for the plaintiff intervenors were instructed to file supplemental affidavits indicating the hours spent on the remaining issues, so that such time could be excluded from the current award of attorneys' fees for the partial summary judgment.

The requested affidavits having been filed and the memoranda in support and opposition having been duly considered, the Court need only determine whether the Tribes' counsel have sufficiently and accurately complied with this Court's order to document the hours to be excluded. The Court in the Memorandum Opinion adjusted the total hours claimed by each attorney where such hours appeared to duplicate other work or for some reason should not be compensated and, accordingly, the calculation of the amount of money payable to each attorney is mechanical because the Court has heretofore determined the number of otherwise compensable hours and the rate of compensation for each attorney.

In awarding attorneys' fees to each of the lawyers involved the Court has taken into consideration the twelve factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69 (9th Cir.1975), adopted by the Court of Appeals as the guidelines for determining reasonable attorneys' fees. In this Memorandum Opinion as well as in the prior Memorandum Opinion the Court has

noted the time and labor required, has eliminated any duplicative effort, and has emphasized the novelty and difficulty of the questions of law and fact developed by counsel together with the skill required to perform such services properly. Fees suggested by counsel are, if anything, on the low side considering the experience, reputation, and ability of the attorneys. The amount involved is relatively small, but the results obtained are clearly of great benefit to the Tribes.

I

The basis for determining the hours spent on issues yet to be decided is, as previously noted, the affidavits of tribal counsel. Defendants make note of the fact that the applicants have submitted five affidavits identifying only about 200 hours as excludable from an aggregate of more than 4,500 work hours claimed. Notwithstanding the general averment by defendants that the applicants have grossly underestimated the number of work hours which must be withheld from the present fee award, this Court finds that the plaintiff intervenors have met the burden of documentation imposed by Court. Defendants, on the other hand, have not challenged the calculations of tribal counsel with sufficient particularity to undermine the claims as supported by affidavits. *See North Slope Borough v. Andrus*, 515 F.Supp. 961, 965 n. 18 (D.D.C.1981).

In attacking the adequacy of tribal counsel's exclusions, defendant State divides the course of this phase of the case into two time periods. It concedes that all hours claimed for work done between July, 1978, and the present are specifically related to the issues already resolved and, thus, it does not oppose an award of attorneys' fees for any hours claimed for that period.

The State does, however, challenge the sufficiency of the exclusions for the time period preceding 1978 during which time the initial formulation of the case and the bulk of discovery were conducted. The State argues that whereas approximately

2,250 hours were expended in discovery, the fact that only 172 hours of that time have been identified for exclusion indicates that the defendants felt compelled to exclude only those work hours that were totally unrelated to the issues resolved. If this were true, of course, it would go against the Court's order, which required exclusion of hours expended "in whole or in large part" on the remaining issues.[29]

The fact that some, or even much of, the evidence relevant to the status of the environment may be relied upon in further litigating the question of the State's culpability for degradation of the fish habitat does not, in and of itself, indicate that discovery of such evidence was addressed "wholly or in large part" to the issue of culpability. There is substantial overlap in the evidence that, while relevant to the issue of culpability, was also pertinent to the resolution of the issues already decided.

Specifically, evidence of the status of the environment was necessary in order for the Tribes to establish that there was a justiciable case or controversy at stake here. Also, a central issue raised and resolved in this phase of the litigation involved the right of the Tribes to an allocation of hatchery-bred fish. Evidence of the status of the environment was directly relevant to the question of whether the State hatchery program was designed to mitigate habitat degradation.

Furthermore, as a defense to the Tribes' claim of a right to have the habitat protected from degradation, the State argued that no environmental right should be declared because of the adequacy of state law remedies. Plaintiffs point out that much discovery, though focused generally on evidence of the status of the environment, was aimed at rebutting this contention of the State rather than at establishing the State's culpability for habitat degradation.

Thus, the mere fact that the copious discovery conducted in this phase of the litigation may have produced evidence relevant to the remaining issues does not undermine

29. *Supra* at 1454.

the fact that in order to reach the issue of culpability, it was first necessary to lay a foundation by declaring that a right to protection from habitat degradation was vested in the Tribes. This is precisely the issue resolved in the portion for which payment of attorneys' fees is sought. Therefore, the general suspicion raised by the State that substantial portions of discovery were directed toward the culpability issue is not persuasive.

For the reasons stated above, the Court finds that defendant State has not met its burden of challenging the calculations of tribal counsel with particularity, nor has it given this Court reason to generally suspect that tribal counsel have underestimated the number of hours properly excludable. Accordingly, the Court is entitled to and does rely on the affidavits of tribal counsel in establishing the number of hours to be excluded as representing work expended wholly or in large part on issues not yet resolved in this litigation.

## II

The Court now turns to the task of calculating the fees awarded to the individual applicants for work expended on the issues heretofore resolved in Phase II of this case. As noted above, the determination of the total number of otherwise compensable hours and the rate of compensation for each attorney was established by the previous Memorandum Opinion and Order. Also established therein were the number of hours claimed by each applicant for travel which is to be compensated at a lesser rate. Those figures are adopted here and, after the proper exclusions where appropriate, are used to compute the final award in each instance.

### A. *Evergreen Legal Services*

Four staff attorneys employed by Evergreen Legal Services during the course of

the Phase II proceedings have filed applications for fees with this Court.

Mr. Alan Stay has recorded a total of 2,246.68 hours spent on this litigation. Seventy-nine of those hours were travel time to be compensated at the rate of $40 per hour. Mr. Stay was constrained to estimate the number of excludable hours because to do otherwise and reread every interrogatory, deposition, and request for admission with a view toward discerning its relevance to the severable issues would expend more hours than might reasonably be saved by exclusion. Mr. Stay's method of estimation was reasonable, however, and resolved doubtful questions in favor of exclusion.[30] Furthermore, his estimations regarding which portions of each separate category of discovery were devoted in large part to the culpability issue were reviewed by Michael Thorp, the staff attorney for the Justice Department who participated in these discovery matters, who agreed with the approximations of Mr. Stay.[31] Therefore, Mr. Stay's excludable time is a total of 125.4 hours, as certified by his affidavit.[32]

Mr. Stay has a total of 2,042.28 hours compensable at the rate of $105 per hour, and a total of 79 hours compensable at the rate of $40 per hour. Mr. Stay is awarded attorney's fees of $217,599.40.

Mr. Phillip Katzen has recorded a total of 256 hours of which 4 are identified as travel time. In his affidavit he identified 15.75 hours as excludable.[33] Therefore, Mr. Katzen has a total of 236.25 hours compensable at $70 per hour and 4 hours compensable at $40 per hour. Mr. Katzen is awarded attorney's fees of $16,697.50.

Mr. Thomas Schlosser seeks compensation for a total of 285 hours of work expended while employed by Evergreen Legal Services. He has filed an affidavit iden-

---

30. Affidavit of Michael R. Thorp dated May 12, 1982.

31. Affidavit of Alan C. Stay re attorneys' fees dated February 12, 1982.

32. *Id.*

33. Supplemental affidavit of Phillip E. Katzen dated February 11, 1982.

tifying 8.7 hours as properly excludable.[34] He has a total of 276.3 hours compensable at the rate of $75 per hour. Mr. Schlosser is awarded attorney's fees of $20,722.50.

Ms. Cynthia Davenport expended a total of 65 hours chiefly in preparing discovery responses for two of the Tribes at $65 per hour and has no excludable hours. Ms. Davenport is awarded attorney's fees of $4,225.

### B. *Ziontz, Pirtle, Morisset, Ernstoff & Chestnut*

Mr. Steven Anderson, who worked closely with Mr. Stay in coordinating the efforts of all tribal counsel, expended a total of 1,044 hours in this phase of the litigation. His work was more involved with the summary judgment proceedings than with the discovery stage. By affidavit, he identifies a total of 50.10 hours from his daily-kept records as excludable.[35] He thus records a total of 993.9 hours compensable at the rate of $95 per hour. Mr. Anderson is awarded attorney's fees of $94,420.50.

Messrs. Mason Morisset and Alvin Ziontz jointly claimed 229 hours, of which 24 hours were identified as travel time. They do not certify any excludable time; their involvement was in the very early stages of this phase and entailed organizing the fundamental strategy of litigating the general claim for habitat protection rights. They will be compensated for 205 hours at $95 per hour and 24 hours of travel at $40 per hour. Messrs. Morisset and Ziontz are awarded attorneys' fees of $20,435.

Mr. Thomas Schlosser also expended time on this case while employed by the Ziontz firm after transferring from Evergreen Legal Services. His total of 40 hours was not expended on excludable issues and will be compensated at $75 per hour. Mr. Schlosser is awarded attorney's fees of $3,000 while employed by the Ziontz firm.

Upon receipt of the awards granted here, the Ziontz firm shall refund any sums received from their tribal clients for which the present award constitutes recovery.

### C. *Native American Rights Fund*

Four attorneys who represent the Native American Rights Fund have applied for a fee award. By affidavit of Mr. Robert Pelcyger, none of the 373 hours claimed is proper for exclusion.[36]

Messrs. Bruce Green and David Getches claimed a total of 274 hours, of which 24 hours were identified as travel time. They will be compensated for 250 hours at $90 per hour and 24 hours at $40 per hour. Messrs. Green and Getches are awarded attorneys' fees of $23,460.

Mr. Robert Pelcyger claimed 31 hours and will be compensated at the rate of $80 per hour. He is awarded attorney's fees of $2,480.

Mr. Steven Rios claimed 68 hours; 16 hours are deducted as having been spent in traveling to and attending a meeting at which his presence was not necessary. He will be compensated for 52 hours at $55 per hour. He is awarded attorney's fees of $2,860.

### D. *Daniel Raas*

Mr. Daniel Raas, a Reservation Attorney for the Lummi Tribe, expended a total of 188.5 hours principally responding to discovery requests, and applying for attorney's fees. From this total, 56 hours are deducted because of the inexact record of hours expended. He has not filed an affidavit acknowledging or denying that any portion was spent on the unresolved issues. Because it appears that at least some of his discovery hours may have been related to these issues, the Court will deduct an additional 10 percent or 18 hours. *Cf. Heigler v. Gatter*, 463 F.Supp. 802, 803–04 (E.D.Pa. 1978). He will be compensated for 114.5 hours at a rate of $75 per hour. Mr. Raas is awarded attorney's fees of $8,587.50.

---

**34.** Supplemental affidavit of Thomas P. Schlosser dated February 12, 1982.

**35.** Affidavit of Steven S. Anderson dated February 12, 1982.

**36.** Affidavit of Robert S. Pelcyger dated January 29, 1982.

### E. *Peter Wilke*

Mr. Peter Wilke claimed a total of 145 hours of service for the Swinomish Indian Tribal Community; an across-the-board deduction of 20 percent or 29 hours was made because of his failure to establish the reasonableness of his claim. Although Mr. Wilke has not filed an affidavit regarding excludable time, his hours were primarily expended on document review and advising his client in the later part of this phase, and do not appear to have involved the issue of culpability. He will be compensated for 116 hours at the rate of $65 per hour, and is awarded attorney's fees of $7,540.

### F. *Joanne Eileen Foster*

Ms. Joanne Foster represented the Quinault Tribe from September, 1978, to January, 1981. Because this period falls within the portion of this phase for which a fee recovery is not challenged by the State, it is reasonable to assume that her failure to file an affidavit identifying or denying excludable hours is indicative that the portion of her work expended on discovery matters did not involve the unresolved issues. She will be compensated for 49.75 hours at the rate of $65 per hour, and is awarded attorney's fees of $3,233.75.

### G. *John Clinebell*

Mr. John Clinebell, staff attorney for the Puyallup Tribe, claimed 23.75 hours for work involving the issue of exclusion of Puyallup steelhead from the order in Phase II. His affidavit certifies that none of these hours were expended on the issue of violation of environmental rights.[37] He will be compensated for 23.75 hours at the rate of $75 per hour, and is awarded attorney's fees of $1,781.25.

On the basis of the reasoning and calculations set forth above,

IT IS ORDERED that counsel for the plaintiff intervenor tribes shall have and recover reasonable attorneys' fees for prevailing in the heretofore resolved portion of Phase II of this ongoing litigation in the amounts set forth above.

**37.** Supplemental memorandum of John Clinebell dated January 27, 1982.

### RULING RE: PUGET SOUND CHINOOK

(February 3, 1982)

CRAIG, District Judge.

(This matter was referred to Magistrate John L. Weinberg, who filed a Report and Recommendation dated December 21, 1981. After hearing objections to the Report and supplemental testimony, the court issued an oral ruling approving the following Magistrate's Report and Recommendations with two exceptions. The first is that it would not be appropriate to close the Strait of Juan de Fuca, or any area of Puget Sound, to non-Indian sport fishing at this time. Second, the parties are to develop and submit to the court within 30 days a plan that will pay back to the tribes their 1980 and 1981 shortfalls in summer/fall chinook and reach full sharing throughout Puget Sound by 1984, rather than by 1982 as the Magistrate recommended.)

### MAGISTRATE'S REPORT AND RECOMMENDATION ON PUGET SOUND CHINOOK

(December 21, 1981)

JOHN L. WEINBERG, United States Magistrate.

### I. INTRODUCTION

This motion involves two disputes concerning fishing for Puget Sound chinook salmon.

The first portion of the motion relates to the "summer/fall" chinook runs in Puget Sound. The tribes entitled to harvest these fish seek court assistance in securing the 50% share guaranteed them by treaty.

The second portion of the motion relates to the "spring" chinook runs. These have become depleted to a level below escapement. There are therefore no spring chinook harvestable by treaty or non-treaty fishermen, and at least some of the spring runs are in danger of permanent extinction.

Yet a substantial portion of the returning spring chinook are harvested as "incidental catch" in the Puget Sound sport fishery, which consists predominantly of non-treaty fishermen. The tribes ask the court to require the State to regulate the sport fishery in a manner which will conserve the spring chinook runs.

## II. SUMMER/FALL CHINOOK

### 1. *Factual and Procedural Background*

The tribes which brought this motion are entitled, by treaty, to an opportunity to take 50% of Puget Sound summer/fall chinook salmon from each region of origin. Many Puget Sound chinook originate in hatcheries operated by the State of Washington ("State"). The "resident chinook program" conducted at State expense at its hatcheries has apparently had a significant effect in enhancing chinook harvests. But the tribes' 50% right applies to hatchery-bred salmon, as well as to wild salmon.

In August of 1980, the State improved its method of calculating the treaty and non-treaty harvests of Puget Sound chinook.[38] It immediately became apparent that the tribes were taking substantially less than their 50% share. The principal reasons for this imbalance is the large and growing catch by the Puget Sound sport fishery. Consisting predominantly of non-treaty fishermen, the sport fishery in Puget Sound is generally "open" 365 days per year, with few if any limitations upon who can participate. The catch by this sport fishery is so large that substantially less than 50% of the harvestable chinook are available to the treaty tribes.

The tribes have therefore urged the State and its fisheries officials to impose closures of the sport fishery and adopt other regulatory measures to assure the tribes their 50% share. The State has forthrightly acknowledged, throughout the dispute, that the tribes' claim is valid and

that the balance must be redressed. The problem has been to determine how quickly this must be achieved, and therefore what control measures are appropriate.

The tribes and the State spent many months attempting to negotiate agreement upon a "plan" to resolve the problem. When no agreement was reached, the tribes brought this motion, asking the court to order the State to take the necessary actions. A negotiated solution developed by parties, who have extensive expertise on these issues, would be far preferable to a solution imposed by the court. Therefore this court directed the parties to negotiate further, and even participated to some extent in those settlement discussions. While the parties came close to an agreement, the State and all of the tribes could not resolve all issues; and were unwilling to settle some issues without settling all. Consequently, the court is now obliged to rule on the merits.

### 2. *Positions of Parties*

As previously noted, the issue here is not whether the treaty tribes are entitled to a 50% share. Nor is there any question, at this late date, that the State must regulate the fishery in a manner which will assure the tribes that share. The basic question is how quickly that must be achieved.

The tribes assert they are entitled to their 50% share beginning with the 1982 runs. They have been denied their treaty share at least since August of 1980, they argue, and there is no valid reason to extend that deficit into future years.

It seems to be agreed that the State could achieve a 50/50 allocation in 1982 only by closing the Puget Sound sport fishery for a substantial portion of the year. Other regulatory techniques are available, and a few have been implemented or formally proposed (e.g. reduced bag limit, barbless hooks, one rod per fisherman, and a size limit). But even in combination, these measures cannot realistically be ex-

---

**38.** The change consisted, *inter alia,* of new methods of calculating prior interceptions and the "adult equivalency factor." See affidavits of

Richard H. Lincoln, docket # 7853, and first affidavit of Paul T. Sekulich, docket # 7854.

pected to correct the deficit unless the State also imposes substantial closures.

The State acknowledges that this court is obliged to fashion some form of order, directing the State to take corrective action over a period of time to be determined by the court. Instead of an immediate full correction, however, the State proposes[39] a "phased in" plan which would eliminate 35% of the deficit by December 31, 1982; 70% of the deficit by December 31 1984; and 100% of the deficit by December 31, 1985. Between 1985 and 1991, under the State's proposal, the share of the tribes *may*, "under appropriate circumstances," exceed 50%, to compensate for the earlier deficits incurred ("equitable adjustment").

Finally, the State offers to program hatchery operations to increase future harvests of summer/fall chinook, but does not specify target dates or harvest levels.

### 3. *Analysis*

The court must start with the presumption that the tribes are entitled to enforcement of their treaty rights without further delay. This court, in this case, found over seven years ago that the tribes were entitled to a 50% share of each run. That holding has been consistently affirmed in every appellate challenge. It has been more than a year since it became clear that these tribes were being denied their treaty share; yet the deficit is greater now than it was in 1980.[40] The State suggests, however, that the tribes should wait over four more years before they are granted the fishing rights guaranteed them by treaty. The court should sanction such a delay—or any further delay—only upon a very strong showing of good cause.

First, the State points out that Judge Boldt did not require immediate 50/50 allocations at the time of his original decision in 1974, and that roughly equal catch of Puget Sound stocks did not occur until 1977. Even if this argument was persuasive in 1974, it has no effect today,

seven years later. The treaty rights of the tribes have been affirmed on appeal and have long been known to all.

The State also argues that it would be equitable to delay the full 50% share of summer/fall chinook for these tribes because they were projected to take 51% of the total Puget Sound catch of all types of salmon. But as the State itself points out, the tribes are entitled to 50% summer/fall chinooks from each region of origin. If they are taking more than their share of some other type of salmon, there no doubt is a remedy for the fishermen not receiving their share. But it would not be appropriate to respond by denying the tribes their share of summer/fall chinook, or to delay that share.

Although not stated in so many words, the essence of the State's resistance to 50% allocation in 1982 seems to be its concern that there will be strong negative public reaction to substantial Puget Sound closures. In effect, the State argues that, if the tribes will wait a few more years for their treaty rights, the State can take measures which will make the re-allocation more palatable to non-treaty fishermen.

But there are two fundamental problems with this argument. First, there is nothing in the record to support the State's hope that the non-treaty fishermen will accept the re-allocation more readily in 1985 than they would today. Paul T. Sekulich, Assistant Chief of the Harvest Management Division in the Washington Department of Fisheries Salmon Program, testified that if a phased-in plan were adopted, the closures required in 1985 could be the same as those required to achieve 50/50 allocation in 1982, if certain of their assumptions were correct and if production didn't help in the meantime.

Even more fundamentally, however, opposition by non-treaty fishermen to the full exercise of treaty fishing rights should neither prevent nor delay action by the

---

**39.** Letter of Rolland A. Schmitten, Director, Washington Department of Fisheries, September 22, 1981, attached to affidavit of Deputy Director William R. Wilkerson, docket #7851.

**40.** (First) Affidavit of Michael M. Grayum, p. 3, docket #7793.

court—or by the State—to protect those rights.

Perhaps the concern voiced most strongly by the State is that a 50/50 allocation in 1982, and the closures it would require, would jeopardize the State's "resident chinook program." Deputy Director Wilkerson testified that legislators ask him, "Why produce them if we can't catch them?"

Again, there is little in the record beyond speculation that closures would have this dire consequence. It is equally logical to assume that non-treaty fishermen, who are being cut back to 50% of the total harvest, would be very anxious to have that total harvest enhanced as much and as soon as possible. The court can hardly deny or delay treaty fishing rights on the basis of speculation that the State Legislature will take inappropriate or retaliatory action.

The tribes are also entitled to "equitable adjustment" to compensate them for denial of their treaty share since August 8, 1980. Although the tribes suggest an earlier date, there is no adequate showing that the tribes were denied their proper share prior to August 8, 1980.

In summary, the State has shown no persuasive reason for further delay of full implementation of the tribes' treaty right to 50% of the summer/fall chinook. The court should order the State to formulate a plan to accomplish this objective, as well as equitable adjustment, and to file and serve that proposed plan within 20 days after the entry of the order. The tribes should then respond to the proposal within 10 days; and the court can then take appropriate action. If at any point the State and the tribes reach agreement on a plan they may, of course, submit it jointly to the court.

### III. *Spring Chinook*

The parties agree that, if the court orders 50/50 allocation of summer/fall chinook in 1982, the required closures will, as a side effect, afford all necessary protection for spring chinook. Because I have recommended that relief, I will not address in detail the issues relating to special closures to protect spring chinook. A few of those issues should be noted in passing, however.

The evidence indicates that the Puget Sound sport fishery takes about ⅓ of the total Puget Sound spring chinook run. By contrast, however, spring chinooks represent only 2–3% of all chinook taken by the sport fishery.[41] The tribes say that closures of the sport fishery would be appropriate, because of the significant impact on the depressed stock, the spring chinooks. The State responds, however, that such closure would contravene principles of sound fisheries management, because the sport fishery is not "targeted" or "directed" toward spring chinook. The court's Fisheries Technical Advisor tends to support the latter view.

While the court need not resolve the dispute at this time, it raises again an issue which has caused problems on past occasions in this case. In November of 1978 and again in December of 1980, the court ordered the parties to develop "standards and guidelines governing fisheries in mixed stock areas where there may be some impact on fish from runs which are not the target of the fishery" (Order of November 3, 1978). In March of 1981, the court authorized the parties to defer action in developing those guidelines. The court's Fisheries Technical Advisor now suggests, and the parties concur, that these efforts should be resumed. I have therefore forwarded to the court and parties a proposed order to that effect.

A theme running throughout the briefing and testimony on the spring chinook issue is that the available data is not adequate to assess the status of spring chinook runs and to identify the most effective measures for their improvement. While improved data perhaps is not needed for this motion, the parties and perhaps the court will eventually need it; and the time to begin devel-

**41.** "Joint Technical Report," November 6, 1981, attached to (third) affidavit of Paul T. Sekulich, docket # 7920.

oping it is now. Accordingly, I have forwarded to the court and parties a third proposed order, directing them to attempt through the Fisheries Advisory Board to identify what additional data is needed with regard to spring chinook, to formulate a plan for developing that data, and to report to the court within 90 days after entry of the order.[42]

## ORDER APPROVING PLAN FOR PUGET SOUND

## CHINOOK SALMON

(April 12, 1982)

CRAIG, District Judge.

The court has considered the attached plan as submitted by the parties pursuant to the court's February 3, 1982 ruling (*supra* at p. 1458). The court adopts and approves the plan for immediate implementation.

## PLAN FOR PUGET SOUND CHINOOK SALMON

### I. PURPOSE

■ The purpose of this plan is to achieve court ordered allocation of the harvest of Puget Sound origin summer/fall chinook salmon and to protect Puget Sound spring chinook stocks.

### II. REDUCTION AND ELIMINATION OF ALLOCATION DISCREPANCY

A. The Washington Department of Fisheries shall undertake the steps as detailed in this plan or otherwise necessary to reduce and eliminate the chinook harvest imbalance, as measured by catch percentages for the 1981 runs, in each Puget Sound region of origin as follows:

1. By December 31, 1982, the discrepancy shall be reduced by at least 35%.
2. By December 31, 1983, the discrepancy shall be reduced by at least 70%.
3. By December 31, 1984, the discrepancy shall be totally eliminated. That

is, the opportunity to take the full treaty share of harvestable chinook shall be afforded for the 1984 season.

B. The Washington Department of Fisheries shall enact as part of its annual regulations for 1982 the following restrictions on non-treaty sports salmon fisheries in Puget Sound salmon punch card areas 5–13:

1. A three-fish daily bag limit, no more than two of which shall be chinook.
2. All chinook smaller than the following lengths must be immediately released:
 a. October 16—June 30: 22 inches
 b. July 1—October 15: 26 inches
3. Barbless hooks shall be required in the sport fishery.
4. Sport fishermen shall be limited to one rod/line per person.

C. The Washington Department of Fisheries shall implement no later than January 31, 1983, such restrictions as will be necessary to achieve the goal set for December 31, 1983, described in Section II(A)(2), above.

D. The Washington Department of Fisheries shall implement such restrictions no later than January 31, 1984, as will be necessary to eliminate the allocation discrepancy. Although it is impossible to determine with precision the exact impact of earlier restrictions and the extent of additional restrictions necessary thereafter, the parties anticipate that it may be required to enact additional daily bag limit restrictions on the salmon sport fishery, additional minimum size limits (seasonal), annual bag limits, maximum size limits, and possibly time and area closures of salmon sport fishing in Puget Sound.

E. Each year the parties shall meet and seek agreement on measures needed to alleviate existing or anticipated shortfalls in satisfying the terms of this plan.

### III. EQUITABLE ADJUSTMENT

The Tribes shall be provided full equitable adjustment in chinook salmon for

---

**42.** Order entered January 11, 1982, docket # 8034.

the discrepancy between their harvest and their opportunity to take a full share of the resource beginning August 8, 1980, through 1983, for each region of origin. Only fish in adult equivalents harvested by tribes shall be considered in determining equitable adjustment, pursuant to prior orders of the court. That equitable adjustment shall be accomplished in the following ways:

A. Any failure to reach the interim goals for reducing the allocation discrepancy in the years 1982 and 1983 as provided in this plan shall be compensated by equitable adjustment in the following incremental period. For example, as measured in adult equivalents, if the non-treaty harvest in 1982 for South Puget Sound chinook exceeds the interim goal by 1,000 fish, then 1,000 chinook shall be added to the treaty allocation for that region for 1983.

B. The allocation discrepancies incurred in 1980 and 1981 described above, and the discrepancies between either the interim goals for 1982–1983, or the actual catch, whichever is greater, and the opportunity to take the full treaty share for those years, shall be compensated as follows:

1. During the years 1982–1984, equitable adjustment shall be made only from unanticipated surpluses occurring in terminal areas, and any unique Indian fisheries which may be agreed to by the parties; that is, there shall be no additional restrictions on the sport fishery for the purpose of achieving equitable adjustment, other than those necessary to reach the interim goals and to afford the full treaty share thereafter. The tribes intend to take advantage of surpluses occurring in terminal areas, including special fisheries to accomplish this adjustment, subject to agreement between the parties.

2. If these measures have not eliminated the discrepancy for each region of origin by the end of 1984, then the equitable adjustment to eliminate the remaining discrepancies shall be accomplished by 1987.

3. If the non-treaty harvest for any region of origin for any year exceeds its share before the 1980–1984 discrepancy is made up, then equitable adjustment to eliminate that year's excess shall be accomplished in the first succeeding year. Once the 1980–1984 imbalance is made up in each region of origin, then all imbalances will be calculated and made up according to orders of the court, including Section 7.2 of the Salmon Management Plan, 459 F.Supp. at 1111.

## IV. PRODUCTION LEVELS–SUMMER/FALL CHINOOK

The Washington Department of Fisheries intends to maintain its chinook delayed-release hatchery program at least at current levels subject to budget constraints.

## V. PROTECTION OF SPRING CHINOOK RUNS

Protection of depressed Puget Sound spring chinook runs will be accomplished through a combination of closure of terminal area fisheries which target on spring chinook and maximum size limits for certain mixed-stock fishing areas. This shall include:

1. Closure of river sport fisheries targeted on spring chinook.

2. Closure of net fisheries which target upon spring chinook.

3. Maximum size limits for WDF Puget Sound Salmon Punch Card Areas 5, 6, and 7: 30-inch maximum size limit on Chinook Salmon April 15 through June 15, unless otherwise agreed by the parties.

4. The following areas will be closed to salmon angling:

a. April 15—June 15 [43]: Skagit Bay—Those waters lying easterly of a line projected from West Point on Whidbey

---

**43.** Closure may be extended to June 30.

Island to Reservation Head on Fidalgo Island, northerly of a line projected from Polnell Point to Rocky Point, northerly of the State Highway 532 Bridge between Camano Island and the mainland, and south of the Burlington Northern Railroad Bridge at the north end of Swinomish Slough. With respect to the boundary between Rocky Point and Polnell Point, the parties agree that special enforcement efforts will be required to ensure that fishing does not occur in the closure area. WDF agrees to mobilize existing and additional effort in Area 8 during the closure period to enforce the marine closure area to adequately protect spring chinook returning to the Skagit system. A weekly report on enforcement activity with respect to this effort shall be submitted to the tribes. WDF staff, in cooperation with appropriate tribal staff, will examine historical sampling sport fishing/catch/effort data from Saratoga Passage to evaluate the impact of that fishery upon adult spring chinook. Additionally, to the extent practicable, WDF sport sampling program will gather data on that fishery in 1982 to fill any information gaps and extend our understanding of the fishery.

b. April 15—June 30: Port Susan—Those waters north of a true east-west line passing through Tulare Point located approximately 2.25 miles south of Kayak Point.

c. April 15—July 31: Carr Inlet—Those waters northerly of a line from Allen Point to the southernmost point of land on the eastern shore of Glen Cove.

d. April 15—June 15: Commencement Bay—Those waters south of a line extending from the foot of McCarver Street marked by a line from partially burned Top of Ocean restaurant to Brown's Point.

e. April 15—June 15: Bellingham Bay—Those waters of Portage Bay and Bellingham Bay north of a line from Point Francis to Post Point.

## VI. INFORMATION SHARING

The parties agree that in order to monitor effectively the success of state measures provided for in this plan, reliable, adequate data must be gathered and promptly analyzed. To accomplish this will require improvement in current sampling and evaluation techniques with respect to both recreational and commercial fisheries information. In regard to the computation of catch shares, the WDF will continue to improve the Washington Model or an agreed substitute model. In implementing this plan, the parties will work together closely and shall consult with each other and exchange information in a timely manner. The parties shall seek to reach agreement on data collection, input in computing catch shares, models, evaluation techniques, and other key elements. Accordingly, unless the parties otherwise agree, agreement shall be sought on technical matters as provided in the following schedule.

1. *Annually, prior to January 1:*

 (a) Seek to agree upon a sampling program for the sport fisheries which will permit reliable estimates of sport catch and efforts, and the impact of state regulations.

 (b) Seek to agree upon procedures and methods to estimate sport catches twice monthly.

2. *Annually, prior to June 1:*

 (a) Seek to agree upon input data for calibration and regulation phases of the Washington Model or any agreed substitute model.

3. *Twice each year, once prior to July 1, and again at least one month prior to the state's hearing on proposed, annual salmon sport regulations:*

 (a) WDF shall provide to the tribes soft data on Puget Sound Chinook treaty/non-treaty (recreational and commercial) harvests, run sizes, and anticipated escapement.

 (b) The parties shall meet to seek to agree on measures needed to alleviate

shortfalls in satisfying the terms of this agreement.

4. *Prior to December 1 of each year:* (a) The parties shall evaluate the data regarding spring chinook enhancement, escapement, distribution and life history.

## VII. ANNUAL REVIEW

This plan shall be reviewed by the parties in January of each year to evaluate the success of this plan in achieving protection for spring chinook, allocation of summer/fall chinook and all other aspects of the plan. WDF shall file with the court and its technical advisor and the tribes a progress report covering enhancement, enforcement, and interagency cooperation as related to this plan. The parties shall agree on modification of this plan where shown to be necessary or appropriate in order to achieve its purposes.

## VIII. MIXED–STOCK FISHING RULES

Once guidelines are developed and approved by the court for mixed-stock fisheries, such fisheries, including fisheries affected by this plan, will be managed consistent with those guidelines.

## IX. RESOLUTION OF DISPUTES

The parties shall continue their best efforts to negotiate and resolve any areas of disagreement throughout the life of this plan and thereafter. Any dispute which cannot be resolved by the parties shall be resolved by the Fisheries Advisory Board subject to review by the court.

## X. ENFORCEMENT

The parties to this plan fully recognize the importance of effective enforcement of its provisions. To that end, WDF shall develop an annual plan to enforce regulatory measures adopted consistent with this plan. WDF shall work with the tribes and federal agencies to utilize available resources to protect spring chinook and make reasonable progress toward elimination of allocation imbalances, including joint patrols as appropriate, to implement the provisions of this agreement, and it will periodically report its progress with respect to those efforts. WDF will consider enforcement of the provisions of this plan as a top priority among its enforcement activities.

## XI. ALLOCATION

This plan addresses the court ordered 50% sharing of the harvest of Puget Sound origin chinook salmon, but it is recognized that the share is subject to modification by the court. In the event such change is made during the period of this plan, future shares will be calculated as directed by the court and adjustments, if any, accomplished as set forth above.

## ORDER RE: QUILLAYUTE RIVER STEELHEAD

(April 21, 1982)

CRAIG, District Judge.

(The Washington Department of Game filed a motion for a temporary restraining order and preliminary injunction against the Quileute Indian Tribe regarding its steelhead fishery. The court denied the Department's motion and directed the parties as follows.)

■ The parties are directed to reach agreement on all matters required for management of their respective steelhead fisheries, including such matters as escapement goals, run sizes, and in-season update methodologies, by no later than December 1, 1982. The agreements of the parties on such matters must be sufficiently flexible to accommodate changes in the fishing seasons according to information gained during the season on matters such as run size.

In the future, there shall be no steelhead fishing on the Quillayute River System by anyone until the parties have reached agreement on the matters referred to in this Order. If the parties have not reached agreement by December 1, the matter shall be presented to the Fisheries Advisory Board for resolution, and, if necessary following such FAB proceedings, to the court.

## ORDER RE: SOUTH PUGET SOUND TREATY FISHERIES

### (November 5, 1982)

CRAIG, District Judge.

 This matter came on for hearing on motion of the Nisqually Indian Tribe for a temporary restraining order against the Puyallup Tribe's fisheries in the outer Chambers Creek fishing area, and for an order directing the affected tribes to enter into mediated negotiations for an agreement on the sharing of runs available to these tribes' fisheries. The Court heard this matter by telephone conference hearing on October 25, 1982, because the tribes involved did not appear able to resolve their differences without the intervention of this Court, and because each one of these tribes has treaty fishing rights that this Court has a responsibility to see implemented. This dispute does not involve the State of Washington, although the State participated in the hearing.

The Court has considered the positions and arguments of the parties and the views of the Court's Technical Advisor, and being fully advised, the Court ORDERS:

1. That the Nisqually Tribe's motion for a temporary restraining order against the Puyallup Tribe to prevent further fishing in the area known as "Outer Chambers Creek" is hereby granted. The temporary restraining order shall remain in effect until midnight, November 4, 1982, unless otherwise ordered by the Court.

2. The Nisqually Tribe and the Puyallup Tribe are hereby directed to confer and to negotiate to resolve their differences regarding the treaty sharing of the south Puget Sound salmon runs. The Squaxin Island Tribe also may, and is encouraged to, participate fully in these negotiations if that Tribe so chooses.

3. Dr. Clark is directed to sit as an observer in the negotiations between these tribes insofar as technical issues are involved in the dispute, and to assist the tribes in reaching agreement on purely technical (numbers) matters.

4. The party tribes are further directed to keep the State advised insofar as technical matters or management issues are discussed that could affect non-treaty fisheries managed by the State, and to closely coordinate their efforts with the State consistent with the other orders of this Court in *United States v. Washington*, No. 9213.

5. The Court requests that Mr. Dysart, on behalf of the United States, sit in the negotiations between the tribes as directed by this Order, as appropriate. The Tribes are directed to give Mr. Dysart notice of any meetings undertaken consistent with this Order at least one day in advance of the meeting, and as far in advance as possible.

6. The tribes here involved shall take all appropriate steps to negotiate and conclude an agreement on the fair and equitable sharing and management of the runs bound for their fishing areas, while ensuring that their actions are fully considerate of *each* tribe's fishing rights.

7. The Clerk shall direct copies of this order to all parties in the case.

## ORDER RE: MAKAH TRIBE'S OCEAN FISHING GROUNDS

### (December 9, 1982) [44]

CRAIG, District Judge.

The court referred this matter to the Honorable Robert E. Cooper, United States Magistrate (retired) as a Special Master pursuant to F.R.Civ.P. 53(b). The court has reviewed the proceedings before the Special Master and considered the Special Master's recommended Order, the United States' objections, and the responses to the objections. The court now Orders the adoption · of the Special Master's recommended Order as modified and set forth below pursuant to F.R.Civ.P. 53(e)(2).

---

**44.** Affirmed 730 F.2d 1314 (9th Cir.1984).

SUPPLEMENTAL FINDINGS OF FACT

343. At treaty times, the Makah Indians engaged regularly and successfully in off-shore fisheries for halibut, salmon, cod, and other kinds of fish as well as for whales and seals. (Ex. MK–M–1, pp. 4, 6, 13–19). They used a variety of harpoons, spoons, and hooks to harvest offshore species. (*Id.* pp. 13, 17–21). They fished for salmon in the ocean by trolling. (*Id.*, p. 4). They were known to fish in waters 80 to 100 fathoms deep. (*Id.*, p. 21). George Gibbs reported in 1855 that the Makah were al-most exclusively maritime in their habits, and James Swan observed in the early 1860's that "the principal subsistence of the Makah is drawn from the ocean and is formed of nearly all of its products the most important of which are the whale and the halibut.... Next to the halibut are the salmon and codfish...." At treaty times, the offshore fisheries were the mainstay of the Makah subsistence and provided them with surpluses for trade to other Indians and to non-Indians. (*Id.*, pp. 4 to 6).

344. There does not appear to be any way to document the precise outer limits of the Makah offshore fishing grounds at treaty times. The only feasible way to describe Makah usual and accustomed fish-ing grounds for offshore fisheries is in terms of distance offshore that the Makah reportedly navigated their canoes. (*Id.*, pp. 14–21). Makah canoes were large, fast, and seaworthy, capable of traveling in the ocean conditions that obtained off of Cape Flattery and at least 30 to 40 miles off-shore. The Makah were skilled in manag-ing their canoes, were able to predict weather conditions, and were able to navi-gate at night and out of sight of land. (*Id.*, pp. 3–16). It is reported by a number of observers that they were often away for days at a time. (*Id.*, pp. 4 and 21). It is documented that the Makah regularly fished at known fishing banks some 30 to 40 miles offshore. Reports by mid-19th Century observers indicate that the Makah would start at midnight for the fishing grounds 15 or 20 miles due west of Cape Flattery where they would remain until the afternoon of the following day. (*Id.*, pp. 5,

8, and 10). Some later 19th Century re-ports tell of trips from 50 to 100 miles at sea. (*Id.*, p. 13). Specific fishing banks utilized by the Makah at treaty times are noted by various sources. These included various banks off Ozette and off Cape Flat-tery. (*Id.*, pp. 5 and 14–16). The most productive halibut banks were those lying northwest of Tatoosh Island. (*Id.*, p. 15).

345. The Special Master determined that the Makah customarily fished at dis-tances of from forty to one hundred miles offshore. Although the Makah traveled distances greater than forty miles from shore for purposes of whaling and sealing, the Court finds that it is clearly erroneous to conclude that the Tribe customarily trav-eled such distances to fish.

346. On the basis of all evidence sub-mitted and reasonable inferences drawn therefrom, the Court finds that at the time of the treaty of Neah Bay, 12 Stat. 939, the Makah Tribe's usual and accustomed off-shore fishing grounds included, in addition to those areas previously determined by this Court:

> Waters of the Pacific Ocean west of the coasts of Vancouver Island and what is now the State of Washington bounded on the west by longitude 125° 44′ W. and on the south by a line drawn westerly from the Norwegian Memorial along latitude 48° 2′ 15″ N., including but not limited to the waters of 40 Mile Bank, Swiftsure Sound, and the waters above Juan de Fuca Canyon, to the extent that such waters are included in the area de-scribed.

The Court makes no Finding at this time as to whether other tribes were also fishing or entitled to fish in all or any portion of this area.

347. The foregoing Findings of Fact are made on the basis of current evidence and are not intended to infer that the areas not included in the Findings are not usual and accustomed fishing places of the Makah Indian Tribe.

## SUPPLEMENTAL CONCLUSIONS OF LAW

■ 89. The Treaty of Neah Bay, 12 Stat. 939, secures to the Makah Tribe non-exclusive fishing rights in those portions of the fishing grounds described in Finding of Fact No. 346 that are under the fisheries management jurisdiction of ‘the United States, including jurisdiction conferred upon the State of Washington.

90. This determination of additional usual and accustomed fishing places shall in no way limit the Makah Indian Tribe or any other party from seeking further determination of other usual and accustomed grounds and stations.

In considering this matter, all evidence submitted in the matter, including evidence and testimony admitted at the hearing of September 7, 1977, has been considered and is deemed part of the record herein.

## ORDER RE: HOOD CANAL AGREEMENT

### (March 8, 1983)

CRAIG, District Judge.

■ (The Skokomish Tribe filed a Request for Determination on June 17, 1981 of its claim that its pre-treaty occupancy and control over the Hood Canal drainage area gave it the primary right to control fishing by any other Indian tribe. The Skokomish Tribe asserted that this right was reserved and secured to them by the Stevens Treaties. Other tribes that had or claimed usual and accustomed fishing grounds in that area filed objections to the Skokomish Tribe's claim.

The issue was referred to a Special Master for hearing and recommendation. Prior to the evidentiary hearing, the Skokomish Tribe and several of the objecting tribes entered into a settlement agreement which fixed the relevant rights of the contracting tribes. This agreement was submitted to the special master and then to the court for

approval as a settlement of the conflicting claims.[45]

The court finds that the Hood Canal Agreement, the principal provisions of which are summarized and set out below, represents a fair and equitable resolution among the Skokomish Tribe and the named Klallam Bands of the matters identified therein. It is therefore ORDERED that the Hood Canal Agreement is approved and the terms are binding on the parties to the Agreement.

## HOOD CANAL AGREEMENT AMONG SKOKOMISH INDIAN TRIBE, PORT GAMBLE BAND OF KLALLAM INDIANS, LOWER ELWHA BAND OF KLALLAM INDIANS AND JAMESTOWN BAND OF KLALLAM INDIANS

As a basis for settlement, the Agreement recites that:

"Since time immemorial, members of the Skokomish Tribe and its aboriginal predecessors have relied for their livelihood on the Hood Canal fishery. Today the Skokomish Tribe continues to be entirely dependent on the Hood Canal fishery for its catch because it has no established usual and accustomed fishing places outside Hood Canal and the rivers and streams draining into it. Historically, substantial numbers of Clallam Indians have also fished in Hood Canal and in rivers and streams draining into it. Today the Klallam Bands, and particularly the Port Gamble Band of Klallam Indians, continue to have a strong interest in access to and protection of the Hood Canal fishery."

The stipulating parties agree on the following statements to support this Agreement:

A. On and before January 6, 1855, the date the Treaty of Point-No-Point was executed by its signatories, the Skokomish Tribe, through its aboriginal predecessors the Twana Indians, exer-

---

**45.** See p. 1486, *infra,* for the court's ruling on the remaining aspect of the Skokomish Tribe's request for determination. See p. 1478, *infra,*

for the agreement between the Skokomish and Tulalip Tribes.

cised legitimate territorial control over the Hood Canal fishery, including Hood Canal and all rivers and streams draining into it. This territorial control was the product of: (1) the proximity of Hood Canal and its drainage basin to the winter villages and summer camping and fishing grounds of the Twana people; (2) the high frequency of use of the Hood Canal and the rivers and streams draining into it by the Twana Indians; (3) a contemporary conception among the Coast Salish Indians (of whom the Stipulating Parties are constituent groups) that Hood Canal and the rivers and streams draining into it were legitimately in the possession of the Twana people and subject to use by others only upon invitation and permission given by the Twana; (4) behavior of the Stipulating Parties consistent with a mutual recognition that the Twanas controlled the Hood Canal fishery, including Hood Canal and all rivers and streams draining into it.

B. The Clallam Indians, the aboriginal predecessors of the Stipulating Klallam Bands, and the Twana Indians enjoyed a strong and cordial relationship at and before treaty time. This relationship was unique in degree to the two peoples and was founded in a common culture, mutual respect and admiration, and resulting marriage and ritual ties. The Clallam villages were situated at the mouths of rivers draining into the Strait of Juan de Fuca. Each year significant numbers of Clallam Indians would travel from their villages to sites on Hood Canal to fish with the Twana. Most, if not all, of these Clallam visitors were marriage relatives of Twana Indians. The Clallam who fished on Hood Canal did so with the understanding that the Hood Canal fishery was Twana territory. There is no evidence that the Twana people ever attempted to, or did, exclude Clallam fishermen from the Hood Canal fishery, or that any need to do so ever arose. Because of their shared culture and the perceived importance of favorable relations between the Clallam and Twana peoples, it is likely that the Twa-na people welcomed and affirmatively encouraged Clallam friends and marriage relatives to come to the Hood Canal area for fishing, as well as for socializing and ritual activities. The Clallam reciprocated by inviting Twana people to their villages as guests and relatives.

TERMS OF THE AGREEMENT

In consideration of the mutual promises contained in this Agreement, the stipulating parties hereby agree as follows:

1. A. The Skokomish Tribe has the primary right to fish in the Hood Canal fishery. As used in this agreement, the term "Hood Canal fishery" includes all waters of the Hood Canal south of a line drawn between Foulweather Bluff and Olele Point, and all rivers and streams draining into Hood Canal. The primary right of the Skokomish Tribe is an aboriginal right of that tribe confirmed and preserved by the Treaty of Point-No-Point (12 Stat. 933). (*See United States v. Lower Elwha Tribe,* 642 F.2d 1141 (9th Cir.1981), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981).)

B. Because of the close relationship that exists and has existed between the Skokomish Tribe and the Klallam Bands and Because they have traditionally fished together in Hood Canal sharing the fishery resources in a mutually acceptable manner, the stipulating parties further agree that north of Ayock Point on Hood Canal the Skokomish Tribe and the Klallam Bands may exercise their respective treaty fishing rights without any limitation or control whatsoever by any of the stipulating parties, except as the stipulating parties may mutually agree by compact or otherwise. The Skokomish Tribe specifically agrees that it will not, under any condition or for any reason whatsoever, exercise or seek to exercise its primary right on Hood Canal north of Ayock Point, or on the streams and rivers draining into Hood Canal north of Ayock Point, against any of the other stipulating parties without its or their express consent.

2. The parties agree that this court's previous determination of the Port Gamble and Lower Elwha Usual and Accustomed Fishing Places shall be revised to exclude the Skokomish River and all of its tributaries from Klallam usual and accustomed fishing areas.[46] The Klallam usual and accustomed fishing areas shall include all of Hood Canal and the streams draining into Hood Canal except the Skokomish River and all of its tributaries. Fishing in Hood Canal and the streams draining into Hood Canal shall be subject to the primary right of the Skokomish Tribe as set forth in this Agreement.

3. The parties recognize that the Jamestown Band does not yet have adjudicated usual and accustomed fishing areas and is currently fishing pursuant to an interim order. The parties agree that while fishing pursuant to any interim orders, the Jamestown Band's treaty fishing rights in Hood Canal and the streams draining into Hood Canal shall be as follows:

> The usual and accustomed fishing grounds of the Jamestown Band of Klallam Indians include Hood Canal and all streams draining into Hood Canal except the Skokomish River and all of its tributaries.

Nothing in this paragraph shall have the effect of waiving or qualifying any objection to the final determination of usual and accustomed fishing areas of the Jamestown Band by any of the other Stipulating Parties.[47]

### ORDER DENYING MAKAH INDIAN TRIBE'S MOTION TO DISMISS

(May 25, 1983) [48]

CRAIG, District Judge.

The Makah Indian Tribe moves to dismiss for lack of jurisdiction the Motion for Declaratory Judgment and for Preliminary and Permanent Injunctions and Other Relief filed on April 22, 1983 by the Quinault

Indian Nation and the Hoh and Quileute Indian Tribes. In their motion, the Quinault, Hoh, and Quileute Tribes allege that the Makah Indian Tribe's ocean fishery for coho salmon threatens to substantially interfere with the treaty right fishing for fall coho and chinook of the Queets Band, Hoh, Quileute, and Quinault Tribes. The court concludes that it has jurisdiction over the issues raised by the Quinault, Hoh, and Quileute Tribes' motion.

1. The Quinault, Hoh, and Quileute Tribes' motion is within the scope of this case. The motion properly invokes the continuing jurisdiction of this Court pursuant to paragraph 25 of the Court's Injunction of March 22, 1974. 384 F.Supp. at 413, 419.

2. The Makah Indian Tribe is a party to this case and has used the equitable powers of this Court to protect its treaty rights. This case is about enforcement of each of the tribes' treaty fishing rights adjudicated in this case and this Court has jurisdiction over the subject matter of the dispute, the fish. *Washington v. Washington Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

3. This is not the first proceeding in which this Court has been asked to determine the rights of one tribe as against another. *See, e.g., United States v. Washington (Lower Elwha Tribe)*, 459 F.Supp. 1020, 1066 (1976), *aff'd*, 642 F.2d 1141 (9th Cir.1981), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981).

4. This Court's ruling that the question of intertribal allocation is a matter for the tribes rather than the state to resolve, 384 F.Supp. at 410 and 417, prohibits the state from interfering with intertribal allocation but in no way limits this Court's jurisdiction over this or any other matter that directly or indirectly affects interests

---

46. See Findings 341 and 342 at pp. 1442–1443, *supra.*

47. See p. 1486, *infra,* for Order Re: Jamestown Band's Usual and Accustomed Places.

48. Appeal dismissed November 8, 1983 without prejudice for lack of jurisdiction (No. 83–4022 9th Cir. Unpublished).

in treaty right fishing. 384 F.Supp. 312 at 328.

5. The Secretary of Commerce is not an indispensable party to this case. Resolution of the matter before the Court does not challenge the validity or substance of the Secretary's Regulations for 1983 ocean fisheries off the Washington Coast. As no relief is sought against the Secretary, the Magnuson Fishery Conservation and Management Act's judicial review provisions are inapplicable, and the Secretary need not be separately joined.

6. Sovereign immunity is not a bar to the relief requested by the Quinault, Hoh, and Quileute Tribes. The Makah Tribe waived its immunity and consented to a full adjudication of its treaty fishing rights when it intervened in this case seeking a determination of those rights, and asking that the Court exercise its equitable powers to protect those rights. *United States v. Oregon*, 657 F.2d 1009 (9th Cir. 1981). The Court therefore has jurisdiction over the Makah to determine whether they threaten to infringe the adjudicated treaty rights of other tribes as alleged, and to grant equitable relief if it is appropriate.

The Court therefore Orders:

1. The Makah Indian Tribe's Motion to Dismiss is denied.

2. The Makah Indian Tribe and the Quinault Indian Nation, Hoh Indian Tribe and Quileute Indian Tribe are directed to confer and negotiate their differences with respect to sharing of coastal runs. Any other tribe whose treaty rights are affected by the Makah fishing are encouraged to participate fully in such negotiations, and the Makah Tribe is directed to confer and negotiate with such Puget Sound Tribes to resolve any differences they may have with the Makah Tribe with respect to sharing of Puget Sound salmon runs.

3. The parties are directed to report to the Court on the status of their negotiations in 10 days.[49]

ORDERS APPROVING SETTLEMENT AGREEMENTS BETWEEN THE TULALIP TRIBES AND VARIOUS OTHER PUGET SOUND TRIBES RE: TULALIP FISHING AREA CLAIMS[50]

CRAIG, District Judge.

On July 19, 1982, the Tulalip Tribes filed a renewed Request for Determination seeking to establish their usual and accustomed fishing grounds and stations. Several tribes filed responsive pleadings objecting to the proposed Tulalip fishing places. The matter was referred to a special master for an evidentiary hearing, report, and recommendation pursuant to F.R.Civ.P. 53. Prior to the hearing the Tulalip Tribes and a number of the objecting tribes entered into settlement agreements which, on recommendation of the special master, were approved by the court by orders that are consolidated as follows.

The agreements reached are embodied in the Stipulations attached to the original orders (hereinafter "Settlement Agreement") which, pursuant to this consolidated order and subject to the provisions hereof, are incorporated herein.[51] The court recognizes, and the stipulating parties have so represented, that the Settlement Agreements are a product of compromise on all sides and, if this matter were required to be tried to the court, the stipulating parties would make different representations, put on different proof, and urge the court to reach different conclusions. Notwithstanding this fact, it appears that the Settlement Agreements reached among these parties as herein construed are fair to them and will enhance their abilities to coordinate

**49.** See doc. nos. 9060 and 9064 for reports of the Tribes.

**50.** This consolidates the Orders filed July 21, 1983 (doc. nos. 9187, 9189, 9190), October 13, 1983 (doc. no. 9387), and May 8, 1985 (doc. no. 10,042).

**51.** The full Settlement Agreements are omitted here. Their principal provisions are summarized at the end of this Order.

their fisheries among themselves without impairing the rights and interests of other parties.

The court emphasizes that this consolidated order affects only the rights *inter se* of those parties signatory to each Settlement Agreement. The Tulalip Tribes have specifically acknowledged that even though individual opposing tribes have withdrawn their objection to the Tulalip Tribes' claims in areas not specifically dealt with in the Settlement Agreement between a particular Tribe and the Tulalip Tribes, other parties may continue to challenge the Tulalip Tribes' right to fish in some of these areas. Nothing in this consolidated order shall be deemed to be a determination of any portion of the Tulalip Tribes' Request for Determination that is not herein dismissed. However, to the extent that the court does not further limit Tulalip rights, each Settlement Agreement shall continue to bind the participating tribes consistent with its terms and the terms of this consolidated order.

There being no just reason for delay, the clerk is directed to enter a final judgment upon the claims determined by this order, provided that this direction shall not be deemed to alter the finality for purposes of 28 U.S.C. § 1291 of the original orders consolidated herein. F.R.Civ.P. 54(b).

Now, therefore, IT IS ORDERED as follows:

APPROVAL OF SETTLEMENT AGREE-
MENT AMONG NISQUALLY, PU-
YALLUP, AND TULALIP TRIBES
RE PUGET SOUND FISHING AREA
CLAIMS

(July 8, 1983)

1. So much of the request of the Tulalip Tribes that seeks to establish usual and accustomed fishing places for that tribe in those waters of Puget Sound southerly of a true east-west line passing through the Point Vashon light (currently designated by the Washington State Department of Fisheries as Puget Sound Salmon Commercial Management and Catch Reporting Ar-

eas 11, 11A, 13, 13A, and 13B), and in all rivers and streams, including their tributaries, which drain into those waters, is dismissed with prejudice. The Tulalip Tribes shall not attempt to exercise or establish fishing rights in any of those waters.

2. Subject to the interpretations and limitations specified in this order, the Settlement Agreement is approved and is adopted as part of this order.

3. This order, including the Settlement Agreement, shall be enforced pursuant to the procedures established under the continuing jurisdiction in this case and shall further be enforceable as any other final order and judgment of this Court.

4. Nothing in this order shall limit the parties' right to seek enforcement of the Settlement Agreement consistent with its terms in any separate proceeding.

5. The parties to the Settlement Agreement are enjoined from taking any action that fails to comply with the terms of this order and the terms of the Settlement Agreement.

6. Nothing in this order or in the Settlement Agreement approved by this order shall prevent the parties to the north Puget Sound and south Puget Sound allocation agreement from amending, extending, or terminating that agreement, and the reference in the Settlement Agreement to the "current" allocation agreement means the agreement in effect at the particular time involved.

7. Nothing in this order shall alter or otherwise affect the provisions of this Court's prior orders approving the Puget Sound Salmon Plan (459 F.Supp. at 1107–13) or answering questions re Salmon Fisheries Management (459 F.Supp. at 1069–72).

8. Nothing in this order shall constitute a determination of a Tulalip right to fish, or authorize the Tulalip Tribe to fish (whether by invitation or otherwise), in any area in which that Tribe's right to fish has not been heretofore or is not hereafter recognized by this Court, nor shall this order increase or affect the nature or ex-

tent of any such right in relation to the rights of any tribe not a signatory to the Settlement Agreement. No provision of the Settlement Agreement approved by this order shall apply to water within the boundaries of a non-signatory tribe's reservation without the consent of that tribe.

SUMMARY OF SETTLEMENT AGREEMENT OF NISQUALLY, PUYALLUP AND TULALIP TRIBES RE TULALIP USUAL AND ACCUSTOMED FISHING PLACES

(June 13, 1983)

The Puyallup and Nisqually Tribes withdraw their objections to those portions of the Tulalip request for determination of usual and accustomed places as provided in this Agreement, and agree to remain neutral in any disputes between the Tulalip Tribes and any other tribe(s) over any portion of those areas.

The following definitions and standards apply to this agreement.

A. The terms PRIMARY and INVITEE FISHING RIGHTS refer to areas which are the usual and accustomed fishing areas of more than one tribe, but where one tribe has primary rights in that area ("primary tribe"), and by virtue of that status has the right to exclude all other tribes from fishing in that area. Other tribes with invitee rights ("invitee tribes") may fish in those areas only if they receive an invitation and permission from the primary tribe, and then only to the extent and on the terms set out by the primary tribe. "PRIMARY AREA" refers only to the aspect of regulatory control and does not relate in any way to whether a particular fishery is a primary fishery of any tribe.

B. The terms REGULATORY and SECONDARY FISHING RIGHTS refer to areas which are the usual and accustomed fishing areas of more than one tribe but where one tribe (the "regulatory tribe") has the right to set non-discriminatory fishing regulations which the other tribes with secondary rights ("secondary tribes") must follow. The regulatory tribe does not have the right to exclude other tribes with secondary rights; secondary tribes can fish without obtaining an invitation from the regulatory tribe but can fish only in compliance with the regulations set for all tribes by the regulatory tribe.

C. The term IN COMMON FISHING RIGHTS refers to areas which are the usual and accustomed fishing areas of more than one tribe where each tribe has the right to set its own fishing regulations.

The Agreement provides that the Tulalip Tribes withdraw their claim to establish usual and accustomed fishing areas in those waters of Puget Sound specified in paragraph 1 of the Approving Order [p. 1472, supra]. Should the boundary lines of any of those Catch Reporting Areas be modified, however, this Agreement shall be controlled by the geographical description set forth and not by the Catch Reporting Area designations. The Tulalip Tribes shall not attempt to exercise or establish fishing rights in any of those waters. This is a final, conclusive and binding determination that the Tulalip Tribes do not have usual and accustomed fishing areas in any of those waters. The subject of Tulalip usual and accustomed fishing areas shall not be subject to further determination by the court.

The Puyallup and Nisqually Tribes withdraw their opposition to the claims contained in the Tulalip Amended Request for Determination, dated July 19, 1982, other than in those waters described in paragraph 1 of the Agreement. The Puyallup and Nisqually Tribes agree that they will not oppose the Tulalip Tribes in any dispute which the Tulalip Tribes may have with any other tribe(s) over the usual and accustomed fishing areas in any waters other than those described in paragraph 1 of the Agreement.

The Tulalip Tribes will conduct their fisheries in accordance with the current north Puget Sound (Point Elliott Treaty Area) and south Puget Sound (Medicine Creek Treaty Area) allocation agreement.

The Tulalip Tribes, in the future, will support the Puyallup and Nisqually Tribes'

claims to primary and secondary fishing right areas south of Catch Reporting Area 10, provided that in any dispute between Puyallup and Nisqually, the Tulalip Tribes shall stay neutral.

In order to preserve an equitable share of South Sound origin fish to South Sound tribes, the Tulalip Tribes agree that they will support future litigation which attempts to make binding on all Point Elliott and other northern tribes the provisions, including the percentage shares, contained in the current "South Puget Sound Region of Origin Treaty Salmon Allocation Agreement."

## APPROVAL OF SETTLEMENT AGREEMENT BETWEEN SWINOMISH TRIBAL COMMUNITY AND TULALIP TRIBES RE PUGET SOUND FISHING AREA CLAIMS

(July 8, 1983)

CRAIG, District Judge.

1. So much of the request of the Tulalip Tribes that seeks to establish usual and accustomed fishing places for that Tribe in those parts of Puget Sound designated by the State Department of Fisheries as Puget Sound Commercial Salmon Management and Catch Reporting Areas 6D, 7B, 7C, 9A, 10A, 10B, 10C, 10D, 10E, 11, 11A, 12, 12A, 12B, 12C, 12D, 13, 13A, and 13B, and all rivers and streams, including their tributaries, which drain into those areas as described in Attachment A to the Settlement Agreement,[52] is dismissed with prejudice. The Tulalip Tribes shall not seek to fish in those areas identified in this paragraph except as that expansion is expressly agreed to between the parties to the Settlement Agreement and is approved by the court upon motion.

2. Subject to the interpretations and limitations specified in this order, the Settlement Agreement is approved and is adopted as part of this order.

3. This order, including the Settlement Agreement, shall be enforceable pursuant to the procedures established under the continuing jurisdiction in this case and shall be enforceable as any other final court order and judgment of this court.

4. Notwithstanding any other order of this court involving the Tulalip Tribes and any other treaty tribe, to the extent the harvesting rights of the Tulalip Tribes in areas 6, 6A, 6B, 7, 7A, 7B, 7C, and 8 are affected by the Settlement Agreement and this order, the Settlement Agreement shall represent the maximum right of the Tulalip Tribes in these described areas.

5. Nothing in this order shall constitute a determination of a Tulalip right to fish or shall authorize the Tulalip Tribe to fish (whether by invitation or otherwise) in any area in which that Tribe's right to fish has not been heretofore or is not hereafter recognized by this court. Nor shall this order increase or affect the nature or extent of any such right in relation to the rights of any tribe not a signatory to the Settlement Agreement. No provision of the Settlement Agreement approved by this order shall apply to waters within the boundaries of a non-signatory tribe's reservation without the consent of that tribe.

6. Nothing in the Settlement Agreement, including Section 8 thereof, or in this order, shall authorize any tribe to adopt any regulations that would purport to authorize any fishing that is in any time, place, manner, or amount prohibited by regulations of the United States or any agency thereof to carry out or comply with the Sockeye and Pink Salmon Convention and Protocol between the United States and Canada or any successor convention party.

7. To the extent not prohibited by other orders of this court, the parties to the Settlement Agreement shall be bound by and shall comply with the harvest and management limitations contained therein until a comprehensive management plan is agreed to by the stipulating parties and is approved by the court and made enforceably by a federal court order. Nothing in

---

**52.** Attachment A is omitted here.

this order shall alter or otherwise affect the provisions of this court's prior orders approving the Puget Sound Salmon Plan (459 F.Supp. at 1107–13) or answering questions re Salmon Fisheries Management (459 F.Supp. at 1069–72).

8. If a comprehensive management plan agreed to in accordance with Paragraph 12 of the Settlement Agreement is revoked, held to be contrary to the law, or violated by any party, any injured party may petition the Court for an order terminating the comprehensive management plan and reinstating the interim management plan and harvest limitations contained in the Settlement Agreement. The court will not entertain any motion by any signatory party to modify the Settlement Agreement unless such motion is agreed to by all parties signatory thereto. Those harvest and management considerations contained in the Settlement Agreement shall continue to govern unless modified by express written agreement of the signatory parties.

9. Nothing in this order shall limit any party's right to seek enforcement of the Settlement Agreement consistent with its terms in any separate proceeding.

10. This order constitutes approval of the Settlement Agreement within the meaning of Paragraph 12 thereof.

11. The parties to the Settlement Agreement are enjoined from taking any action that fails to comply with the terms of this order and the terms of the Settlement Agreement incorporated herein.

## SUMMARY OF SETTLEMENT AGREEMENT OF SWINOMISH TRIBAL COMMUNITY AND THE TULALIP TRIBES

### (June 9, 1983)

The Swinomish Tribal Community withdraws its objections to the Tulalip Request for Determination Re: Usual and Accustomed Fishing Places in all areas not specifically dealt with in the Agreement, consistent with the terms of the Agreement. The following definitions and standards apply to the Agreement:

A. The terms PRIMARY and INVITEE FISHING RIGHTS refer to rights which exist in certain areas which are the usual and accustomed fishing areas of more than one tribe, but where one tribe has been determined by agreement or court order to have primary control in that area ("primary tribe"), and by virtue of that status has the right to exclude all other tribes from fishing in that area. Other tribes with invitee rights ("invitee tribes") may fish in those areas only if they receive an invitation and permission from the primary tribe, and then only to the extent and on the terms set out by the primary tribe.

B. The terms REGULATORY and SECONDARY FISHING RIGHTS refer to rights which exist in certain areas which are the usual and accustomed fishing areas of more than one tribe but where one tribe (the "regulatory tribe") has been determined by agreement or court order to have the right to set non-discriminatory fishing regulations which the other tribes with secondary rights ("secondary tribes") must follow. The regulatory tribe does not have the right to exclude other tribes with secondary rights; secondary tribes can fish without obtaining an invitation from the regulatory tribe but can fish only in compliance with the regulations set for all tribes by the regulatory tribe.

C. The term IN COMMON FISHING RIGHTS refers to rights which exist in certain areas that are the usual and accustomed fishing areas of more than one tribe and where each tribe has the right to set its own fishing regulations.

D. AREA NUMBERS refer to areas designated by the Washington State Department of Fisheries as Puget Sound Commercial Salmon Management and Catch Reporting Areas, described in Attachment A to the Settlement Agreement, and designated on the Washington Department of Fisheries maps adopted in March, 1980.

E. "IPSFC waters" refers to waters defined as convention waters in the United States/Canada Sockeye Convention, signed May 26, 1930, 50 Stat. 1355.

The Agreement provides that the Tulalip Tribes withdraw their claim to and will never seek to establish usual and accustomed fishing areas in the waters specified in Paragraph 1, above. The Tulalip Tribes also withdraw their claim to those portions of Areas 6 and 6B lying southerly and westerly of a line from Wilson Point westerly to McMurdy Point westerly to the northernmost tip of Protection Island and thence northwesterly to the 6B line, thence westerly to 123° 20″ longitude, thence north to the International Border.

The Tulalip Tribes disclaim any right to fish for herring north of a line from Tumbo Point on Tumbo Island to Alden Point on Patos Island, thence along the shore to Toe Point, thence southeasterly to Ewing Island, thence from the southeasterly point of Ewing Island to the most northerly point of Puffin Island, thence southeasterly to the most northerly point of Clark Island, thence in a direct line to William Point on Samish Island.

*Recognized Areas.* In addition to the specific provisions set forth below, the Tulalip Tribes shall have the following usual and accustomed fishing areas:

Areas 8A, 9, 10 (but not including that portion of Area 10 east of a line from Alki Point to West Point, thence to Meadow Point, and west of a line from Point Monroe on Bainbridge Island to Point Jefferson on the Kitsap Peninsula), and the Snohomish River system.

*Area 6A.* As between the Tulalip Tribes and the Swinomish Tribal Community, it is agreed that the Swinomish Tribal Community has primary salmon fishing rights in Area 6A. The Tulalip Tribes shall have invitee rights and will fish this area only with the permission of and at the invitation of the Swinomish Tribal Community, and subject to Swinomish regulations.

*Area 8.* As between the Tulalip Tribes and the Swinomish Tribal Community, it is agreed that the Swinomish Tribal Community has primary fishing rights in Area 8 north of a line drawn due west from Camano City. The Tulalip Tribes shall have invitee rights and will fish this area only with the permission of and at the invitation of the Swinomish Tribal Community and subject to Swinomish regulations. As between Swinomish and Tulalip, all other parts of Area 8 shall be in-common fishing areas.

*Areas 7, 7A and portions of 6 and 6B.* The Tulalip Tribes shall have in-common fishing rights in Area 7, 7A, and 6 and 6B except as limited in paragraph 3 above. However, Tulalip fishing rights in those portions shall be limited by and proceed pursuant to the provisions set forth in this Agreement.

Finally, Section 8 of the Agreement includes an Interim Management Plan concerning sharing of the total treaty share of sockeye in IPSFC waters. The Interim Plan is effective immediately and is binding on the parties unless and until a modification to the Interim Plan or a comprehensive management plan is agreed to in writing by each of the parties. The Interim Plan shall be enforceable as a court order in the same manner as any other final order and judgment of the court.

The Tulalip Tribes represent that they have not entered into any agreement that recognizes the primary right of any tribe to fish in Areas 7, 7A, 7B, 7C and 7D. They agree that in the future they will remain neutral in any dispute over primary rights between the Lummi Tribe and the Swinomish Tribal Community.

## APPROVAL OF SETTLEMENT AGREEMENT AMONG MUCKLESHOOT, SUQUAMISH, AND TULALIP TRIBES RE PUGET SOUND FISHING AREA CLAIMS

(July 8, 1983)

CRAIG, District Judge.

1. So much of the request of the Tulalip Tribes that seeks to establish usual and accustomed fishing places for that tribe in those parts of Puget Sound designated by the State Department of Fisheries as Puget Sound Commercial Salmon Management and Catch Reporting Areas 10A, 10B, 10C, 10D, 10E, 12, 12A, 12B, 12C, 12D, and that

part of area 10 east of a line drawn from Alki Point to West Point thence to Meadow Point and west of a line drawn from Monroe Point on Bainbridge Island to Point Jefferson on the Kitsap Peninsula, as those catch reporting areas are defined in Exhibit A to the Settlement Agreement,[53] is dismissed with prejudice. The Tulalip Tribes shall not seek to fish in those areas identified in this paragraph except as that expansion is expressly agreed to by the parties to the Settlement Agreement and approved by the court upon motion.

2. Subject to the interpretations and limitations specified in this order, the Settlement Agreement is approved and is adopted as part of this order.

3. This order, including the Settlement Agreement, shall be enforceable pursuant to the procedures established under the continuing jurisdiction in this case and shall further be enforceable as any other final order and judgment of this court.

4. Notwithstanding any other order of this court involving the Tulalip Tribes and any other treaty tribe, to the extent the harvesting rights of the Tulalip Tribes in areas 6B, 9, and 10 are affected by the Settlement Agreement and this order, the Settlement Agreement shall represent the maximum right of the Tulalip Tribes in these described areas.

5. Nothing in this order shall constitute a determination of a Tulalip right to fish or shall authorize the Tulalip Tribe to fish (whether by invitation or otherwise) in any area in which that Tribe's right to fish has not been heretofore or is not hereafter recognized by this court, nor shall this order increase or affect the nature or extent of any such right in relation to the rights of any tribe not a signatory to the Settlement Agreement. Paragraph II C of the Settlement Agreement pertains only to a recognition that the right of the Suquamish Tribe to fish in the area referred to in that paragraph as has been heretofore or as may be hereafter determined in other proceedings in this case shall be primary to

any right which the Tulalip Tribe may subsequently be found to have in that area. No permission granted by the Suquamish Tribe pursuant to that paragraph shall enlarge the rights of the Tulalip Tribes in relation to the rights of other tribes with respect to fish runs in or passing through that area. No provision of the Settlement Agreement approved by this order shall apply to waters within the boundaries of a non-signatory tribe's reservation without the consent of that tribe.

6. To the extent not prohibited by other orders of this court, the parties to the Settlement Agreement shall be bound by and shall comply with the harvest and management limitations contained therein until a comprehensive management plan is agreed to by the stipulating parties and is approved by the court and made enforceable by a federal court order. Nothing in this order shall alter or otherwise affect the provisions of this court's prior orders approving the Puget Sound Salmon Plan (459 F.Supp. at 1107–13) or answering questions re Salmon Fisheries Management (459 F.Supp. at 1069–72).

7. If a subsequent comprehensive management plan developed in conformity with paragraph III E of the Settlement Agreement is revoked, held to be contrary to the law, or violated by any party, any injured party may petition the Court for an order terminating the comprehensive management plan and reinstating the interim management plan and harvest limitations contained in the Settlement Agreement. The Court will not entertain any motion by a signatory party to modify the Settlement Agreement unless such motion is agreed to by all parties signatory thereto. Those harvest and management considerations contained in the Settlement Agreement shall continue to govern unless modified by express written agreement of the signatory parties.

8. Nothing in this order shall limit any party's right to seek enforcement of the Settlement Agreement consistent with its terms in any separate proceeding.

---

**53.** Exhibit A is omitted here.

9. This order constitutes approval of the Settlement Agreement within the meaning of Paragraph IV 7 thereof.

10. The parties to the Settlement Agreement are enjoined from taking any action that fails to comply with the terms of this order and the terms of the Settlement Agreement incorporated herein.

SUMMARY OF SETTLEMENT AGREE-
MENT OF MUCKLESHOOT, SU-
QUAMISH AND TULALIP TRIBES
RE: TULALIP USUAL AND ACCUS-
TOMED FISHING PLACES

(June 13, 1983)

The Agreement provides that the Suquamish and Muckleshoot Tribes withdraw their opposition to the Tulalip Tribes' request for final determination of its usual and accustomed places in all areas not specifically dealt with in the Order. The Tulalip Tribes agree to dismiss with prejudice their request for final determination of usual and accustomed places in the areas of Puget Sound specified in Paragraph 1 above.

In paragraph IIC, the Tulalip Tribes recognize that the Suquamish Tribe has primary rights to fish in that part of area 9 south of a line drawn from Foulweather Bluff west to Tala Point. Tulalip fishing in this portion of area 9 shall be with the permission of the Suquamish Tribe. The Suquamish Tribe shall grant permission to the Tulalip Tribe to fish in that part of area 9 described in this paragraph when it appears treaty fisheries will not be able to harvest the full treaty share of Hood Canal origin fish available for harvest without Tulalip harvest.

The parties agree to a Management Plan for harvest of coho and chum salmon in Area 10, pending final agreement on a Comprehensive Management Plan between all Point Elliott Tribes with treaty fishing rights in Areas 7, 7A, 6, 6A, 6B, 9, and 10. The Management Plan is effective immediately and is irrevocably binding on all parties unless and until a modification to the

interim plan or a comprehensive plan between all parties is agreed to in writing and approved by the court. The Management Plan sets forth a procedure for estimating the total available treaty allocation and the harvest allocation for each Tribe. The Agreement also contains an equitable adjustment clause.

The parties agree to certain remedies in the case of failure to comply with the terms of the Agreement. The remedies set out are exclusive, and self-help is not an available remedy.

APPROVAL OF SETTLEMENT AGREE-
MENT AMONG LOWER ELWHA,
PORT GAMBLE AND JAMESTOWN
BANDS OF KLALLAM, SKOKOMISH
TRIBE, AND TULALIP TRIBES RE
TULALIP FISHING AREA CLAIMS

(August 12, 1983)

CRAIG, District Judge.

1. So much of the request of the Tulalip Tribes that seeks to establish usual and accustomed fishing places for that tribe in those parts of Puget Sound presently included in the following portions of State Department of Fisheries Puget Sound commercial salmon management and catch reporting areas (as described in Attachment A to the Settlement Agreement) [54] is dismissed with prejudice:

a. That portion of Area 6 west of a line connecting the northernmost tip of Protection Island and Trial Island just southeasterly of Victoria, British Columbia. Fishing in Area 6 east of that line shall be subject to the limitations of paragraph C of the Settlement Agreement;

b. That portion of Area 6B lying south and west of a line connecting McCurdy Point, the northernmost tip of Protection Island, and Trial Island. Fishing in Area 6B north and east of that line shall be subject to the limitations of paragraph D of the Settlement Agreement;

54. Attachment A is omitted here.

c. Those portions of Area 9 south and west of a line drawn from Foulweather Bluff to Kinney Point, on the southernmost tip of Marrowstone Island, and south and west of a line drawn from Marrowstone Point, on the northernmost tip of Marrowstone Island, to Point Wilson, including Kilisut Harbor;

d. Area 9A;

e. Areas 6D, 10A, 10B, 10C, 10D, 10E, 12, 12A, 12B, 12C, 12D, and all rivers and streams draining into any of these areas; and

f. Area 10 east of a line drawn from Alki Point to West Point, thence, to Meadow Point; and, west of a line drawn from Monroe Point on Bainbridge Island to Point Jefferson on the Kitsap Peninsula;

The Tulalip Tribes shall not seek to fish in those areas identified in paragraphs 1(a) through 1(f) above, except as that expansion is expressly agreed to by all parties to the Settlement Agreement and approved by the court upon Motion.

2. Subject to the interpretations and limitations specified in this order, the Settlement Agreement is approved and adopted as part of this order.

3. This order, including the Settlement Agreement, shall be enforceable pursuant to the procedures established under the continuing jurisdiction in this case, and shall be further enforceable as any other final court order and judgment of this court.

4. Notwithstanding any other order of this court involving the Tulalip Tribes and any other treaty tribe, to the extent the harvesting rights of the Tulalip Tribes in Areas 6, 6B, and 9 are affected by the Settlement Agreement and this order, the Settlement Agreement shall represent the maximum right of the Tulalip Tribes in these described areas.

5. Nothing in this order shall constitute a determination of a Tulalip right to fish, or authorize the Tulalip Tribes to fish (whether by invitation or otherwise), in any area in which that tribe's right to fish has not been heretofore, or is not hereafter,

recognized by this court, nor shall this order increase or affect the nature or extent of any such right in relation to the rights of any tribe not a signatory to the Settlement Agreement. No provision of the Settlement Agreement approved by this order shall apply to waters within the boundaries of a nonsignatory tribe's reservation without the consent of that tribe.

6. To the extent not prohibited by any other orders of this court, the parties to the Settlement Agreement shall be bound by and shall comply with the management limitations contained therein unless or until a comprehensive management plan is agreed to by the signatory parties and is approved by the court and made enforceable by a federal court order. Nothing in this order shall alter or otherwise affect the provisions of this court's prior orders approving the Puget Sound Salmon Plan (459 F.Supp. at 1107–1113) or answering questions re Salmon Fisheries Management (459 F.Supp. at 1069–1072).

7. Nothing in this order shall limit any party's right to seek enforcement of the Settlement Agreement consistent with its terms in any separate proceeding.

8. This order constitutes approval of the Settlement Agreement within the meaning of paragraph III, 7 thereof.

9. The parties to the attached Settlement Agreement are enjoined from taking any action that fails to comply with the terms of this order and the terms of the Settlement Agreement incorporated herein.

SUMMARY OF SETTLEMENT AGREEMENT OF LOWER ELWHA, PORT GAMBLE AND JAMESTOWN BANDS OF KLALLAM, SKOKOMISH TRIBE, AND TULALIP TRIBES

The Agreement provides that the Lower Elwha, Port Gamble and Jamestown Bands of Klallam, and Skokomish Tribe agree to withdraw their opposition to the Tulalip Tribes' request for final determination of usual and accustomed places in all areas not specifically dealt with in the order consistent with the terms set out in the Agree-

ment. Additionally, the Tulalip Tribes agree not to oppose the Jamestown Klallam Tribe's request for final determination of usual and accustomed fishing places in those areas already found to be within the usual and accustomed fishing places of the other Klallam tribes.

The Tulalip Tribes agree to dismiss with prejudice their request for final determination of usual and accustomed places in areas of Puget Sound described in paragraph 1 above. The Agreement states that Tulalip usual and accustomed fishing places include that portion of Area 6 east of a line connecting the northernmost point of Protection Island to Trial Island, just southeasterly from Victoria, British Columbia, subject to Klallam regulatory fishing control during times that area is not under IPSFC control. In this area, "Klallam regulatory fishing control" means that the Tulalip Tribes may fish only during such times as may be opened by any Klallam Tribe, without an invitation from them, but only in compliance with the regulations set by such Tribe. Sockeye and pink fishing by the Tulalip Tribes in this portion of Area 6 shall proceed pursuant to the provisions applicable to all tribes with sockeye fishing rights governed by the United States/Canada Sockeye Convention, signed May 26, 1930, 50 Stat. 1355, or a successor treaty governing the same subject matter.

Paragraph D recognizes that Tulalip usual and accustomed fishing areas include that portion of Area 6B lying northerly and easterly of a line connecting McMurdy Point, the northernmost tip of Protection Island and Trial Island just southeasterly of Victoria, British Columbia subject to regulatory control of the Klallam Tribes. In this area, "regulatory control of the Klallam Tribes" means that the Tulalip Tribes may fish in the prescribed area only during those times when any Klallam Tribe opens a mixed stock fishery in any part of Area 6B. In this context, "mixed stock fishery" is defined as any fishery in which more than an incidental number of the fish harvested would have migrated to regions of origin other than the Strait of Juan de Fuca or its tributaries. Sequim Bay, Dis-

covery Bay and Port Angeles Harbor are presumed to be terminal areas and, as such, a Klallam fishery in those areas does not mean that the Tulalip Tribes may fish in Area 6B. Tulalip fishing, when it occurs, shall be in compliance with the regulations set by such Tribe.

"In compliance with the regulations set by the Klallam Tribes" means all regulations and tribal laws made by any Klallam Tribe with respect to gear types, time periods, and methods of fishing. It is specifically understood that the Klallam Tribes do not allow the use of purse seines in their fisheries, and as long as that regulation still applies to the Klallams, the Tulalip Tribes also shall not allow the use of purse seines in the above areas when subject to Klallam regulatory control.

The Agreement provides that Tulalip usual and accustomed fishing places include a portion of Area 9, except as described in paragraph 1c above.

The parties acknowledge the need to develop an equitable sharing formula for tribes participating in IPFSC-controlled sockeye and pink salmon fisheries and the need for a comprehensive management plan. Tulalips recognize the importance to the Klallam Tribes of sockeye fishing in the Strait of Juan de Fuca, and will cooperate in working towards a management plan that recognizes this.

The parties also agree to certain remedies in the event that any party fails to comply with the terms of the Agreement. The remedies set out are exclusive, and self-help is not an available remedy.

## APPROVAL OF SETTLEMENT AGREEMENT BETWEEN STILLAGUAMISH AND TULALIP TRIBES RE PUGET SOUND FISHING AREA CLAIMS

1. Subject to the interpretations and limitations specified in this order, the Settlement Agreement is approved and adopted as part of this order.

2. The Stillaguamish River has been found to be a usual and accustomed fishing

area of the Stillaguamish Tribe (Finding of Fact No. 146, 384 F.Supp. at 370). It is hereby found that the predecessors of the Tulalip Tribes were permitted to fish on that river only with the permission and at the invitation of the Stillaguamish Tribe. Accordingly, it is hereby determined that as between the Tulalip Tribes and the Stillaguamish Tribe, the latter has primary rights on that river and the Tulalip Tribes have invitee rights to fish on that river.

3. In accordance with the Settlement Agreement between the tribes, it is hereby held that invitee rights to fish in the Stillaguamish River are irrevocably extended to the Tulalip Tribes to the extent and subject to the conditions and other provisions set out in Paragraph III A of the Agreement between the parties.

4. For the purpose of this order the Stillaguamish River means the river upstream from an East-West line drawn across the mouth of South Pass at approximately the N ¼ corner of Section 35, T.32N., R.3E, and upriver from a northwesterly line across the mouth of Hat Slough located in S ½ of the SW ¼ Section 1, T.31N., R.3E., also an East-West line drawn across the mouth of Hat Slough located in the NE ¼ of the NE ¼ Section 12, T.31N., R.3E., together with all tributaries upstream from these lines, as shown on the maps (Attachments A and B in the Settlement Agreement),[55] which are incorporated herein by reference.

5. To the extent that the Tulalip Tribes Request for Determination seeks to establish usual and accustomed areas in the Stillaguamish River and northern Area 8A to a greater degree than in the Agreement between the tribes, such request is hereby dismissed with prejudice. The Tulalip Tribes shall not exercise or seek to exercise rights in violation of that Agreement.

6. The Tulalip Tribes, as of the date of this order, shall irrevocably extend an invitation to the Stillaguamish Tribe to fish in northern Area 8A without prejudice to the

latter's right to establish its independent right to fish in that area.

7. This order, including the Settlement Agreement, shall be enforceable pursuant to the procedures established under the continuing jurisdiction in this case and shall be enforceable as any other final order and judgment of this court.

8. Notwithstanding any other order of this court involving the Tulalip Tribes and any other treaty tribe, to the extent the harvesting rights of the Tulalip Tribes in any other areas are affected by the Settlement Agreement and this order, the Settlement Agreement and this order shall represent the maximum right of the Tulalip Tribes in those areas.

9. Nothing in this order shall constitute a determination of a Tulalip right to fish or shall authorize the Tulalip Tribes to fish (whether by invitation or otherwise) in any area in which that tribe's right to fish has not been heretofore or is not herein or hereafter determined by this court. Nor shall this order increase or affect the nature or extent of any such right in relation to the rights of any tribe not a signatory to the Settlement Agreement. No provision of the Settlement Agreement approved by this order shall apply to waters within the boundaries of a non-signatory tribe's reservation without the consent of that tribe.

10. To the extent not prohibited by other orders of this court, the parties to the Settlement Agreement shall be bound by and shall comply with the harvest and management limitations contained therein until a comprehensive management plan is agreed to by the stipulating parties. Nothing in this order shall alter or otherwise affect the provisions of this court's prior orders approving the Puget Sound Salmon Plan (459 F.Supp. at 1107–13) or answering questions re Salmon Fisheries Management (459 F.Supp. at 1069–70).

11. If a comprehensive management plan agreed to in accordance with Paragraph VI of the Settlement Agreement is revoked, held to be contrary to the law, or

**55.** Attachments A and B are omitted here.

otherwise found or held to be unenforceable, any injured party may petition the court for an order terminating the comprehensive management plan and reinstating the interim management plan and harvest limitations contained in the Settlement Agreement. The court will not entertain any motion by any signatory party to modify the Settlement Agreement unless such motion is agreed to by all parties signatory thereto. Those harvest and management considerations contained in the Settlement Agreement shall continue to govern unless modified by express written agreement of the signatory parties.

12. Nothing in this order shall limit any party's right to seek enforcement of the Settlement Agreement consistent with its terms in any separate proceeding.

13. This order constitutes approval of the Settlement Agreement within the meaning of Paragraph VIII thereof.

14. The parties to the Settlement Agreement are enjoined from taking any action that fails to comply with the terms of this Order and the terms of the Settlement Agreement incorporated herein.

SUMMARY OF SETTLEMENT AGREEMENT OF STILLAGUAMISH AND TULALIP TRIBES RE TULALIP USUAL AND ACCUSTOMED FISHING PLACES

(May 1, 1984)

The Agreement provides that the Tulalip Tribes' usual and accustomed fishing areas include all those which were provisionally declared by the United States District Court in 1975 as described in 459 F.Supp. 1020 at 1059–1060. The Stillaguamish Tribe withdraws its objections to and supports the Tulalip Tribes' request for determination of its usual and accustomed fishing places in the other claimed areas to the extent consistent with the Agreement and other approved agreements.

Paragraph III A provides that the Stillaguamish Tribe recognizes the Stillaguamish River as a Tulalip usual and accustomed fishing area for invitational sport hook and line fishing. The Stillaguamish Tribe has primary fishing rights in the Stillaguamish River. The Tulalip Tribes shall have invitee rights and will fish the Stillaguamish River only with the permission of and at the invitation of the Stillaguamish Tribe, and subject to Stillaguamish management authority and non-discriminatory Stillaguamish regulations. The invitation to sport fish shall be extended and effective on the date this Agreement is approved by the court.

For purposes of the Agreement, the Stillaguamish River includes the portions of the river described in paragraph 4 of the Approval of Settlement Agreement.

The Stillaguamish Tribe recognizes all of the area designated by the State Department of Fisheries as Puget Sound Commercial Salmon Management and Catch Reporting Area 8A as a Tulalip usual and accustomed fishing area. However, the Tulalip Tribes recognize that portion of Area 8A north of a line from Kayak Point due west to Camano Island (Northern 8A) as a non-exclusive usual and accustomed fishing area of the Stillaguamish Tribe. The Tulalip Tribes support the Stillaguamish Tribe's request for a determination that the Stillaguamish Tribe's usual and accustomed fishing areas extend throughout Northern 8A and that portion of Area 8 southerly of a line drawn from Milltown to Polnell Point and northeasterly of a line drawn from Polnell Point to Rocky Point.

The Tulalip Tribes extend an invitation to the Stillaguamish Tribe to fish in this area until the Stillaguamish Tribe has established the area as a usual and accustomed fishing area. As between the Stillaguamish Tribe and the Tulalip Tribes, the Tulalip Tribes have primary fishing rights in all of Area 8A, other than Northern 8A.

The parties agree to the need for a comprehensive management plan, and agree to certain interim management provisions. The interim plan sets out annual harvest shares, including an adjustment provision. The parties agree to complete a first draft of a comprehensive management plan by June 30, 1985.

The Agreement contains remedies in the event that one party breaches the Agreement. These remedies are exclusive, and self-help shall not be an available remedy.

## MAGISTRATE'S ORDER RE WDF COMPUTER MODEL

### (October 12, 1983) [56]

JOHN L. WEINBERG, United States Magistrate.

■ The Tulalip Tribes filed a request for production of the Washington Department of Fisheries/National Bureau of Standards Catch Regulation Analysis Model (WDF/NBS Model) on April 29, 1983. The Court heard a status report on the Request on May 24 and directed the State to show the plaintiffs by June 2 what the State presently has, including data input and formulae and types of calculations used. Deeming the State's response inadequate, the Tulalip Tribes moved on July 5, 1983 for an order compelling production of the model and the related materials.

Further proceedings were held before the Magistrate on August 23 and August 24. After a dispute over whether the matter was properly before the Magistrate as part of the Equitable Adjustment referral, the Court formalized the referral of the Production Request on August 24.

The State and the Tulalip Tribes stipulated, through counsel, that the tribes shall have "off premises" physical possession of a copy of the model and related materials. They further stipulated that any conditions and limitations regarding use and distribution of the model remained to be agreed upon. If agreement was not realized by September 16, the matter would be submitted to the Magistrate for determination of any conditions and limitations. The parties were unable to agree and a Magistrate hearing was held on September 23. The Magistrate having considered the written submissions of the parties, including affidavits of Richard A. Lincoln and Terry L. Wright, and comments of counsel, and being fully advised,

THEREFORE, IT IS ORDERED as follows:

(1) The State of Washington shall provide the Northwest Indian Fisheries Commission with a hard copy, and a working copy (on disc or tape) of the WDF/NBS Catch Regulation Analysis Model. This shall include coded (*i.e.*, the FORTRAN and any other source code) and compiled versions of the calibration and simulation components, and of the data preparation programs, together with the model's current input data files and formats which are necessary to run the calibration and simulation components. In addition, the State shall provide the Northwest Indian Fisheries Commission with a copy of any and all documentation on the structure and use of the model, its components and programs, and any and all documents pertaining to instruction or training necessary for independent operation. The State shall coordinate with the Northwest Indian Fisheries Commission in performing such identical model runs as may be necessary to verify the accuracy of the copies of both the compiled and uncompiled versions provided pursuant to this paragraph.

(2) The State of Washington will allow the Northwest Indian Fisheries Commission, its representatives, or representatives of the plaintiff tribes, access to inspect any future versions of the WDF model, source codes, input preparation programs, and related materials. In addition, the tribes shall be entitled to possession of a copy of any future versions of the model, any of its components and input preparation programs. The verification requirements of paragraph 1, requiring identical model runs to verify the accuracy of copies, shall apply to any and all copies provided by the State pursuant to this paragraph.

(3) Neither the Northwest Indian Fisheries Commission nor any plaintiff tribe shall sell or lease or authorize any sale or lease of the computer model.

(4) The State's opposition to the motion was not justified. The Court finds that all

**56.** Confirmed by the court by Minute Order of December 15, 1983, doc. no. 9568.

of the plaintiffs involved in this matter are entitled to recover from the State of Washington their reasonable expenses incurred in obtaining this Order, including attorneys' fees, under Fed.R.Civ.P. 37(a)(4). However, since the tribal plaintiffs also would be entitled to an award under the Civil Rights Attorney Fees Award Act, 42 U.S.C. § 1988, consideration of the amount of the award to tribal plaintiffs shall be deferred for consideration along with the attorneys' fees issues previously referred to the Magistrate. The plaintiffs shall serve and file affidavits of fees and expenses within two weeks after entry of this order.

## ORDER RE: PUGET SOUND EQUITABLE ADJUSTMENT

### (Amended Final Order) [57]

### (January 19, 1984)

CRAIG, District Judge.

■■■ United States Magistrate John L. Weinberg issued his Report and Recommendation on the Puget Sound Equitable Adjustment, dated September 7, 1983, for 1981 and 1982. The Report and Recommendation addressed the applications of the State of Washington and various Tribes for equitable adjustment of harvests of coho, chum, pink and sockeye salmon in Puget Sound during 1981 and 1982. The Magistrate conducted an evidentiary hearing on the matter during the week of August 22, 1983.

The Report and Recommendation addressed three (3) procedural disputes involving cross-motions to dismiss the respective 1981 claims and the procedure for fixing the actual numbers which may be due the parties under the rules ultimately approved by this Court. Further, the Report and Recommendation addressed nine (9) substantive issues regarding equitable adjustment entitlements pursuant to § 7.2 of the Puget Sound Salmon Management Plan, 459 F.Supp. at 1111.

This Court heard oral argument, on the Magistrate's Report and Recommendation, on November 14th, 1983. Based on the submitted pleadings and the oral argument, this Court issued a proposed order for the parties' review. After receiving objections to the proposed order, consulting the Court's technical advisor, and in consideration of the merits of the positions, this Court concludes as follows.

## PROCEDURAL ISSUES

IT IS ORDERED that the Magistrate's recommendation on the three (3) procedural issues is fully adopted by this Court.[58]

## FOREGONE OPPORTUNITY

IT IS ORDERED that when one party claims the party(ies) is (are) not entitled to an equitable adjustment for Puget Sound harvests (including coho, chum, pink and sockeye salmon), by reason of "foregone opportunity", the claim should be resolved as follows:

---

**57.** Affirmed with modifications, 774 F.2d 1470 (9th Cir.1985).

**58.** These recommendations dealt with the following issues:

1. Each side had moved to dismiss the other side's claim for equitable adjustment for 1981. The court had previously construed § 7.2 of the Salmon Management Plan, 459 F.Supp. at 1111, as barring a party from asserting an equitable claim unless, before June 1, it takes steps to begin discussions and negotiation of a claim for the prior year. (*see* doc. no. 9146). Each party argued that the other party failed to file a formal, detailed claim for equitable adjustment for the 1981 season prior to the June 1, 1982 deadline.

The Magistrate concluded that various communications between State officials and the Tribes prior to June 1, 1982 should be deemed sufficient to meet the court's requirement. The Magistrate therefore recommended that the Tribes' motion to dismiss the State's claim for the 1981 season be denied.

2. The Magistrate also concluded that, although the Tribes did not file a timely claim for 1981, it would be inequitable to permit the State to pursue claims on some 1981 Puget Sound runs while not permitting the Tribes to present claims on others. The Magistrate recommended that the court deny the State's motion to dismiss the Tribes' claims for 1981.

3. Finally, the Magistrate recommended against the State's suggestion that the Tribes be permitted to claim adjustments, but only insofar as they constitute offsets to State claims. Rather, the court should consider in full all claims by both sides.

*First,* the decision-maker must determine the actual catch by each party from the run in question by using the best available post-season data.

*Second,* the share to which each side is entitled must be determined. This will generally be 50% of the total number of harvestable fish for that run as determined from the best post-season data. The share can be different than this 50% projection if the share is affected by equitable adjustments from previous years. No equitable adjustment would be made unless one party exceeded its share of 50% of the harvestable number of fish. If a party, however, is prevented from harvesting its share due to a conservation closure said party is entitled to an equitable adjustment.

*Third,* the decision-maker must determine if fish caught by one party (in excess of its share) would have significantly increased the other party's catch if the more successful party had stopped fishing before making the excess catch. The decision-maker must also consider whether the fish not caught would have been surplus to the escapement goal for the relevant run. If the catch would not have contributed significantly to the other party's catch, but would have been surplus to escapement needs, no equitable adjustment would be appropriate.

### BEST AVAILABLE DATA v. IN-SEASON METHODOLOGY

IT IS ORDERED that in calculating the Treaty and non-Treaty catches, and other data for purposes of equitable adjustment, the best available data (including post-season data) shall be used. This shall be the case despite the possibility that much of the data might not have been available to the fisheries manager during the season.

### CEREMONIAL AND SUBSISTENCE FISH

IT IS ORDERED that in calculating the ceremonial and subsistence catch by the Tribes, for purposes of equitable adjustment, it is appropriate to use information generated during the season as to actual catch. This method shall be used in lieu of the exclusive use of pre-season estimates. The basis for this is that the decision-maker shall use the data which is most current and most accurate.

### NON–TREATY FRESH WATER SPORT FISHERIES

IT IS ORDERED that coho jacks and chum caught in the fresh water sport fisheries should be included in calculating the catches of all parties. However, because of their distinct value and behavior, shares should be determined separately from other adults of the same run.

### HATCHERY FISH SOLD TO TRIBES

IT IS ORDERED that, except as may have been otherwise agreed between the state hatchery agency and the tribe involved at the time of purchase or acceptance, fish acquired by a tribe from a state hatchery shall be counted in calculating the tribe's catch.

### INCIDENTAL CATCHES OF SOUTH SOUND SOCKEYE

IT IS ORDERED that incidental catches of South Sound sockeye, in Lake Washington and in International Pacific Salmon Fisheries Commission waters (where this Court has jurisdiction), shall be counted as part of each party's total harvest(s).

### NET DROP–OUTS

IT IS ORDERED that, for the purposes of equitable adjustment, the harvest of net fishermen should include an estimate of the number of fish which come in contact with the net and do not survive but are not actually taken by the fishermen. The net "drop-out" fish estimate for 1982 shall be negotiated by the parties. In order to reach a negotiated estimate, it may be necessary to present this issue to a Joint Technical Committee.

### 1981 SKAGIT COHO ORDER

IT IS ORDERED that this Court's previous order confirming the settlement of the Skagit coho dispute, as to the equitable

adjustment resulting from the 1981 run,[59] shall stand undisturbed.

NON–RESIDENT CATCH

IT IS ORDERED that the non-Treaty share shall include the catch, within State-regulated waters, by non-residents of Washington.

IT IS FURTHER ORDERED that the State's Motion for Additional Testimony and its Request for Findings of Fact & Conclusions of Law, which were attached to its objections to the proposed order, are both denied.

ORDER RE: JAMESTOWN KLALLAM REQUEST FOR DETERMINATION OF USUAL AND ACCUSTOMED FISHING PLACES

(March 14, 1984, as amended February 21, 1985)

CRAIG, District Judge.

 It is ORDERED that the Jamestown Klallam Tribe's Motion for Summary Judgment on its Request for Determination of Usual and Accustomed Fishing Places is granted. There remain no genuine issues of material fact. *Adickes v. S.H. Kress and Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The following Supplemental Finding of Fact is entered:

Finding of Fact No. 358. The Jamestown Klallam Tribe (also known as the Jamestown Clallam Tribe of Indians) is one of three successors in interest to the S'Klallam signatories to the Treaty of Point No Point (12 Stat. 933). Its usual and accustomed fishing places (shown on Appendix A attached hereto)[60] include the waters of the Strait of Juan de Fuca, all the streams draining into the Strait from the Hoko River east to the mouth of Hood Canal, the waters of the San Juan Islands archipelago, the waters off the west coast of Whidbey Island, the waters of Hood Canal, and all streams draining into Hood Canal ex-cept the Skokomish River and its tributaries. In addition, the Jamestown Klallam Tribe has usual and accustomed fishing rights on the Sekiu River, but the fishing on this river shall be subject to the control and regulation of the Makah Indian Tribe.

There being no just reason for delay, the Clerk is directed to enter the March 14, 1984 Order as amended February 21, 1985 as a final judgment upon the Jamestown Klallam tribe's Request for Determination of its Usual and Accustomed Fishing Places filed on or about June 21, 1981. F.R.Civ.P. 54(b).

ORDER ADOPTING THE SPECIAL MASTER'S REPORT AND RECOMMENDATION RE SKOKOMISH INDIAN TRIBE'S REQUEST FOR DETERMINATION OF PRIMARY RIGHT IN HOOD CANAL FISHERY

(March 22, 1984)[61]

CRAIG, District Judge.

This Court referred the above-referenced dispute to Special Master Robert E. Cooper on March 11, 1982. Special Master Cooper filed his Report and Recommendation, proposed Findings of Fact, Conclusions of Law, and Order as the final adjudication of the Skokomish Tribe's request for determination on January 19, 1984.

Having reviewed the Suquamish Tribe's objection to the Special Master's Report and Recommendation and all pertinent pleadings, it is ORDERED that:

(1). The Skokomish Indian Tribe holds the primary right to take fish in Hood Canal and on all rivers and streams draining into Hood Canal south of the line displayed on Exhibit A[62] (attached to Special Master's Report and Recommendation, etc...) commencing on the west shore of Hood Canal at Termination Point and following the course of the

---

**59.** That Order, dated August 27, 1982, approved an agreed upon allocation of the 1981 Skagit River coho run.

**60.** Appendix A is omitted here.

**61.** Affirmed 764 F.2d 670 (9th Cir.1985).

**62.** Exhibit A is omitted here.

Hood Canal Floating Bridge to the east shore of the canal.

(2). No tribe or member of a tribe shall exercise treaty fishing rights within the area of Hood Canal or on rivers or streams draining into Hood Canal subject to the primary right of the Skokomish Indian Tribe without the prior express consent of the Skokomish Indian Tribe or as otherwise provided by the Hood Canal Agreement Between Skokomish Indian Tribe, Port Gamble Band of Klallam Indians, Lower Elwha Band of Klallam Indians and Jamestown Band of Klallam Indians and Order of March 8, 1983. P. 1468, *supra.*

(3) This order constitutes a final decision pursuant to 28 U.S.C. § 1291 on the Skokomish Tribe's request for determination of its primary right.

IT IS FURTHER ORDERED that this Court fully adopts the Report and Recommendation, Findings of Fact, Conclusions of Law of Special Master Robert E. Cooper, dated January 19, 1984. These Findings and Conclusions are as follows:

### FINDINGS OF FACT [63]

348. In this proceeding to determine whether the Skokomish Indian Tribe, as successor in interest to the aboriginal Twana Indians (384 F.Supp. at 376), holds the primary right to take fish in the waters of Hood Canal and in the rivers and streams draining into it, the court heard and closely considered the testimony of three professional anthropologists, Dr. Barbara Lane, Dr. William W. Elmendorf, and Dr. Jay Miller. Dr. Lane and Dr. Elmendorf testified in behalf of the Skokomish Indian Tribe. Both concluded that at treaty times the Twana Indians controlled the territory comprised of, and held the primary right to take fish in, the Hood Canal drainage basin and the waters of Hood Canal south of the Port Gamble area. Dr. Miller testified in behalf of the Suquamish Tribe, which opposed the Skokomish Tribe's request for determination. He concluded that at treaty times the Twana Indians held the primary right only within several hundred yards of their winter villages. As on numerous previous occasions in this case, the court finds that Dr. Lane's testimony and reports in this proceeding were based on exceptionally thorough historical and ethnographic research and are highly reliable. Dr. Elmendorf, who testified by deposition, is the acknowledged authority on the Twana Indians. (Tr. of Hearing, pp. 54–55, 98.) His monograph, *The Structure of Twana Culture* (1960) (Ex. 2 to Ex. SK–SM–1), is based on data collected between 1935 and 1955 from knowledgeable Indian informants born shortly after negotiation of the treaties and is widely regarded to be the best ethnography of a case-area tribe. The court finds that Dr. Elmendorf's testimony and his scholarly monograph are highly reliable. By comparison to that of Dr. Lane and Dr. Elmendorf, Dr. Miller's research related to the issues in this proceeding has been of very short duration. His testimony and report are based largely on informant testimony gathered in 1982 from current members of tribes participating in this proceeding and directly conflict in important respects with the findings of George Gibbs, secretary to the 1855 western Washington Treaty Commission, and the other two anthropologists, whose studies were more comprehensive than Dr. Miller's. For these reasons, where there are variances between the conclusions of Drs. Lane and Elmendorf and those of Dr. Miller, the former are more credible and are accepted.

349. Hood Canal is a long, narrow body of saltwater lying within a well-defined drainage bordered by the Olympic Mountains on the west and the crest of the Kitsap Peninsula on the east. It is more fully described by Dr. Elmendorf as

an L-shaped, salt-water inlet west of Puget Sound.... The main arm of this inlet extends about 45 miles south-south-

---

[63]. With respect to the findings of fact that are accompanied by citations to the record, it is not the court's intention to indicate that the evidence specifically cited is the only evidence supporting a particular finding or that other evidence not cited that could support the finding was not considered.

west from its entrance on the west side of Admiralty Inlet, then makes an acute angle and extends some 15 miles east-northeast to its head. Its tidal shoreline, measured in one-mile steps, is 181 ± miles in length and its width varies from one to four miles. The only large tributary inlets are Dabop and Quilcene Bays, opening together on the west side of the canal about twenty miles from its mouth. (Ex. 2 to Ex. SK–SM–1, p. 20.) The principal rivers flowing into Hood Canal from north to south are the Quilcene, Dosewallips, Duckabush, Hamma Hamma, and Skokomish. Numerous other smaller streams flow into the canal around its periphery. The court finds that largely due to its elongated configuration, Hood Canal is a unique body of saltwater in the case area. It is generally distinguishable from the open waters of Puget Sound in that it terminates in a cul-de-sac within a single drainage, while Puget Sound links a number of otherwise separate drainages and provides an avenue of transportation between them.

350. At and before treaty times, the Twana Indians occupied nine winter villages situated in the Hood Canal drainage basin. Eight of these villages were saltwater communities located at or near the mouths of streams flowing into Hood Canal. No other aboriginal Indian group occupied a village located within the Hood Canal drainage south of the Port Gamble area. The aboriginal neighbors of the Twana Indians, who spoke languages distinct from Twana, included the Klallam Indians to the northwest along the Strait of Juan de Fuca, the tiny Chemakum (or Tchimakum) group to the north at the mouth of Hood Canal, the Suquamish Indians to the east across Kitsap Peninsula on Puget Sound, the Squaxin Indians overland on the Sound to the south and southeast, and the Satsop Indians to the southwest. The Twana had varying degrees of contact, including in most instances marriage, ceremonial and other cultural ties, with these neighbors, and at treaty times were most closely associated with the Klallam Indians. The Olympic Mountains, which form the western perimeter of the Hood Canal drainage, impeded significant contact between the Twana and the Indian peoples occupying the western slope of the Olympic Peninsula. (Ex. 2 to Ex. SK–SM–1, pp. 255–262, 283–298; Ex. SK–SM–3; Tr. of Hearing, pp. 20–36.)

351. All areas of Hood Canal, and the rivers and streams draining into it, were easily accessible by canoe to the treaty-time Twana people residing in the nine winter villages. (Ex. SK–SM–1, pp. 31–32, 88–89.) For approximately seven months each year, beginning in March and concluding in October, the Twana residents of the saltwater communities left their winter villages and dispersed around the canal shoreline and streams flowing into the canal to engage in food-gathering activities. Many Twana families visited a customary round of camping places in the Hood Canal drainage and along the canal shoreline. Congregations of Twana moved along the canal shores, generally from south to north as the summer season progressed, to fish and to obtain other resources in and along the canal. The waters of Hood Canal were used frequently to move Twana personnel, their belongings and accumulated food stores from beach to beach around the canal, and to and from summer camping sites and the winter villages. (Ex. SK–SM–1, pp. 27–31, 88–89; Ex. 2 to SK–SM–1, pp. 260–62; Tr. of Hearing, pp. 154–55.) The Twana named numerous sites along the canal south of the Port Gamble area and on streams draining into that part of the canal. (Ex. 2 to Ex. SK–SM–1, pp. 32–55, and Ex. SK–SM–3.) The main arm of Hood Canal was a "central directional axis for all of Twana territory [,]" (Ex. 2 to Ex. SK–SM–1, p. 24) and Twana terms denoting direction were relative to the direction of the canal or other water courses flowing into it. (*Id.* pp. 21–25.) By using these directional terms in combination with site names, the Twana were able to identify all points on the canal shoreline. (Ex. SK–SM–1, pp. 46–47.) The Twana name for Hood Canal itself was "the Twana's saltwater." (Ex. 2 to Ex. SK–SM–1, pp. 20, 266.)

The court finds that, south of the Port Gamble area, the waters of Hood Canal, its shoreline, and the rivers and streams draining into it were intensively used by, and of great importance to, the treaty-time Twana people.

352. At and before treaty times, the Twana engaged in a variety of fishing and hunting activities in and around Hood Canal and the streams flowing into it. These activities included river and stream fishing for salmon and other species; saltwater fishing in the canal by trolling, spearing and other methods; clamdigging and other shellfish gathering on the tidal zone of the canal; herring-roe harvesting in canal waters; and water-fowl hunting and marine-mammal hunting and trapping on the waters and tide flats of the canal. (Ex. SK–SM–1, pp. 32–35; Ex. 2 to Ex. SK–SM–1, pp. 56–84.) The Twana assigned some of these activities, such as water-fowl and marine-mammal hunting, to specialists who possessed "guardian spirit power" giving them unusual prowess in the activity. (Ex. SK–SM–1, p. 37.) Although river fishing was the most important source of fish for the Twana, all of the other fishing and marine hunting activities noted above were also important to them. (384 F.Supp. at 377; Ex. SK–SM–1, pp. 32–38; Ex. USA 23, p. 8.)

353. In his 1854–55 journal, George Gibbs, a lawyer, ethnographer and secretary to the 1855 Treaty Commission, described Skokomish (or Twana) territory as:

> extend[ing] from Wilkes' Portage northwest across to the arm of Hood Canal up to the old limits of the Tchimakum, thence westerly to the summit of the Coast Range, thence southerly to the head of the west branch of the Satsop, down that branch to the main fork, thence east to the summit of the Black Hills, thence north and east to the place of beginning.

(Tr. at Hearing, p. 29–30.) Gibbs' description of Twana territory embraces Hood Canal and its drainage basin northward along the canal to the point on the west shore now known as Termination Point, which was the southern limit of the Tchimakum shown on a map prepared by Gibbs in 1856. (Ex. SK–SM–4; *see also* Ex. SK–SM–5 for contemporary names.) Gibbs' description of Twana territory was based on information gathered from Indians at and before the treaty councils and at contemporaneous meetings. The court finds it to be the best available evidence of the treaty-time location of Twana territory.

354. Gibbs' description of Twana territory is also corroborated by other evidence in this proceeding, including the work of Dr. T.T. Waterman and Dr. Elmendorf. Waterman, an anthropologist working with Indian informants around 1920, compiled an extensive list and map of sites used by Indians in the western Washington area, including the Suquamish, Klallam and Twana Indians. His data confirm that the areas within the Skokomish (or Twana) territory described by Gibbs were long used and occupied by the aboriginal Twana people. (Tr. of Hearing, pp. 43–49.) Dr. Elmendorf, who did not have access to Gibbs' 1856 journal or to Waterman's site information, concluded that the aboriginal Twana territory encompassed, with minor variances, the same area described by Gibbs in his 1854–55 journal. (Ex. SK–SM–1, pp. 22–23, 92–93.) The accuracy of Dr. Elmendorf's list of Twana sites (Ex. 2 to Ex. SK–SM–1, pp. 32–55) is also corroborated by Waterman's earlier list. Dr. Lane found that the cross-checking made possible by these independent sources of data presented a particularly reliable basis for determining the location of treaty-time Twana territory. (Tr. of Hearing, pp. 45–48.) The court agrees, and upon consideration of all the relevant evidence in this matter, finds that the treaty-time territory of the Twana Indians encompassed all of the waters of Hood Canal, the rivers and streams draining into it, and the Hood Canal drainage basin south of a line extending from Termination Point on the west shore of Hood Canal directly to the east

shore, as depicted on Exhibit A hereto.[64] (*See also* Ex. G 17(h).)

355. The court finds that the foregoing description of Twana territory is also consistent with the customary Indian understanding of territory at treaty times. The treaty-time Twana and their neighbors, like other aboriginal peoples in western Washington, bounded their territories at the divides between drainage basins. (Ex. SK–SM–1, pp. 94–95; Tr. of Hearing, pp. 17–21.) This pattern reflected the predominant Indian conception that territories were centered on the water bodies or courses upon which people relied for subsistence. Territory was most clearly defined, and the sense of ownership strongest, along the waters at its center and was generally less sharply defined at the peripheries. (Ex. 2 to Ex. SK–SM–1, pp. 20–25, 286–287; SK–SM–1, p. 93.) As distinguished from waters lying within single drainage basins, the open waters of Puget Sound usually were not subject to territorial claims. (Tr. of Hearing, pp. 123–125, 142.) The court finds that Twana territory, as described by Gibbs, conforms to the general pattern: Hood Canal formed its centerpiece, and the canal, its shoreline and the streams draining into it were the areas most intensely felt to be owned by the Twana people. By contrast, the boundaries of Twana territory at the crest of the drainage basin were not precisely defined, although the drainage basin as a whole was considered Twana country. (Ex. 2 to Ex. SK–SM–1, pp. 266–270.)

356. The Twana and their neighbors, like other treaty-time Indians in the case area, recognized a hierarchy of primary and secondary or permissive use rights, including fishing rights. (Tr. of Hearing, pp. 14–18; finding 12 herein.) The people occupying a territory held the primary right to fish in the territory. Women who married into a community outside their natal territory retained secondary fishing rights in that territory. Marriage relatives could also acquire such secondary rights in the natal territories of their spouses. The secondary or permissive fishing rights were ineffective, however, unless holders of the primary fishing right first invited or otherwise permitted persons with secondary rights to fish in the territory. The holders of the primary fishing right exercised the prerogative to exclude some or all secondary users from their territorial fishing grounds for any reason they deemed adequate. (Tr. of Hearing, pp. 162–63.) The court finds that at and before treaty times, the Twana Indians held the primary fishing right within their territory, and this right was acknowledged by neighboring peoples. (Tr. of Hearing, pp. 68–69, 144–146, 159–162.) To the extent that Klallam and Suquamish people fished in Twana territory at treaty times, the court finds they did so by virtue of secondary rights or as invited guests. (Tr. of Hearing, pp. 66–67; Ex. SK–SM–2; Ex. SK–SM–1, pp. 22, 44–46, 57.) The court further finds that the Suquamish Tribe's evidence of fishing activity by Suquamish people in the Hood Canal area around the turn of the 20th Century, even if fully credited, would not support a finding that, at treaty times, the Suquamish Tribe's forebears fished in Twana territory as other than persons holding secondary rights subject to the Twanas' primary right.

357. The Twana and their treaty-time neighbors, including the Klallam and the Suquamish, enjoyed peaceful relations founded on marital, ceremonial and other cultural ties. (Tr. of Hearing, pp. 16–18, 141; Ex. SK–SM–1, pp. 56–61; Ex. 2 to Ex. SK–SM–1, pp. 283, 465.) Because of these peaceful relations, it was unnecessary for the Twana to defend their territory or the fishing places within it from unauthorized use by non-Twana neighbors and there is no evidence that such unauthorized use occurred. There was a common understanding among the Twana and their neighbors concerning the respective location of their territories and the nature of fishing

---

**64.** Exhibit A map is omitted here. This line coincides with the Hood Canal Bridge. See paragraph (1) of the Order.

rights in those territories. (Tr. of Hearing, pp. 184–46; Ex. SK–SM–1, pp. 40–42, 57–58.) The customary behavior of Indian people in the area at and before treaty times generally reflected these common understandings through restraint from intrusion on or unauthorized use of others' territories. (Tr. of Hearing, pp. 17–18, 60, 162; Ex. SU–SM–22 at pp. 54–55.) The court finds that the treaty-time Twanas' control of their territory inhered primarily in the network of shared customary understandings concerning territory. However, the court also finds that Twana had readily available means to deter unauthorized use of their territory and fishing areas within it. These included social disapproval and magical retaliation against would-be intruders, both of which deterrents were taken very seriously in the aboriginal societies of western Washington. (Ex. SK–SM–1, pp. 54–57.) It is also highly likely that had the other deterrents proved inadequate, the Twana would have responded with physical force to extreme or obvious intrusions upon their fishing territory. (Ex. SK–SM–1, pp. 118–119.)

### CONCLUSIONS OF LAW

■ 91. The court has previously held that the usual and accustomed fishing places of the Skokomish Indian Tribe encompass Hood Canal and the rivers and streams draining into it. (384 F.Supp. at 377.) The court has also determined that the usual and accustomed fishing places of the Port Gamble and Lower Elwha bands of Klallam Indians include the waters of Hood Canal and all rivers and streams draining into it, except the Skokomish River, (order of May 24, 1983, revised findings 341 and 342 at pp. 1442–1443, *supra* ), and that the Suquamish Tribe's usual and accustomed fishing places include Hood Canal. (Orders of March 28, 1975, and April 18, 1975, finding 5, 459 F.Supp. at 1049.) The court has not previously determined which tribe, if any, has the primary fishing right within Hood Canal or its surrounding drainage basin. The earlier determinations

establishing that more than one tribe has usual and accustomed fishing places within the Hood Canal region do not preclude a later determination that one of the tribes holds the primary right within that area. *United States v. Lower Elwha Tribe,* 642 F.2d 1141 (9th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 161 (1981).

■ 92. The aboriginal primary right of the Twana Indians to take fish within their territory was fully preserved to the Skokomish Indian Tribe by the Treaty of Point No Point, 12 Stat. 933 (January 26, 1855), as a "right of taking fish" thereunder. Members of tribes other than the Skokomish Tribe may not exercise treaty fishing rights by fishing at usual and accustomed places of those tribes within the territory described in finding 354, above, south of the line shown on Exhibit A hereto, without the prior express consent of the Skokomish Indian Tribe. Subject to the limitations contained in the following paragraph, the Skokomish Indian Tribe possesses the right to preclude or otherwise regulate Indian treaty fishing by members of tribes other than the Skokomish Tribe within the area described in finding 354, above.

93. By order of March 8, 1983, the court approved the Hood Canal Agreement Between Skokomish Indian Tribe, Port Gamble Band of Klallam Indians, Lower Elwha Band of Klallam Indians and Jamestown Band of Klallam Indians. P. 1468, *supra.* This stipulation and order contains the consent of the Skokomish Indian Tribe to fishing within certain parts of its territory, or primary right area, by the members of the named Klallam bands, subject to conditions stated therein. That stipulation and order shall continue to govern treaty fishing by members of the Klallam bands in the areas described in it.

### ORDER DENYING MOTION TO VACATE

(April 25, 1984) [65]

CRAIG, District Judge.

The Suquamish Tribe seeks an order vacating this Court's Order Adopting the Spe-

---

**65.** See 764 F.2d 670 (9th Cir.1985).

cial Master's Report and Recommendation Re: Skokomish Indian Tribe's Request for Determination of Primary Right in Hood Canal Fishery, dated March 24, 1984. The Suquamish Tribe partially base their motion on Federal Rules of Civil Procedure, Rule 53(e)(2). Rule 53(e)(2) requires a hearing on the merits of a Special Master's Report and Recommendation when a timely and valid objection to the Report and Recommendation has been made. This Court did not hold a hearing on the Report.

The Skokomish Tribe has responded to the Suquamish Tribe's Motion to Vacate. There has been no timely reply to the response. The Suquamish Tribe, however, filed a Notice of Appeal to the Ninth Circuit Court of Appeals on April 20, 1984.

This Court will treat the Suquamish Tribe's Motion to Vacate Order as a motion to alter or amend a judgment pursuant to Federal Rules of Civil Procedure, Rule 59. This Court has reviewed the Special Master's Report and Recommendation, the Motion to Vacate, all pertinent pleadings, and concludes as follows.

▇▇▇ The Suquamish Tribe's objections to the Report and Recommendation were filed within the ten (10) day period as prescribed by Rule 53(e)(2). The objections, however, are equivocal and ambiguous. The objections are merely a referral to memoranda previously filed by the Suquamish Tribe in this case. The objections, therefore, are too general to be valid. *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 381 n. 4 (D.D.C.1978); *Houston v. Atlanta Federal Savings and Loan Association*, 414 F.Supp. 851, 854 (N.D.Ga. 1976). After careful review of the Special Master's report, this Court adheres to its conclusion that the results are not "clearly erroneous".

▇▇▇ Further, this Court notes that the Suquamish Tribe filed its Notice of Appeal before this Court rendered judgment on its Motion to Vacate. The Ninth Circuit has held that it does not have appellate jurisdiction in similar circumstances. *Bestran*

*Corp. v. Eagle Comtronics, Inc.*, 720 F.2d 1019 (9th Cir.1983).

Finally, this Court has applied a *de novo* review of the Special Master's finding that the Skokomish Tribe holds the primary right to take fish in the specified areas of Hood Canal. This Court affirms the Special Master's mixed finding. *United States v. State of Washington*, 730 F.2d 1314 (9th Cir.1984).

IT IS THEREFORE ORDERED that the Suquamish Tribe's Motion to Vacate is denied. This is a final order on all of the claims pending before the Court on this subject matter. Federal Rules of Civil Procedure, Rule 54(b).

## ORDER ON CHEHALIS RIVER CONTEMPT PETITIONS

### (May 10, 1984) [66]

CRAIG, District Judge.

▇▇▇ The Court has reviewed the petitions of the Quinault Indian Nation ("Quinaults") and of the United States for findings that the State of Washington, *et al.*, should be adjudged in contempt of Court for enforcement actions taken against the Quinaults on the Chehalis River on January 21, 1983. The Court has reviewed all portions of the record relevant to those petitions including, *inter alia*, respondents' Motions to Dismiss and To Strike, all pertinent memoranda, United States Magistrate John L. Weinberg's "Report & Recommendation on Chehalis River Contempt Petitions," and the memoranda and objections relevant to the Report and Recommendation. This Court, having heard argument on the Findings of Fact and Report & Recommendation on May 4, 1984, concludes as follows.

This Court has applied a *de novo* review of the Magistrate's mixed Findings of Fact and Report & Recommendation. *United States v. Washington*, 730 F.2d 1314 (9th Cir.1984).

**66.** Affirmed 761 F.2d 1419 (9th Cir.1985)

IT IS THEREFORE ORDERED that the State of Washington, Department of Game, Washington State Game Commission, Mr. Frank Lockard (as director of the Department of Game) and Mr. John Gillespie (an agent of the Department of Game) are in civil contempt of the prior orders of this Court. This finding is based upon the actions of those agencies in promulgating and enforcing a state-imposed closure (for allocation purposes only) without first securing approval of this Court. The enforcement actions were in violation of *United States v. Washington*, 384 F.Supp. 312, 402, 404, 414–415 (W.D.Wash.1974). This Court's March 22, 1974 injunction (paragraphs 1(c), 2, and 6) was violated.

IT IS ORDERED that the Court adopts the Magistrate's Report & Recommendation as modified by this Order and the Court's Findings of Fact in this matter.

IT IS ORDERED that the Quinaults and the United States are entitled to the following relief against the above-named respondents:

(a) The Quinaults shall recover $1,844.34, representing costs incurred in these proceedings through the evidentiary hearing;

(b) The United States shall recover $499.90 representing costs incurred in these proceedings through the evidentiary hearing;

(c) Petitioners may apply for any additional costs incurred since April 7, 1983. They shall do so by a motion filed and served within twenty-one (21) days after entry of this Order. Such a motion shall be accompanied by full documentation;

(d) Petitioners are entitled to recover their reasonable attorneys' fees incurred in these proceedings pursuant to the guidelines in *Kerr v. Screen Extras Guild*, 526 F.2d 67 (9th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726 [48 L.Ed.2d 195] (1976). The Court refers that issue to United States Magistrate John L. Weinberg for further proceedings.

IT IS ORDERED that the State of Washington; Department of Game; Washington State Game Commission; Mr. Frank Lockard (director of Department of Game); Washington State Department of Fisheries; Mr. Bill Wilkerson (director of Department of Fisheries); their agents, officers, employees, successors-in-interest, and all persons acting in concert or participation with any of the above are enjoined and restrained as follows:

Unless they have secured the prior specific approval of this Court, or the concurrence of all affected treaty tribes in the specific proposed restriction, the respondents (and those others mentioned above) shall neither promulgate nor enforce for purposes of allocation, any regulations or other measure prohibiting or restricting fishing by treaty tribes where such fishing is permitted under existing tribal regulations. This Order shall not be deemed in any respect to authorize actions by respondents heretofore prohibited by Order of this Court.

IT IS ORDERED that, except as set forth in this Order, the petitions of the Quinaults and of the United States, and respondents' Motions to Strike and to Dismiss, are denied.

IT IS ORDERED that the fishermen whose nets were damaged have thirty (30) days, from the date of this Order, within which to file a written claim with the Washington Attorney General. The Attorney General shall provide a response to the claimant within sixty (60) days of this Order. The claim resolution procedure, as outlined in *United States v. Washington*, 384 F.Supp. 312, 418–419 (W.D.Wash.1974), shall be followed within its practical limits. In the event either party invokes this Court's continuing jurisdiction over the dispute, the matter is referred to the United States Magistrate for his Report & Recommendation to the Court.

IT IS ORDERED that liquidated damages in the amount of $250.00 per illegally seized net are granted. These liquidated damages are for lost fishing time, fish and

harvest opportunity due to the state enforcement actions.

IT IS ORDERED that the Attorney General of the State of Washington shall take steps to assure that relevant State of Washington personnel are fully aware of the provisions of this Order, of the Report & Recommendation by the Magistrate as adopted by this Court, and of all other injunctive or mandatory orders of this Court in this case as shall pertain to their duties and operative conduct.

IT IS FURTHER ORDERED that this is the final order on all of the claims pending before the Court on this subject matter. Federal Rules of Civil Procedure Rule 54(b).

## FINDINGS OF FACT ON CHEHALIS RIVER CONTEMPT PETITIONS

### (May 10, 1984)

CRAIG, District Judge.

The Quinault Indian Nations ("Quinaults") and the United States seek an Order holding in civil contempt four agencies or persons for alleged violation of this Court's orders in *United States v. Washington*, 384 F.Supp. 312 (W.D.Wash.1974). This Court finds as follows.

### FISHING IN THE CHEHALIS RIVER (GENERALLY)

(1) The Chehalis River ("the river") enters Grays Harbor at Aberdeen, Washington. The usual and accustomed fishing grounds of the Quinaults include, *inter alia,* the lower portion of the river. The Quinaults conduct an annual fishery there for winter run steelhead trout.

(2) This Court has classified the Quinaults as a "self-regulating" tribe, for purposes of its fisheries.

(3) The reservation of the Chehalis Tribe, a non-treaty tribe, is located up-stream on the river, near Oakville. Members of the Chehalis Tribe harvest steelhead on the reservation.

(4) Non-treaty fishermen also harvest steelhead on the reservation.

(5) Under prior orders of this Court, treaty and non-treaty fishermen are each entitled to an opportunity to catch fifty percent (50%) of the harvestable winter steelhead in the river.

### ALLOCATING THE HARVEST BY THE CHEHALIS TRIBE

(6) There has been a long-standing dispute among the State, the Quinaults, the Chehalis Tribe and other interested parties as to how to treat, for allocation purposes, the harvests of the Chehalis Tribe. The State asserts the harvest of the Chehalis Tribe should be "counted" against the treaty share because they are Indians, and take their fish on the reservation. Because the Chehalis Tribe is not a treaty tribe, however, the Quinaults assert their harvest should be counted against the non-treaty share.

(7) Frederick E. Olney, then chairman of this Court's Fisheries Advisory Board, considered in October of 1980 a similar dispute as to the allocation of the coho salmon harvest of the Chehalis Tribe. Mr. Olney's report of that meeting, in which the Quinaults participated, includes:

"I explained that I had raised this issue with Judge Craig and that he had advised me that if the Board has any question about the status of the Chehalis Tribe, half of their catch should be assigned to the treaty share and half assigned to the non-treaty share until there could be a legal determination of this matter."

FAB 80–24, October 10, 1980, p. 2.

(8) Mr. Olney considered the same issue at an FAB on February 1, 1982, relating to the harvest of the 1981–82 winter steelhead in the Chehalis River. This is the same run in the same river as the present case, but for the prior year. The report of that meeting, FAB 82–4, is Exh. QN–M–10. Mr. Olney again suggested the 50–50 allocation of the harvest of the Chehalis Tribe as an interim solution. At that time, the harvest by the Quinaults, added to half the harvest of the Chehalis Tribe, approximately equalled the treaty share. The Quinaults

agreed to close their steelhead fishery for the season. Exh. QN–M–15. This constituted an implied agreement by the Quinaults to accept the 50–50 interim solution, at least for the 1981–82 run.

(9) The parties first submitted the issue of allocating the harvest of the Chehalis Tribe to the Court for resolution in 1983, after the conclusion of the Quinaults 1982–83 season. It is now pending before the Court in a separate, but related, proceeding.

(10) In their negotiations with each other for a permanent resolution, and for purposes of their application to this Court for a ruling, the Quinaults and the State preserved their formal positions seeking 100% allocation of the harvest of the Chehalis Tribe (Finding No. 6, *supra*). But for purposes of day-to-day management of the 1982–83 fishery, the Quinaults were willing to abide by the 50–50 interim solution suggested in 1980 and 1982 by Mr. Olney. Joseph DeLa Cruz, President of the Quinaults, testified that the Quinaults had accepted the interim solution for the 1982–83 winter steelhead fishery. Hearing transcript, p. 278 ("R. 278"). Justine James, Senior Vice-Chairman of the Quinaults, confirmed this fact. See p. 28 of his deposition, Exh. QN–M–27. The State's position (until it enacted the disputed closure), however, was that the entire Chehalis tribal catch should count against the treaty share. QN–M–9 and QN–M–16; R. 100 and 179–80.

CALCULATING THE QUINAULTS' SHARE FOR 1982–83

(11) Prior to the 1982–83 winter steelhead run, the State and the Quinaults entered into negotiations as to the total number of harvestable steelhead. Eventually, they reached tentative agreement on a total of 4,000 fish. This is reflected in the exchange of letters between the parties' biologists, Exhs. QN–M–9 and QN–M–8. The Quinaults' later reference to their share of 2,000 fish in QN–M–3 confirms their tentative agreement to the total harvestable number of 4,000. The State and Quinaults were unable to resolve their dis-

pute as to allocation of the harvest of the Chehalis Tribe. But as noted in Finding 10, *supra*, the Quinaults were willing to agree to a 50–50 division of the Chehalis Tribe harvest for 1982–83.

(12) There was therefore no genuine dispute between the State and the Quinaults as to the harvestable number for the 1982–83 winter steelhead run on the Chehalis River. The parties had deferred to some unspecified future time a formal Court determination of the issue of allocating the harvest of the Chehalis Tribe. Instead of reaching agreement with the Quinaults as to allocation for the 1982–83 season, the respondents State and Department of Game enacted a closure of the Chehalis River which they then sought to enforce without seeking either FAB or Court approval. Nothing in the record indicates that the respondents were willing to count the Chehalis tribal catch 50–50 for their 1982–83 season until they attempted to justify their closure.

THE 1982–1983 STEELHEAD SEASON

(13) By regulation passed on January 5, 1983, the Quinaults opened the river to fishing by treaty fishermen for three (3) five-day periods, starting at noon Sunday on January 9, January 16 and January 23, 1983. Tribal Regulation No. 82–83–C–21, Exh. QN–M–11.

(14) For the period of approximately January 11–18, 1983, administrative errors caused a delay in reporting to Game the catch by the Quinaults. The catch reports were brought up to date on Tuesday morning, January 18, 1983. Deposition of Paul Huffman, Exh. QN–M–26, pp. 100–101.

(15) As of Wednesday, January 19, 1983, Quinault fishermen had harvested approximately 1,934 steelhead, subject to certain minor adjustments, and were taking less than forty (40) per day. Deposition of Justine James, Exh. QN–M–27, p. 27. Paul Huffman, a biologist, employed by the Quinaults, projected that as of the Tribal closure scheduled for noon Friday, January 21, 1983, the total harvest by Quinault fishermen would be approximately 2,000 fish.

These figures did not include any of the harvest by fishermen from the Chehalis Tribe.

(16) In fact, fishermen from the Chehalis Tribe had harvested approximately 531 fish as of Friday, January 21.

(17) While the Quinault fishery was scheduled to close for the week at noon Friday, January 21, it was scheduled to re-open for an additional five days at noon on Sunday, January 23. Upon the recommendation of Mr. Huffman, the Quinaults adopted Regulation No. 83–83–C–22 on Wednesday, January 19, 1983, cancelling the additional five-day fishery. Exh. QN–M–3. The net effect was that the Quinault fishery would close for the season at noon on Friday, January 21.

(18) After receiving the Quinault catch reports Tuesday, January 18, the State determined that, prior to the tribal closure scheduled for noon Friday, January 21, the sum of the Quinault harvest and half of the harvest of the Chehalis Tribe would exceed the Quinault's share by approximately 250 fish. The additional five days of scheduled fishing would substantially increase the amount by which the Quinaults exceeded their share. Therefore, on Wednesday, January 19, the Washington State Game Commission adopted a regulation closing the river to Indian fishing effective 6:00 p.m. on Thursday, January 20. Exh. QN–M–1.

(19) The State determined that, as of 6:00 p.m. on Thursday, January 20, 1983, the sum of the Quinault harvest and half of the Chehalis Tribe harvest exceeded the treaty share for the 1983–83 winter steelhead run in the Chehalis River.

(20) One or more Assistant Attorneys General advised Gillespie and other representatives of Game that promulgation and enforcement of this closure by the State and its officials would not violate existing orders in this case. Exh. QN–M–14; R. 160–1.

(21) Respondent Gillespie gave the order to enforce the closure against the Quinaults. For that purpose, he arranged the enforce-

ment action described, *infra,* and scheduled it for Friday morning, January 21.

(22) The State furnished sufficient notice to the Quinaults of the closure and the enforcement action that it was generally known to tribal officials and some fishermen. Tribal officials advised the fishermen that only the Tribe, not the State, could close down the fishery of a self-regulating tribe. They counselled the fishermen to cooperate and not to resist. Deposition of Justine James, Exh. QN–M–27, pp. 32–35.

(23) As of Thursday, January 20, and perhaps on Wednesday, January 19, both the Quinaults and respondents were aware that there was a conflict between their respective closures. The Quinaults were aware that the State intended to enforce its closure. Neither party took steps to convene a meeting of the Fisheries Advisory Board, or to seek relief from this Court.

(24) The difference between the parties was as to the proper date for an allocation closure of the treaty fishery. The dispute involved no issues of conservation.

(25) On Thursday evening January 20, after the close of working hours, the Quinaults deposited in the mail slot of Game's office in Aberdeen a copy of their regulation cancelling the additional five days of fishing. This was the first written notice of the Tribal closure received by the State or its representatives; and it was not read until Friday morning, after the enforcement action had begun. But prior to the enforcement action, Gillespie had learned orally from a Quinault police officer that the Quinault closure scheduled for noon Friday, January 21 had been changed to a *season* closure (R. 137–139).

(26) Gillespie, the state officer who began the enforcement action at 8:00 a.m. on Friday, January 21, was therefore aware that it would, at most prevent only four hours of 1982–83 steelhead fishing by the Quinaults.

ENFORCEMENT ACTION FRIDAY, JANUARY 21, 1983

(27) Three jet boats containing nine enforcement officers from Game, put into the

Chehalis River at Montesano and headed down river at 8:00 a.m. on Friday, January 21, 1983. The officers were under the direction of Gillespie, who was in radio contact with them. Gillespie anticipated the possibility of conflict with the Quinault fishermen, and had alerted various other police departments. The officers all carried sidearms.

(28) The purpose of the enforcement action was to sweep the river, removing the nets of Quinault fishermen who were violating the State closure. Gillespie instructed the officers not to arrest or issue citations to the fishermen, unless they resisted.

(29) In the course of the sweep to the mouth of the river at Aberdeen, the officers confiscated about 19 Quinault nets, damaging some in the process. They issued citations to two Quinault fishermen, David Frank and James DeLa Cruz, one of whom requested or demanded a citation. R. 131–32 and 147–48. DeLa Cruz showed them a copy of the tribal regulation closing the season as of noon Friday. Exhs. QN–M–4 and –5. There were no physical conflicts and no fisherman was taken into custody. The citations issued to the two Quinault fishermen were based on RCW 77.16.-060. Ex. QN–M–4 and –5.

(30) The officers also conducted a sweep of the river in the area of the Chehalis Reservation on the afternoon of the same day, Friday, January 21. They made no contacts with fishermen. Gillespie made the decision to conduct the patrol for the Quinault fishermen in the morning and for the Chehalis Tribe in the afternoon, instead of *visa versa.*

## DAMAGES, COSTS AND ATTORNEYS' FEES

(31) The Quinaults filed their petition for a contempt finding within a week after the incident. Since that time, counsel for the parties have negotiated, Exhs. G–M–2 and QN–M–21, and have met with the Court. The State has taken several steps to minimize the damage to the Quinault fishermen. The prosecuting attorney for Grays Harbor County dismissed the criminal pros-

ecutions against Frank and DeLa Cruz with prejudice, prior to trial, on April 12, 1983, upon request by the office of the Attorney General of Washington. The confiscated nets were returned on April 13, 1983. Return of the nets was delayed by a dispute as to *where* they were to be returned. (The foregoing dates are based upon letters to the Court from counsel for respondents).

(32) Neither the Quinaults nor the United States has produced evidence to establish any of the following:

(a) Damage suffered by a fisherman as a result of receiving a citation or the temporary pendency of a criminal proceeding;

(b) The nature or extent of damage to any fishing net; or

(c) The value of lost fishing time resulting from damage to the nets or from their possession by respondents for almost three (3) months.

(33) The major element of monetary relief sought by the Quinaults and the United States is for attorneys' fees, incurred in presenting this matter to the Court. When and if the Court determines they are to recover those fees, and after conclusion of other issues in this dispute, the Court will set the amount of such recovery.

(34) Through April 7, 1983, the date of the evidentiary hearing, the Quinaults had incurred the following expenses, apart from attorneys' fees, in presenting this matter to the Court:

| | |
|---|---|
| Court Reporter, depositions of State Officials Exh. QN–M–24 . . . . . . . . . | $ 769.75 |
| Court Reporter, depositions of Tribal Officials Exh. QN–M–25 . . . . . . . . . | $ 261.00 |
| Time devoted by Paul Huffman, Exh. QN–M–13 . . . . . . . . . . . . . . . . . . . . . | $ 755.78 |
| Mileage, Huffman, 282 mi. at 20.5¢, Exh. QN–M–13 . . . . . . . . . . . . . . . . . | $ 57.81 |
| | $1844.34 |

(35) Through April 7, 1983, the date of the evidentiary hearing, the United States had incurred the following expenses, apart from attorneys' fees, in presenting this matter to the Court:

| | |
|---|---|
| Travel expenses (Dysart affidavit, 4/11/83, docket no. 8900) . . . . . . . . . | $ 474.80 |
| Copy charge, deposition transcript . . . | $ 25.10 |
| | $ 499.90 |

## MAGISTRATE'S REPORT AND RECOM-MENDATION ON CHEHALIS RIVER CONTEMPT PETITIONS

(April 23, 1984)

JOHN L. WEINBERG, United States Magistrate.

### INTRODUCTION

The Quinault Indian Nation ("Quinaults") and the United States seek an order holding four respondents in civil contempt of court: the State of Washington ("State"); the Washington Department of Game ("Game"); Frank Lockard, Director of Game; and John Gillespie, a regional wildlife agent for Game. The dispute arises from action taken by respondents to enforce against Quinault fishermen a state-imposed closure of the Chehalis River on Friday morning January 21, 1983. At that time, state officers confiscated nineteen Quinault steelhead nets, and issued citations to two Quinault fishermen.

The incident frames this principal issue: whether prior orders of this court prohibit the State from imposing and enforcing against the Quinaults an allocation closure, without securing prior approval from this court.

Intertwined with this issue is a continuing dispute as to whether the on-reservation steelhead harvest by the Chehalis Tribe, a non-treaty tribe, is to be counted against the treaty share, against the non-treaty share, or partially against each. The merits of this issue will be resolved in a separate proceeding.

The court has referred to the United States Magistrate, for report and recommendation, the two petitions for contempt findings, and the two motions by the respondents to strike and dismiss those petitions. The parties have thoroughly briefed the matter, and participated in an evidentiary hearing.

Through good faith efforts on both sides, the parties have narrowed the issues from those presented in the original pleadings. No longer do the Quinaults or the United States seek a finding of contempt against subordinate enforcement officers of Game, or against the Assistant Attorney General who provided legal advice to the respondents. The State has been instrumental in securing a dismissal of the criminal prosecutions against the Quinault fishermen, and has returned all confiscated nets. Petitioners have made clear they seek only a finding of civil, not criminal contempt. Respondents have therefore not pursued their demand for a jury trial.

The Quinaults and the United States now seek the following relief:

(1) a finding of civil contempt against each of the four respondents;

(2) compensatory relief to Quinault fisherman whose nets were confiscated;

(3) an injunction against similar future action by respondents; and

(4) their costs and attorneys fees in this proceeding.

### SUMMARY OF RECOMMENDATIONS

Based upon all the evidence presented, I recommend the court adopt the "Proposed Findings of Fact on Chehalis River Contempt Petitions," which accompany this Report and Recommendation.

I further conclude, for the reasons discussed below, that those facts establish a clear and unequivocal violation of this court's prior orders. I therefore recommend that the court find the State of Washington, and the Department of Game, in civil contempt. In light of all the circumstances, however, the court should deny the petitions to hold the individual respondents, Lockard and Gillespie, personally in contempt.

The State and Game should be required to pay the costs established in Findings of Fact [34] and [35], and attorneys' fees of the Quinaults and the United States in amounts to be determined in later proceedings. Petitioners have not established any other costs or damages. Lest there be any further uncertainty, the court should spe-

cifically enjoin respondents, and others who might act on their behalf, from similar future conduct.

## SUMMARY OF DISPUTE

The findings of fact reveal a relatively simple dispute. As of 6 p.m. on Thursday, January 20, 1983, the steelhead harvest by the Quinaults, properly computed, already exceeded their proper allocation. Yet tribal regulations permitted treaty fishing through noon the next day. The State, and Game, apparently deemed it imperative to take strong action to "close down" the Quinault fishery during the intervening period. The State closure was strictly for allocation purposes. There has been neither allegation nor evidence that issues of conservation were involved in any way.

The enforcement effort resulted in seizures after 10:00 a.m. on Friday. The effect, therefore, was to prevent less than two hours of Quinault fishing. Given the testimony that the Quinault catch was less than 40 steelhead per day, serious questions arise as to the judgment of the State and Game in sending armed enforcement officers to sweep the river, risking confrontations and possible violence with Quinault fishermen.

In any event, the facts frame this issue, to be resolved in light of this court's prior orders: when the State determines that the harvest by a self-regulatory tribe has exceeded its proper allocation, may the State take direct action to close the tribal fishery, and enforce that closure? Or must the State seek relief through other channels?

## PERMISSIBLE SCOPE OF STATE REGULATION

This case has had a long and complex history. The primary statement of the rights, duties and obligations of the parties, and prohibitions on state conduct, are set forth in Judge Boldt's original decision, reported at 384 F.Supp. 312 (W.D.Wash. 1974). That must serve as the principal text for the resolution of this dispute. Since the original decision, there have been several related determinations, including:

(1) the affirmance in the Court of Appeals, reported at 520 F.2d 676 (9th Cir.1975); (2) subsequent orders in this court, including but not limited to those reported at 459 F.Supp. 1020 (W.D.Wash.1978); and (3) the 1979 decision of the United States Supreme Court in a related case, *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). But the parties have not shown that those later determinations modified Judge Boldt's original decision in any way relevant to this dispute.

This court must also consider the procedures the court and parties have developed to deal with resolution of day-to-day disputes.

If there is one explicit and uncontradicted theme which runs throughout Judge Boldt's original decision, it is the following:

"The state has police power to regulate off reservation fishing only to the extent reasonable and necessary for conservation of the resource."

Final Decision # I, 384 F.Supp. at 333.

The court held unlawful state statutes and regulations restricting off-reservation fishing because they were not shown to be reasonable and necessary for conservation. *Id.* at 333. The court further held:

"The arrest of, or seizure of property owned or in permitted custody of, a treaty right fisherman under a regulation not previously established to be reasonable and necessary for conservation, is unlawful and may be actionable as to any official or private person authorizing or committing such unlawful arrest or seizure."

*Id.*, at 342.

The court repeats the same theme, (384 F.Supp. at 345) quoting with approval similar holdings in *Sohappy v. Smith*, 302 F.Supp. 899 (D.Or.1969), and reiterates the point in conclusions of law 23 and 29 (384 F.Supp. at 401–2), and paragraph 20 of the Declaratory Judgment and Decree (*Id.*, at 407–8).

■ The importance of these holdings is that the court declared, in no uncertain terms, that while the State can regulate off-reservation fishing by treaty tribes for purposes of conservation, it cannot do so for any other purpose. In this case, the regulation and enforcement was for allocation, not for conservation. The State acted unlawfully.

## SELF–REGULATORY STATUS OF QUINAULTS

Judge Boldt's decision goes on to discuss procedures and mechanisms to resolve disputes regarding regulation for conservation. Although this is not such a case, we must consider that discussion, because the parties have injected the issue of the "self-regulating" status of the Quinaults.

Judge Boldt envisioned two different sets of procedures for the State in regulating, for conservation purposes, off-reservation fishing by treaty tribes. Certain tribes, including the Quinaults, have qualified as "self-regulating." In "regulating" for conservation purposes, the State is limited to a less active role as to a "self-regulating" tribe than as to tribes which have not so qualified. The answer to question No. 8, 384 F.Supp. at 410, sets forth some of the differences.

The crucial point for the present dispute, however, is that the self-regulating status of a tribe is important only in defining the respective responsibilities of the tribe and the State in regulating for purposes of conservation. Nowhere in Judge Boldt's decision is there any suggestion that the State may regulate, for allocation purposes, the off-reservation fishing of *any* tribe.

Viewed in this light, the vigorous dispute between the parties as to the existence and nature of the Quinaults' self-regulatory status is essentially a red herring.

Nevertheless, the conclusion of the Attorney General of Washington that the concept of self-regulating tribes had been abolished led directly to the confrontation on the Chehalis River. After the decision of the Supreme Court in *Passenger Fishing*

*Vessel*, the Attorney General of the State advised the Governor:

"The Court has confirmed that the state has the primary management responsibility for the resource outside of reservation areas and thus Judge Boldt's creation of 'self-regulating tribes' which regulate their members to the exclusion of state regulation has been terminated."

Exh. QN–M–2, p. 2.

This conclusion apparently remained the position of the Attorney General through the date of the incident at issue here. It formed the basis for the advice from the Assistant Attorney General to Gillespie and others that the closure of the Chehalis River, and its enforcement, were consistent with this court's orders.

In their initial responses to the contempt petitions, respondents relied in part upon the alleged termination of the concept of self-regulating tribes. Under challenge by the tribes and by the United States, however, respondents have cited nothing in the Supreme Court's opinion that so holds. Indeed, later in this proceeding the State explicitly abandoned that argument. Transcript of argument, May 11, 1983, p. 48 (docket no. 9157).

For whatever relevance they have to this dispute, the concept of self-regulatory tribes, and the Quinault's status as such, are alive and well.

## VIOLATION OF INJUNCTION

For the foregoing reasons, the actions of respondents here were unlawful, when measured against the original decision of this court. As this is a contempt proceeding, however, we must examine further to determine whether the conduct of respondents violated any injunctive order directed to them.

The original decision included a comprehensive injunction, reported at 384 F.Supp. 413 *et seq.* That injunction is directed against all four respondents as well as others. As discussed below, its terms prohibit, both generally and specifically, the

conduct established by the evidence in this dispute.

Paragraph 1(c) of the injunction (384 F.Supp. at 414) requires defendants to "conform their regulatory action and enforcement to each and all of the standards set forth in Final Decision # I." As already discussed, Final Decision # I could hardly have been more explicit in limiting to conservation purposes any state regulation of off-reservation fishing by treaty tribes. The regulatory action on the Chehalis River did not conform to the standards in Final Decision # I.

But the injunction also prohibited this conduct explicitly. Paragraph 2 provides:

"2. Defendants shall not interfere with or regulate or attempt to regulate the treaty right fishing of members of the Yakima Indian Nation or Quinault Tribe or any other treaty tribe during any period for which said tribe has been or is hereafter determined pursuant to Final Decision # I to be entitled to self-regulate such fishing by its members without any state regulation thereof; provided however that monitoring by the state as stated as a condition for self-regulation may be exercised by the state and in case of a threat to the resource, the defendants may apply to the court for the exercise of regulatory authority."

384 F.Supp. 414.

Respondents argue that this paragraph prohibited the State from regulating "treaty right fishing;" but that once a tribe exceeds its allocation, fishing by its members is no longer "treaty right fishing." This argument collapses, however, when viewed in the context of the entire decision. The Quinaults have a treaty-protected right to fish for steelhead on the Chehalis River where their nets were seized on January 21, 1983. Without alluding to shares or allocations, this court has declared:

"The state has police power to regulate off reservation fishing only to the extent reasonable and necessary for conservation of the resource."

384 F.Supp. at 333. The State's contention that this restriction on its authority somehow evaporates when a tribe exceeds its allocation is flatly contradictory to the terms and the tenor of the decision.

## PROPER RESOLUTION OF ALLOCATION DISPUTES

This leads to a more troubling issue: what procedures *are* available to ensure that a tribe does not exceed its allocation?

While Final Decision # I decrees the respective shares of the treaty and non-treaty fishermen, it provides little guidance as to what controls are available to limit the treaty harvest to its proper share. The court expects the tribes to enact and enforce fishing regulations designed not only to conserve the resource, but also to limit the treaty harvest to its proper share. Judge Boldt made that clear in resolving a 1975 dispute involving the Nisqually River fishery. 459 F.Supp. 1020, 1047–8 (W.D. Wash.1978).

But less clear is whether and how the State may properly challenge tribal regulations from an allocation standpoint. The State persuasively argues that it must be permitted to protect the legitimate interests of the non-treaty fishermen. For the reasons already discussed, the State is expressly prohibited from doing so by direct regulation and enforcement, as on the Chehalis River in January of 1983. But is there a way of doing so, consistent with this court's prior orders?

In ten years of living with the "Boldt decision," the parties have evolved two other techniques, either of which is an acceptable line of approach.

The court created the Fisheries Advisory Board ("FAB") in 1975. 459 F.Supp. at 1061–3. Although the FAB was originally designed to consider and resolve disputes regarding conservation, its role has expanded to cover allocation disputes. In fact, when a very similar issue arose on the Chehalis River in 1982, it was the FAB which resolved it, upon application by the Quinaults. Neither party approached the FAB in the 1983 dispute.

Parties have also petitioned the court directly for relief in allocation disputes, either by a motion for a temporary restraining order or a "Request for Determination." The State can make such an application immediately, or after an unsuccessful attempt to resolve the dispute through the FAB. In fact, the State has used this technique in prior instances, one of which was on application for a TRO concerning the Quinault River.

The parties can invoke either of these procedures, and can obtain a hearing on the issue, on very short notice. While these procedures differ in form, they are identical in purpose and effect: the conflict between the State and the tribes is resolved under the auspices of the court, rather than between armed officers and tribal fishermen on the river.

### INDIVIDUAL RESPONDENTS

█ While the record fully supports contempt determinations against the State and Game, I recommend the court decline to so find against the individual respondents, Lockard and Gillespie.

Lockard, Director of Game, testified that while he recommended that the Game Commission pass the state regulation closing the Chehalis, he neither directed nor participated in the enforcement action on the river. There is no evidence he had any knowledge of the enforcement action until after it had occurred. At the time of the incident, he had been Director for only two years, coming to Washington from out-of-state. He has never read any of the court decisions in this case in their entirely, but relies upon the advice he receives from the staff of the Attorney General's Office. In this case, based upon that advice, he concluded the Quinault's self-regulating status was "not applicable in this situation" (p. 93, transcript of evidentiary hearing, April 6, 1983).

John Gillespie likewise testified that he was advised by an Assistant Attorney General that the state closure, and its enforcement, were "legal" (Transcript, p. 160–1). (See also, exh. QN–M–14, p. 1). In order-

ing the enforcement action on January 21, 1983, he was acting upon a directive he received in December of 1982 that Game would enforce state closures of off-reservation tribal fisheries (Transcript, p. 155).

Petitioners have the burden of establishing, by clear and convincing evidence, that Lockard and Gillespie acted in contempt of this court's orders. I respectfully recommend the court conclude they have not met that burden. Before acting, each of them was assured of the legality of the action by their counsel, who was far better situated, by training and experience in this case, to make that judgment. It is true that both officers, by virtue of their positions, are responsible for knowing this court's ruling, and must take responsibility for actions which violate those rulings. It is particularly surprising that the Director of Game has not read the Boldt decision in its entirety. But where petitioners ask the court to hold these officers personally in contempt, they must show the officers had knowledge of the court's orders, and refused to comply. Under all the circumstances here, petitioners have not so shown.

### RELIEF

Part of the relief recommended here is a specific order, directed to the four respondents in this case and to others, enjoining such conduct in the future. Entry of such an order should provide clear guidance to respondents and adequate protection for petitioners.

As to monetary relief, the Quinaults and the United States have established costs of $1,844.34 and $499.90 respectively arising from proceedings through the evidentiary hearing on their petitions. The court should award these amounts, and should permit petitioners to seek reimbursement for costs incurred since the hearing.

Petitioners are also entitled to their attorneys' fees. By agreement of the parties, determination of the amount of those fees has been deferred. The court should establish a procedure for that determination.

Petitioners have not established any other losses or damages to the Quinault Indian Nation or to Quinault fishermen individually.[67]

### ORDER RE: ATTORNEYS' FEE PROCEEDINGS

#### (June 22, 1984)

CRAIG, District Judge.

By order of this Court, on December 14, 1981, the quantification of the attorney fee requests for certain proceedings in Phase I of this case was referred to the Magistrate for report and recommendation. After a hearing on September 22, 1982, regarding the specific proceedings to be included in the quantification, the Magistrate ordered that proceedings numerically identified in the record as Numbers 1–65 would be included at that time, with requests for fees for later proceedings to be considered by the Magistrate after Nos. 1–65 were completed. In that order it was specifically noted that:

> Counsel for the plaintiff have agreed to limit the number of proceedings to be considered in the fee application at this time to those designated as numbers 1–65. Counsel for the plaintiff have further indicated that any attorney fee requests for additional proceedings will be submitted after such time as the Magistrate has made a recommendation concerning an award for proceedings numbers 1–65.

In conformity with this order, attorneys for plaintiffs have not filed any requests for attorneys' fees for proceedings completed after February 12, 1982.

The parties agreed that it is appropriate to defer the resolution of any requests for attorneys' fees for proceedings completed after February 12, 1982 until after such time as the Magistrate has made a report and recommendation in proceedings numbered 1–65.

The parties agreed that in order to provide timely notice to the Court and defendant of any requests for attorneys' fees for proceedings completed since February 12, 1982, it is necessary and appropriate to adopt a procedure for filing requests for fees.

IT IS THEREFORE ORDERED that the following procedure be utilized to file requests for attorneys' fees and costs for proceedings completed after February 12, 1982:

(1) For any proceedings completed between February 12, 1982 and the date of this order, for each attorney intending to seek an award of attorneys' fees:

(a) Attorneys will file and serve on defendant a Notice of Intent to seek attorneys' fees identifying all proceedings for which fees are sought, within fifteen (15) days after the entry of this order;

(b) Attorneys will file documentation of the hours claimed for such requests within sixty (60) days from the filing of the Notice.

(2) For any proceedings that conclude after the entry of this order, any attorney intending to seek an award of attorney fees, shall

(a) file with the Court and serve on the defendant a Notice of Intent to seek attorneys' fees for that proceeding within fifteen (15) days from the entry of this order concluding the proceeding in the District Court;

(b) file documentation of the hours claimed for such request no later than forty-five (45) days after the filing of Notice of Intent, unless otherwise agreed by the parties.

For the procedures of both paragraphs (1) and (2), above, plaintiffs need not file other supporting materials, such as briefs, hourly rates or claims for costs or multipliers, until after the report and recommendation for proceedings nos. 1–65 has been filed.

---

**67.** The court awarded liquidated damages of $250.00 per illegally seized net. See p. 1493, *supra.*

**1504**

IT IS FURTHER ORDERED that the Court will not consider any requests for attorneys' fees or costs for proceedings completed after February 12, 1982, until such time as the Magistrate has filed the Report and Recommendation(s) regarding the proceedings that have been previously referred.

This order shall not apply to claims for attorneys' fees submitted pursuant to this Court's May 10, 1984 order in the Chehalis River contempt matter or to any future order which authorizes immediate processing of attorneys' fee claims. Claims for such fees shall be submitted and heard in accordance with the provisions applicable to those awards.

## ORDER AWARDING ATTORNEYS' FEES AND COSTS

(April 30, 1985) [68]

CRAIG, District Judge.

The Court has previously determined that the attorneys for the 26 intervening tribes in this proceeding are entitled to an award of reasonable attorneys' fees and costs. The issue of the appropriate amount of such an award was referred to the United States Magistrate for a Report and Recommendation to the Court. The Court has now reviewed the Magistrate's First Report and Recommendation, Second Report and Recommendation, the relevant submissions of the parties, and the balance of the record. The Court has also heard oral argument on the parties' objections to the Magistrate's First Report and Recommendation and Second Report and Recommendation. Having done so, the Court concludes as follows.

The Court fully endorses the general approach taken by the Magistrate in computing the recommended award of attorneys' fees. A small number of the Magistrate's specific conclusions or recommendations will be either modified or not adopted by the Court and are discussed more fully below. The Court adopts both the Magistrate's First Report and Recommendation

and Second Report and Recommendation to the extent that they are not inconsistent with this Order.

The Court concludes that the schedule of historic billing rates recommended by the Magistrate for the period from 1970 through 1974 does not accurately reflect the actual prevailing market rates for similar legal services in the Seattle area during that period. "Reasonable fees" awarded pursuant to 42 U.S.C. § 1988 are to be calculated according to the prevailing market rates in the relevant community for similar services by attorneys of reasonably comparable skill, experience and reputation. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The Tribes' attorneys are entitled to have their fees calculated in accordance with prevailing rates in the community, even if a lower rate was prescribed in a contract executed by their client. *Blum v. Stenson, supra; Tasby v. Wright,* 550 F.Supp. 262 (D.Tex.1982). After reviewing the various relevant affidavits and documents submitted to the Court, the Court concludes that the schedule of rates prepared by economic consultant John L. Finch from data contained in the annual *Cantor* study most accurately reflects the prevailing rates for comparable legal services in the Seattle area during the period 1970–1974. With respect to legal services provided during the period from 1975 through 1982, the Court adopts the schedule of historic rates recommended by the Magistrate. The Court finds that the Magistrate's recommended schedule accurately reflects the prevailing rates for comparable legal services in the Seattle area during that period.

The Court also finds that the applicable historic billing rates should be adjusted upward to compensate for the loss of use of the funds over the years as well as for the effects of inflation. *See Burgess v. Premier Corp.,* 727 F.2d 826, 841 (9th Cir.1984). The Court concludes that the upward adjustment should be based on the yield on

**68.** Appeals pending (Nos. 85–3908, 85–4009, 9th Cir.)

52-week U.S. Treasury Bills. Such an adjustment will operate to compensate for both the loss of use of the funds and the effects of inflation and will do so at a conservative rate of interest. Accordingly, the Court adopts the following schedule of adjusted billing rates for all applicable years. This schedule is based on the schedules of historic billing rates adopted by the Court in the preceding paragraph.

| Year | Admitted Before 1960 | Admitted Before 1970 | Admitted 1970–1972 | Admitted 1973–1976 | Admitted After 1976 |
|---|---|---|---|---|---|
| 1970 | 163.13 | 138.03 | 125.48 | – | – |
| 1971 | 157.70 | 133.04 | 121.31 | – | – |
| 1972 | 161.72 | 136.85 | 124.42 | – | – |
| 1973 | 150.67 | 127.47 | 115.90 | 92.70 | – |
| 1974 | 151.26 | 127.98 | 116.36 | 93.09 | – |
| 1975 | 155.52 | 131.60 | 119.63 | 95.71 | – |
| 1976 | 169.40 | 146.81 | 124.23 | 101.64 | – |
| 1977 | 170.39 | 149.09 | 127.79 | 117.14 | 95.84 |
| 1978 | 176.97 | 157.31 | 137.65 | 117.98 | 98.32 |
| 1979 | 177.36 | 159.63 | 141.89 | 124.15 | 97.55 |
| 1980 | 174.15 | 158.32 | 142.49 | 126.66 | 102.91 |
| 1981 | 164.98 | 151.23 | 137.49 | 123.74 | 103.11 |
| 1982 | 158.88 | 146.66 | 134.44 | 122.21 | 103.88 |

The Court has computed the total compensable hours for each attorney for each year that such attorney expended compensable time in these proceedings. These totals were then multiplied by the applicable adjusted billing rates and added to arrive at a total award.

The Court also concludes that the attorneys' travel time should be compensated at the otherwise applicable rate, without reduction. *See Henry v. Webermeier,* 738 F.2d 188, 194 (7th Cir.1984). Pursuant to the direction of the Magistrate, the Tribes' attorneys prepared a summary of the compensable hours and the applicable rates that would be applied if the Court adopted the First Report and Recommendation. In preparing that summary, the attorneys reduced the *number* of travel hours by one-half, and billed them at the full applicable rate. Such procedure was suggested by the Magistrate for ease of computation. As the Court concludes that travel time should be compensated at the full applicable rate, the Court has added the previously deducted travel time back to the applicable yearly totals of compensable hours prior to the application of the applicable adjusted billing rates.

The Tribes' attorneys originally submitted a detailed claim for costs totalling $87,883.19. The parties subsequently reached a negotiated stipulation which provided that the claim for costs would be reduced in the same proportion as the Court's reduction in the number of compensable hours. In accordance with that stipulation, the Court has awarded costs in an amount that exceeds the amount recommended by the Magistrate in the same proportion that the Court's ruling on compensable hours exceeds the number of compensable hours recommended by the Magistrate.

It is therefore ORDERED:

■ (1) The Court awards attorneys' fees and costs as follows:

| Recipient | Attorneys' Fees | Costs | Total Award |
|---|---|---|---|
| Evergreen Legal Services | $1,181,275.14 | | $1,181,275.14 |

| Recipient | Attorney's Fees | Costs | Total Award |
|---|---|---|---|
| Native American Rights Fund | 454,388.39 | $12,867.64 | 467,256.03 |
| Ziontz, Pirtle Law Firm | 765,970.10 | 61,843.00 | 827,813.10 |
| James Hovis | 221,072.52 | 6,379.11 | 227,451.63 |
| John H. Bell (Clinebell) | 175,367.68 | | 175,367.68 |
| Bell & Ingram (for services of Lewis Bell, deceased) | 50,217.21 | | 50,217.21 |
| Michael R. Thorp | 3,831.80 | | 3,831.80 |
| Susan Kay Hvalsoe | 15,558.17 | | 15,558.17 |
| Totals | $2,867,681.01 | $81,089.75 | $2,948,770.76 |

(2) The Court adopts both the Magistrate's First Report and Recommendation and Second Report and Recommendation to the extent that they are not inconsistent with this Order.

(3) Each award shall be payable forthwith by the State of Washington to the firms or individuals listed. These awards shall constitute judgments of the Court, and each shall bear interest at the rate applicable to such judgments, from the date that this Order is filed until the date paid.

(4) To the extent that a Tribe has already paid fees to its attorneys for time the Court finds compensable, the Tribe will become entitled to a refund when this award is paid. This refund shall be in the amount of fees actually paid by the Tribe, adjusted upward to reflect inflation from the date the fee was paid by the Tribe to the date of this Order, in the same manner as the fee award itself. The refund shall bear interest after the date of this Order at the same rate(s) as the awards. The Tribes' attorneys shall pay such refunds to the Tribes within thirty (30) days after the State pays the fee awards. In the event of a dispute as to a refund, the Tribe's attorney shall present the matter to the Court for resolution within sixty (60) days after the State pays the fee award.

(5) To the extent that the Tribes have already reimbursed their attorneys for, or paid directly, costs covered by this Court's award, the Tribes are entitled to an award of costs. Attorneys who have advanced costs for their clients are entitled to an award of costs only to the extent that they have not been reimbursed by their clients for costs advanced. The attorneys are therefore directed to negotiate with their clients a written agreement reflecting the appropriate division of costs. A copy shall be served on the State, filed with this Court, and shall not be effective until approved by this Court. The costs awarded by this Court shall be paid to the attorneys filing the cost claim, but shall be held in the attorneys' interest-bearing trust account until such time as the cost agreement described above is approved by the Court. At that time reimbursement of the Tribes for their share shall be made promptly.

(6) The Clerk shall direct copies of this Order in accordance with the Phase I distribution list, and to every attorney or firm listed as entitled to an award of attorneys' fees.

## MAGISTRATE'S FIRST REPORT AND RECOMMENDATION ON PHASE I ATTORNEYS' FEES

(September 21, 1984)

JOHN L. WEINBERG, United States Magistrate.

### I. INTRODUCTION

The court has previously determined that the attorneys for the 26 intervening Tribes

in Phase I ("the Tribal attorneys") are entitled to an award of reasonable attorneys' fees and costs, to be paid by the State of Washington and other defendants ("the State"). The court has ruled that, because the Tribes were "prevailing parties," their attorneys are entitled to such an award under the Civil Rights Attorneys Fees Awards Act of 1976, 42 U.S.C. § 1988.[69]

In a series of Orders of Reference, the court has referred to the United States Magistrate, for recommendation, the issue of the appropriate amounts of the awards to the 29 Tribal attorneys who have applied. This requires detailed findings as to the extent of the legal services performed by each attorney, and the fair and reasonable value of those services, in light of rapidly changing case law interpreting and applying § 1988. The court has also referred the issue of an award of costs.

The Tribal attorneys have submitted extensive documentation of the time they devoted to this case between 1970 and 1982, prevailing hourly rules for legal services, information as to their professional credentials, and other related materials. The State has conducted limited discovery. Both the Tribal attorneys and the State have thoroughly briefed and argued all issues relating to the award. The United States, which is not entitled to attorneys' fees under § 1988, has declined to participate in the proceeding, except to provide some information requested by other parties.

The Tribal attorneys have revised their claims in many respects since their first submission. These revisions reflect changes in prevailing rates, waivers of some hours originally claimed, different multiplier claims in light of changing case law, and other changes. They now seek compensation for a total of almost 24,000 hours. They request total fees of either $3,737,000, if the court uses "historic" hourly rates, or $4,333,000, if the court uses "current" rates.

69. *See* Order of May 4, 1981, *supra* at 1426.

The response to the court's Orders of Reference will consist of a First and a Second Report and Recommendation, and a proposed Order. This First Report and Recommendation sets forth proposed determinations of the legal and factual issues which must be resolved before awards can be computed. It is contemplated that the parties, perhaps with further guidance, can then compute the specific awards which would result if the court were to adopt those determinations of the issues. The Second Report and Recommendation would then propose those specific awards, and be accompanied by a proposed order. The matter will be ready for final action by the court when all of those documents, and the parties' responses, are before it.

This is not the first ruling, within this complex case, upon an application for attorneys' fees by attorneys for the Tribes. The Hon. William H. Orrick, Jr., has awarded attorneys' fees in Phase II of this case, by orders filed December 18, 1981 and October 16, 1982. In doing so, Judge Orrick ruled upon many of the same and similar issues as are presented by this Phase I application. His rulings are discussed below. In almost all respects, this First Report and Recommendation suggests the same or similar rulings in Phase I. In a few respects, however, it is respectfully submitted that the circumstances suggest a different conclusion.

The court, at this time, is passing upon all claims for attorneys' fees and costs in Phase I through February 12, 1982, with the exception of claims for time and expense in seeking an award of attorneys' fees. Claims for fees and costs for several matters arising after February 12, 1982 remain pending for later determination. The court's rulings on the issues involved in this application will provide a framework for resolution of those later claims.

## II. SUMMARY OF CONCLUSIONS

For the reasons discussed more fully below, the court should reach the following conclusions:

(1) The court's general approach to fixing fee awards should be use of the "lodestar" analysis, with modifications as required in light of the *Johnson/Kerr* factors.

(2) The court should award compensation for all of the time claimed by the Tribal attorneys, with only these exceptions: time devoted to seeking fees; Federal Task Force proceedings; *amicus* participation in state court cases; motion to disqualify Judge Boldt; time miscoded to the Mukkaw Bay dispute; and 50% of the time classified either as "Miscellaneous; General Advice and Meetings with Client," or by Ziontz firm attorneys as "Non-Designated Time."

(3) With the exception of the last two categories listed above, the Tribal attorneys have adequately documented their time, despite the absence of contemporaneous records for some of that time.

(4) The Tribal attorneys have demonstrated that the hours devoted to the case, while extensive, were reasonably expended, under all the circumstances. The State's challenges in this regard are not persuasive.

(5) Compensation should be based upon the rates prevailing at the time the services were performed ("historic rates"), not upon rates prevailing at the time the court makes the fee award ("current rates"). The Tribal attorneys are entitled to have the historic rates enhanced, however, in proportion to the Consumer Price Index, to compensate both for inflation and for delay in receiving payment.

(6) For time devoted to performing legal services, the court should adopt and use the historic hourly rates proposed by the Tribal attorneys. They have adequately documented those rates, and the State has not challenged them. For time spent in travel, however, the court should compensate the Tribal attorneys at a rate half of that applicable to performing legal services.

(7) Except for the inflation adjustment described in (5) above, the court should not apply a "multiplier" to the fee award in this case.

(8) The Tribes are entitled to an award of costs in the amount claimed, with a reduction proportional to disallowed attorneys' hours, in accordance with the agreement of the parties. Before entering the award of costs, the court should require the Tribes and the Tribal attorneys to enter into a written agreement governing division of the award.

(9) This court's awards of fees and costs should be entered as judgments of this court. Each award shall bear interest at the rate applicable to such judgments, from the date of the award until the date paid. The amounts of refunds are to be increased at the same rate.

(10) To the extent Tribes have already paid fees to their attorneys for time the court finds compensable, the Tribes are entitled to refunds. Those refunds should consist of the actual amount originally paid, adjusted until the date of the award in proportion to changes in the Consumer Price Index. The refunds should be made within 30 days after the State pays the fee award.

## III. GENERAL APPROACH

In its "Order Regarding Attorney's Fees," filed May 8, 1981, the court specifically instructed the special master,

"... to consider the 12 factors adopted by the Ninth Circuit Court of Appeals in *Kerr v. Screen Extras Guild,* 526 F.2d 67, 70, and to consider the other appropriate variables utilized by the courts in setting awards under 42 U.S.C. § 1988."

Since the entry of that order, there has been extensive federal litigation concerning fee awards under § 1988. Of particular import are two recent decisions of the Unit-

ed States Supreme Court: *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

It is still appropriate to consider the *Kerr* standards, which are based upon *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974). But in *Hensley*, the United States Supreme Court indicated the district courts should apply those factors in the context of a somewhat different approach to the award of fees, known as the "lodestar" analysis:

> "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."

103 S.Ct. at 1939.

This product constitutes the "lodestar," which can then be adjusted upward or downward under certain limited circumstances. The "lodestar" analysis is frequently associated with the decisions of the Third Circuit in *Lindy Bros v. American Radiator*, 487 F.2d 161 (3d Cir.1973) (*"Lindy I"*), and its successor case, *Lindy II*, 540 F.2d 102 (3d Cir.1976).

The Supreme Court recommended, in *Hensley*, an integrated use of the two approaches. Many of the *Johnson/Kerr* factors, the Court held,

> "... usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."

103 S.Ct. at 1940, n. 9.

Other *Johnson/Kerr* factors may lead the district court to adjust the fee upward or downward. *Id.*

In several cases prior to *Hensley*, including *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir.1982), the Ninth Circuit approved a fee-setting procedure which blends the best features of the *Kerr* and lodestar approaches. This "blended" approach has been the technique used in the presentations of the parties, and in this First Report and Recommendation.

The first task is to determine the number of compensable hours. In this case, this requires consideration of a number of the *Johnson/Kerr* factors, and several other determinations, including:

(1) For which sub-proceedings are the Tribal attorneys entitled to recover fees at all?

(2) Have they adequately documented the number of hours claimed?

(3) Was the number of hours reasonable? Or was there unnecessary duplication of time, with attorneys for other Tribes or for the United States?

Secondly, the court must determine reasonable hourly rates. In addition to applying the relevant *Johnson/Kerr* factors, the court must consider the claims of the Tribal attorneys to compensation for the substantial delay between when the fee was earned and the award. The court must also determine whether some hours (e.g. travel) should be compensated at different rates.

Third, the court must resolve the claim for application of a "multiplier" to the lodestar amount.

Fourth, the Tribal attorneys are entitled to an award of costs, in an amount determined by the court.

Finally, where clients have already paid fees and/or costs, the court must direct an appropriate refund.

The balance of this First Report and Recommendation is devoted to those five subjects.

## IV. COMPENSABLE HOURS

### A. *Generally.*

Twenty-nine Tribal attorneys claim compensation for a total of 23,980.35 hours during 1970–1982, inclusive. They have documented their claims with extensive affidavits and, where available, with copies of their time sheets and other contemporaneous records.

The Tribal attorneys have designated two of their number, Messrs. Katzen and Anderson, as lead counsel for purposes of the claim for fees. They have submitted a

series of "Summaries" of the claims, making revisions as required by further analysis and developing case law. For purposes of determining the number of compensable hours, the court should refer to the most recent revision, captioned "Revised Summary of Attorney's Fee Claim for Phase I of U.S. v. Washington, Using Current Rates," filed June 30, 1984.

Under *Hensley* and *Blum*, consideration of at least three of the *Kerr/Johnson* factors is "subsumed" within the calculation of hours reasonably expended. Those are the factors numbered (1), (2) and (8):

(1) the time and labor required;

(2) the novelty and difficulty of the questions involved;

and

(8) the amount involved and the result obtained.

The court considers and gives effect to the first of these factors when it arrives at a fee award based upon the compensable hours and supporting documentation submitted by counsel. The other two factors are discussed below.

In setting the number of compensable hours, the court in this case must address these basic questions: (1) For which activities, or "sub-proceedings," are claimants entitled to compensation? (2) Have they adequately documented their hours? (3) Were the hours reasonably expended?

## B. *For Which Sub-Proceedings?*

To assist in the analysis, counsel have identified 65 separate phases of the case, or "sub-proceedings," during the 13 years in question. They have numbered these sub-proceedings "1" to "65" consecutively, and have described them in their "Narratives" and "Counter-Narratives." In addition, they have identified nine other categories of work which do not fit neatly into any of the 65 categories. These are labelled "A" through "I," and described in the narratives. Finally, the attorneys from the Ziontz firm have listed some of their time as "Non-Designated Time." The Tribal attorneys seek compensation for time allocat-

ed to 59 of these 75 categories. The State contests all but a few.

In its "Order Regarding Attorneys Fees" filed May 8, 1982, paragraph 6, this court found the Tribes were prevailing parties, and

"... entitled to an attorney fee award for the services reasonably necessary to prepare for, try, prosecute and implement the *United States v. Washington* decision, including the related appeals...."

The court denied any award, however, for "participation" in cases outside the framework of *United States v. Washington*. Other guidance as to which sub-proceedings are compensable comes from the Supreme Court in *Hensley* and from the Courts of Appeals, as discussed below.

We turn, therefore, to the specific sub-proceedings comprising the claim by the Tribal attorneys.

*Undisputed Sub-Proceedings.* First, the State does not contest the claims that time in each of the following sub-proceedings is compensable:

No. 2 Filing, Pre-Trial and Trial of *United States v. Washington*

No. 3 Final Decision No. 1

No. 4 Requests for Reconsideration and Amendment of Rulings

No. 6 Appeals from Final Decision No. 1 and Related Rulings

No. 45 (except for portions discussed below) 1977 Allocation Orders and Enforcement Proceedings

No. 58 Remand from United States Supreme Court

No. E Direct Settlement Negotiations

No. G Nisqually Joint Enforcement

The court should grant compensation for time claimed in these sub-proceedings.

*Time Devoted to Seeking Fees.* Secondly, the parties have agreed to defer the award of any compensation for time devoted to seeking an award of attorneys' fees. The court therefore should eliminate, without prejudice, time claimed in sub-proceeding No. 4A.

*Unsuccessful Claims.* One challenge presented by the State is to the Tribal attorneys' time in several sub-proceedings in which the Tribes were not the "prevailing parties." Unfortunately, the test is not that simple in determining whether time spent on an unsuccessful claim is compensable. The court must also consider the extent to which the claim was related to the principal claim or objective in the case; and also the overall success of plaintiff in the litigation. The Supreme Court explored these principles in *Hensley.*

■ A party is not entitled to fees incurred in connection with unsuccessful claims which are unrelated to the basic claim. *Hensley,* at 103 S.Ct. at 1940. But the Tribal attorneys assert they do not claim fees, or have abandoned their claims, to any sub-proceedings which would fit this description. The record bears this out.

■ One of the principal holdings in *Hensley,* however, is that where a claim is unsuccessful, but *is* closely related to the basic, successful claim in the case, the degree of success obtained overall determines whether hours expended on the unsuccessful claim are compensable. If the plaintiff has achieved "excellent results," and his overall success is exceptional, his attorney should recover a fully compensatory fee.

■ The Tribes' success in this case fits that description. They have been overwhelmingly successful on their various claims. While they have not prevailed on every position, they prevailed on their basic claims as to treaty rights, and in the vast majority of the proceedings to interpret, implement, and enforce the court's original decision. Accordingly, their attorneys are also entitled to compensation for time spent on related claims which were unsuccessful, wholly or in part.

In the sub-proceedings listed below, the Tribes were wholly or partially unsuccessful. But because the claims were related to successful claims, the Tribal attorneys are nevertheless entitled to full compensation for their time:

Nos. 13, 15 & 28 Chum Fishing Closures

No. 45 (parts) The Tribes unsuccessfully resisted the petition for *certiorari,* and lost on a few, relatively minor issues in the United States Supreme Court.

■ *Related Claims Never Adjudicated.* Furthermore, because the Tribal attorneys are entitled to fees in sub-proceedings where the court ruled against them, they necessarily are entitled to fees in sub-proceedings that were begun within the framework of *U.S. v. Washington,* but never reached adjudication. This occurred occasionally, for example, because later events rendered an issue moot; or because the court did not rule on an issue and no party pursued it. Again, the Tribal attorneys are entitled to full compensation in those sub-proceedings. They include:

Nos. 9, 23 & 37 I.P.S.F.C. Proceedings

No. 18 State Exclusion of Green River Hatchery-Origin Steelhead from the Treaty Share

No. 36 State Interference With Makah Fish Purchasers

No. 41 1976 Chum Runs

No. 46 Washington's Rule 60(b) Motion for Modification of Final Decision No. 1

No. 57(a) Nisqually River Injunction

■ *Settled Matters.* By the same token, the Tribal attorneys are entitled to full compensation for time devoted to sub-proceedings which were within the framework of the case and related to their basic claims, but were settled between the parties prior to adjudication. This is another instance where a plaintiff need not show he prevailed on a specific claim or sub-proceeding to be entitled to recover attorneys' fees. Entitlement to attorneys' fees on settled issues is confirmed by the recent decision of the Ninth Circuit in *Lummi Indian Tribe v. Oltman,* 720 F.2d 1124 (9th Cir.1983). There is an additional policy reason strongly supporting recovery of fees on issues that are settled. If the Tribes were barred from recovering fees on settled issues or sub-proceedings, this

would inject a strong disincentive to resolve matters by agreement. The Tribal attorneys would be encouraged to press every issue to an adjudication, to enable them to recover their fees.

The Tribal attorneys are therefore entitled to be fully compensated for their time in these sub-proceedings, which were entirely or substantially resolved by agreement:

No. 11 Requests for Determination Re Fishing Gear Return and Damages

No. 27 Notice Required Prior to Enforcement of State Regulations

No. 30 Certain Questions Re Salmon Fisheries Management

No. 32 Establishment of Fisheries Advisory Board and Procedures for State Emergency Regulations

No. 33 Salmon Catch Report Methodology

No. 34 Adoption of Salmon Management Plan

No. 38 Steelhead Management Questions

■ *Sub-proceedings to Implement or Enforce Decision.* As earlier noted, this court explicitly found that the Tribal attorneys are entitled to recover for the time reasonably spent to "implement" this court's decision. The same considerations apply to those sub-proceedings designed to "enforce" the decision. This is consistent with general case law in this area, including the recent decision of the Ninth Circuit in *Rutherford v. Pitchess,* 713 F.2d 1416 (9th Cir.1983).

The Tribal attorneys are entitled to full compensation for their time in each of the following sub-proceedings, because each directly involved implementation and enforcement of this court's decision:

No. 7 Appointment of Fisheries Expert (1974, 1979)

No. 10 Motion re Certain Nisqually River Fishing

Nos. 12 & B The Program to Implement the Interim Plan

No. 14 Quinault Fisheries in Grays Harbor

No. 39 1976 Coho Fishery

No. 48 Judicial Enforcement Via Contempt for 1978 and Subsequent Seasons

No. 50 Salmon Allocation Order for 1978 and Subsequent Seasons

No. 53 1978–79 Proceedings in Aid of Federal Enforcement

No. 57(b) & (c) Coastal Rivers Management Schedule (1978), and Puget Sound Coho (1979)

No. H Development of Tribal Ordinances

■ *Where State Did Not Actively Contest.* In another category of sub-proceedings, the State challenges the claims because the State was not directly involved, or did not actively contest the positions advanced by the Tribes. The State asserts this was true, for example, in certain proceedings to determine the treaty status of a tribe, or its usual and accustomed fishing grounds, or the boundaries of its reservation.

The proper focus, however, should not be on the question of whether the State opposed the Tribal position, or even participated in the sub-proceeding. The issues, instead, are whether the proceeding was a necessary step in implementing the court's decision; and whether it was reasonable, on the part of the Tribal counsel, to initiate and pursue the matter, and to devote the amount of time claimed.

Measured against this test, the Tribal attorneys are entitled to compensation for the sub-proceedings challenged on this basis. Their Tribes can secure the benefits of the treaty rights declared by the court only if the court is satisfied as to such matters as treaty status and fishing grounds. This is the mechanism by which abstract treaty rights become translated into the opportunity for specific Tribes to fish in specific locations. Indeed, in the absence of such showing, treaty fishermen would be subject to arrest and prosecution by the State. Establishing those matters to the court's satisfaction was therefore a crucial part of securing complete relief. The fact that the

State did not contest the issue actively, or even at all, is not relevant. The Tribal attorneys are entitled to full compensation in these sub-proceedings:

No. 5 Intervention of Additional Parties (1974–75)

No. 16 Treaty Status and Usual and Accustomed Fishing Places of Certain Reservation Tribes

No. 61 Treaty Status of Jamestown Klallam Tribe

No. 62 Usual and Accustomed Fishing Areas of the Puyallup, Squaxin Island and Nisqually Tribes in the Carr Inlet Area

No. F Reservation Boundaries

■ *Responding to Court's Request.* For similar reasons, the Tribal attorneys are entitled to compensation for the eleven hours claimed in sub-proceeding, no. 52. They expended this time in responding to a request by the court to list all open and pending matters, and to describe the status of each. This itself was not a contested issue on the merits. But the court has little choice but to find that it was reasonable, on the part of the Tribal attorneys, to expend time preparing a full and careful response to the court's inquiry. The Tribal attorneys are entitled to compensation for that time, despite the fact that it was not devoted to an issue contested by the State.

*Appeal Pending.* The State objected to the claim of the Tribal attorneys with respect to no. 60, Allocation of Quinault River Steelhead, because the State's appeal was still pending. Claimants contend that is not a proper basis for disallowing the claim. In any event, the appeal has now been decided, adversely to the State. Claimants are entitled to compensation on no. 60.

*Opposition Without Merit.* On seven sub-proceedings, the State seems to interpose objections in its "Counter-Narrative." But those objections are unclear in nature, and/or without merit on their face. Claimants are entitled to compensation in:

No. 24 1975 Coho Salmon Runs

No. 31 State Buy-Back Program Applicability to Treaty Fishermen

No. 51 1978 Strait of Juan de Fuca Chum Salmon Fisheries

No. 55 Chinook Minimum Size Limit Regulations

No. 63 Department of Fisheries TRO Request RE: Hoh River Coho

No. 64 Nisqually Tribe's TRO Request RE: Nisqually River Chum Fishery

No. 65 Miscellaneous 1981 and 1982 Proceeding

*Herring.* Sub-proceedings nos. 8, 20 and 25 involved determination of the rules applicable to herring fisheries. The State requested determinations of these issues within the framework of *U.S. v. Washington;* and the court resolved them in favor of the Tribes, interpreting and perhaps extending the original decision (no. 25 was essentially settled). The Tribal attorneys are entitled to compensation, despite the fact that the original decision primarily concerned salmon and steelhead, and did not address questions of entitlement to herring.

*Sub-Proceedings Outside The Framework of U.S. v. Washington.* As noted above, this court has already ruled that the Tribal attorneys are not entitled to compensation for time expended in cases "outside the framework of *U.S. v. Washington.*" In view of this limitation, the Tribal attorneys have already withheld claims for time for certain activities, such as legislative activities on behalf of the Tribes (sub-proceeding no. A). But the court should also disallow compensation for time devoted to two other sub-proceedings: no. 43, Federal Task Force negotiations; and the small portion of the claim in no. 45 which related to *amicus* participation by the Tribes in state court cases.

■ The administration of President Jimmy Carter, at the urging of the Washington congressional delegation, undertook in 1977 the ambitious project of negotiating a settlement of the entire range of issues concerning Treaty fishing rights in the Pacific Northwest. The President established a high level task force, to gather information, meet with the parties, develop pro-

posed lines of action, and ultimately to negotiate solutions to the hotly disputed and time-consuming problems of Treaty fishing rights.

The history and proceedings of the Task Force are summarized at some length at pages 75–81 of a special report in June of 1981 by the U.S. Commission on Civil Rights, entitled "Indian Tribes: A Continuing Quest For Survival." This report is included as part of the record as Attachment E to the Tribes' memorandum filed November 25, 1981. It therefore need not be repeated here.

For present purposes, however, these facts are significant. The Tribal attorneys (and, no doubt, the State) expended many hours preparing their various submissions to the Federal Task Force. Eventually, the Task Force developed a comprehensive set of proposals, which were described by the Civil Rights Commission as,

> "not an attempt to implement the court decision, but rather an attempt to replace the guarantees of the treaties, as determined by the court, with a completely different fishery management and distribution scheme." (p. 78).

This led to extensive negotiations. In the end, the proposals of the Task Force were rejected by both sides.

The Tribal attorneys actively participated and represented the Tribes throughout this process. They now claim compensation for 1,065.15 hours of time expended in this connection. This represents the third largest claim among the 75 sub-proceedings.

This claim presents a close issue, with compelling arguments on both sides. Many (but not all) of the matters at stake in the Task Force negotiations were issues involved in this case. If the court must compensate the Tribal attorneys for time spent in negotiations to settle those issues *within* the case, it seems reasonable to compensate them for negotiation of the same issues *outside* the case.

On the other hand, the Federal Task Force proceedings were entirely outside the "framework of *U.S. v. Washington*." This court had no role in initiating, supervising or terminating the negotiations arising from the work of the Task Force. While much of the subject matter was the same, the Task Force proceedings were essentially a completely different forum for the dispute from *U.S. v. Washington*. The Task Force recommend solutions entirely different from an implementation of the court's decision.

In light of the court's directive to allow compensation only for time spent within the framework of this case, I recommend the court disallow compensation for the time of the Tribal attorneys in Federal Task Force proceedings, no. 43.

█ A similar, but seemingly easier, question arises as to participation by the Tribes as *amicus curiae* in cases on related issues in state courts. It likewise was not participation within the framework of *U.S. v. Washington*. Unlike *Bartholomew v. Watson*, 665 F.2d 910 (9th Cir.1982), this is not a case where bringing the state court action was an essential step for plaintiffs before they could pursue their federal § 1983 claim. While the state cases related to the same subject matter, there is no showing that participation by the Tribes was essential to preserving the benefits secured in this case. The Tribes did not initiate these state court cases. Indeed, they refused to participate as parties, limiting their role instead to that of *amici*. Furthermore, the United States also participated in the state court cases, taking positions essentially consistent with those of the Tribes. This provides further support for concluding that there is no showing that *amicus* participation by the Tribes was necessary to protect their interests.

The court should disallow those portions of the claim in no. 45 which relate to participation as *amici* in state court proceedings.

*Disqualification of Judge Boldt.* The court should disallow the claim for time devoted to resisting the State's motion to disqualify Judge George H. Boldt (sub-proceeding no. C). The motion was directed to Judge Boldt's participation in Phase II. Counsel generally applied for, and were

granted compensation for this time in the Phase II attorneys' fees proceedings before Judge Orrick. There is no indication the same time is covered by the present request. But at oral argument, counsel for the Tribal attorneys candidly stated that "inadvertence" was probably the reason the time claimed here was omitted from the Phase II claim.

The proper place to seek compensation for time devoted to the disqualification motion is in the Phase II proceeding. The court should disallow the time claimed in sub-proceeding "C."

*Time Erroneously Classified.* The tribal attorneys are entitled to compensation for time reasonably expended in relation to the dispute in 1981 relating to Mukkaw Set Net Fishing, no. 59. The State challenges some of the time claimed under this heading, however, pointing out that Mason Morisset claimed time supposedly spent in 1977 and 1979 on this 1981 dispute. The Tribal attorneys have not explained this discrepancy.

An examination of Mr. Morisset's time sheets, however, provides the explanation. The 19.8 hours he spent in 1981 on this issue was erroneously listed under 1979 in the summary. He is entitled to compensation to this time. On the other hand, he devoted 8.1 hours in 1977 to the motion to disqualify Judge Boldt. This time, which is not compensable, was erroneously coded for inclusion in sub-proceeding no. 59, Mukkaw Set Net Fishing.

The State presents no persuasive challenge to the documented claims of attorneys Sam Stiltner and Frank R. Jozwiak on this issue.

In summary, the Tribal attorneys are entitled to full compensation on their claims for sub-proceeding no. 59, except for 8.1 hours claimed by Mr. Morisset.

*Time Not Documented as to Subject Matter.* Finally, there are two sub-categories of time as to which the Tribal attorneys have been unable to specify the subject matter of their work.

Category "I" is entitled, "Miscellaneous; General Advice and Meetings with Clients." Four attorneys claim a total of 507.6 hours, from 1973 through 1982. As to this time, the attorneys apparently can document that they conferred with their Tribal clients, but cannot identify the subject matter of the discussions. They are therefore unable to allocate the time to any of the other 73 sub-proceedings.

Similarly, four attorneys from the Ziontz firm claim compensation for a total of 477.6 additional hours. About two-thirds of this time is claimed by Mason Morisset. The summary identifies this un-numbered category simply as "Non-Designated Time." The attorneys apparently can establish from their time records that this time was spent in connection with *U.S. v. Washington,* and generally how it was spent (e.g. reviewing and analyzing pleadings, tribal regulations, meetings, telephone conversations, etc.). But again, counsel apparently cannot specify the particular subject matter involved. These hours are therefore "non-designated," as they cannot be included in any of the specific sub-proceedings.

The Tribal attorneys assert they are entitled to full compensation for their time in these two categories because their detailed time records are sufficiently specific, even if the "summary" is not. But this argument falls short. The time records establish which attorneys devoted this time on which dates, and in a general way their activity during those hours. But the burden on the Tribal attorneys goes further. They are required to establish their time was devoted to a subject matter as to which they are entitled to compensation. Furthermore, they must show their time was "reasonably" spent. This determination is very difficult if the subject matter of their work is unknown.

Despite these facts, disallowing all of this time, which totals about 1,000 hours, would be unfair to the Tribal attorneys. Under these recommendations, the court would award compensation for all hours claimed in over two-thirds of all identified

**1516**

sub-proceedings; and would find the Tribal attorneys have demonstrated all of their time was reasonably spent. It therefore seems very likely that, if the Tribal attorneys had kept more detailed time records as to these two sub-categories, the great majority of their time would have been fully compensable.

Balancing these factors, it is recommended the court award compensation for 50% of the hours claimed in sub-category "I" ("Miscellaneous; General Advice and Meetings with Clients") and in the un-numbered sub-category entitled "Non-Designated Time."

### C. Adequacy of Documentation.

■ An attorney seeking a fee award has the burden adequately to document all of the hours claimed. Detailed, contemporaneous records are strongly preferred for this purpose, but are not absolutely necessary.

On the whole, the Tribal attorneys have done exceptionally well in providing this documentation. This is particularly true, given the number of attorneys (29), the fact that they use many different record-keeping systems, the time range covered (13 years), the number of hours (almost 24,-000), and the multi-faceted nature of the case. The State has forthrightly conceded the generally high quality of the documentation.

The lack of subject matter designation in two of the sub-categories has already been discussed. Only one other aspect of documentation merits discussion.

Several of the Tribal attorneys have submitted claims for time worked during periods when it was not their office practice to keep contemporaneous, detailed records. This includes at least Messrs. Schlosser, Stay, Taylor and Clinebell. Each of these attorneys has, however, made a detailed showing as to how he re-constructed and estimated the time included in his claim. Each has persuasively shown that he has painstakingly derived time estimates from

reliable sources, and that his estimates are conservative, probably understating actual time spent by a substantial margin. The State has presented no cogent challenge to these conclusions. The court should therefore allow these hours in full, despite the absence of detailed, contemporaneous records.

This finding would parallel that made by Judge Orrick in Phase II:

"In limited instances in which hours requested were reconstructed, the sources used were reliable, the services performed were reasonably detailed, and the hours requested appear to have been conservatively estimated. Such reconstructions are a proper basis for awarding fees. *Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1102–03 (2d Cir.1977)."

"Memorandum Opinion and Order," filed December 18, 1981, at p. 8 (cited hereafter as "Phase II Fees Opinion").[70]

### D. "Reasonableness" of Hours Spent.

■ The final issue in the area of the number of compensable hours is whether all the time claimed was "reasonably expended" by the Tribal attorneys. As directed by the Supreme Court in *Hensley*, the court must eliminate any hours which were excessive, redundant or otherwise unnecessary. Furthermore, in claiming fees under § 1988, an attorney must exercise "reasonable billing judgment" similar to that he would employ in billing his own client.

■ There can be no doubt that the Tribal attorneys claim compensation for a very substantial number of hours. But under all the circumstances, the court should conclude that all of the hours were "reasonably expended." This also would be consistent with the conclusion Judge Orrick reached in Phase II.

The complexity of the case, and the novelty and difficulty of the issues (the second *Kerr/Johnson* factor) are documented *inter alia* in the affidavits of Prof. Ralph W. Johnson and Michael R. Thorp. The court

70. *Supra* at 1446.

hardly requires documentation of these facts, in light of its experience with the case.

The eighth *Kerr/Johnson* factor is "the amount involved and the results obtained." While the case did not seek or result in a monetary judgment, the stakes were extremely high for all the litigants, and others. At issue were the respective rights of treaty and non-treaty fishermen to share in the harvest of salmon and other species. Each annual harvest is worth many millions of dollars; and the decision establishes permanent rights. The Tribes enjoyed an exceptionally successful result. Consideration of these factors supports the conclusion that the many hours claimed by the Tribal attorneys were "reasonably expended."

The Tribal attorneys have stressed, in briefing and argument, the importance of the intransigent and obstructive posture of the State throughout this case. They allege the State has resisted and impeded enforcement of the court's orders, and has contested every possible issue, many of them more than once. To whatever extent this is true, its primary effect has been to swell the number of hours reasonably required for proper representation of the Tribes.

Other special characteristics of this case have the same effect. Counsel have been required to become highly knowledgeable in technical areas ranging from fisheries to Northwest history. The geographic spread of the twenty-six tribes, and the remoteness of some, have also contributed to the time required. All of these factors support the reasonableness of the hours expended by the Tribal attorneys.

The State, however, challenges on several grounds the "reasonableness" of the time expended. First, the State asserts the Tribal attorneys devoted inordinate amounts of time to the case, given the important role played by the United States and its counsel. Much of the work of the Tribal attorneys, the State contends, unnecessarily duplicated efforts by counsel for the United States. A similar contention is that the many Tribal attorneys unnecessarily duplicated each other's efforts.

But the record does not bear out this contention. Affidavits of the Tribal attorneys, and of counsel for the United States, demonstrate several facts which controvert the State's position. In many respects, the positions of the Tribes differed from that of the United States, and/or with each other. All counsel made diligent efforts to identify areas where their interests were congruent, and to share responsibility and avoid duplication in those areas. Frequently, many tribes agreed to prepare a single brief on behalf of all. Indeed, without this coordination and cooperation among Tribal attorneys and counsel for the United States, the time expended and claimed by Tribal counsel would have been much greater than it is.

The State has asserted duplication of efforts in a general way, but has not shown specific instances where this occurred. Its objection on this ground is without merit. Judge Orrick reached a similar conclusion in Phase II. "Phase II Fees Opinion," *supra* at pp. 1445–1446.

The State also asserts the Tribal attorneys have not exercised reasonable billing judgment because in some instances an attorney claimed compensation for more than seven hours in one day; and because all Tribal attorneys' claimed an aggregate of 70 to 80 hours for one specific day. These objections are frivolous. An attorney who actually works abnormally long hours on a given day is certainly entitled to compensation for that time. The day which resulted in a large aggregate claim was the day several Tribal attorneys worked long hours together to meet a deadline in completing their lengthy brief in the United States Supreme Court. Incidentally, this was the principal instance in which the Tribal attorneys demonstrated the applicability of the seventh *Johnson/Kerr* factor, "time limitations imposed by the client or the circumstances."

Apparently in support of its challenge to the reasonableness of the hours claimed by the Tribal attorneys, the State has sub-

mitted a computer analysis of the time records. See Exh. F to the State's Memorandum filed February 27, 1982. But this computer analysis is very difficult to use and to understand; and has been demonstrated to be factually erroneous as to several material matters. It is of little or no probative weight as to the reasonableness of the hours claims.

In summary, the court should find the time claimed by the Tribal attorneys in compensable sub-proceedings was all "reasonably expended."

## V. HOURLY RATES

■ In calculating the "lodestar" amount, the court must next set hourly rates of compensation for each of the 29 Tribal attorneys. In setting those rates, the court should consider the following *Johnson/Kerr* factors:

(3) The skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(7) time limitations imposed by the client or the circumstances;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

The Supreme Court, in *Blum*, also directs the district court to take the quality of representation into account in setting hourly rates.

The Tribal attorneys have made persuasive showings as to all of these factors except the eleventh *Johnson/Kerr* factor, "the nature and length of the professional relationship with the client." There has been no showing that the fee award should be affected in any significant respect by this factor. The other factors, and their significance to the award in this case, are discussed below.

The parties present three principal issues related to fixing hourly rates:

A. Should the court use "historic" or "current" rates? Are the Tribal attorneys entitled to compensation for the delay in receiving payment?

B. What specific rates should the court use? What are the significance of prevailing contract rates and the non-profit status of Evergreen Legal Services and NARF?

C. Should travel time be compensated at a lesser rate?

### A. *Historic or Current Rates?*

■ The fee award covers services provided as early as 1970. The Tribal attorneys argue persuasively that it would be unfair to pay them, in 1984, fees at rates in effect at the time they performed the services ("historic rates"), without an adjustment to reflect the delay in payment. This is especially true in light of the marked inflation during the period covered by the award.

The State argues, essentially on two grounds, that the court should make no adjustment to the historic rates. First, the State asserts the Tribal attorneys have been dilatory in applying for Phase I fees. Secondly, the State contends because it has not been responsible for any delay in the fee award, it should not be penalized by an award at rates higher than the historic rates.

Neither of the State's contentions has merit. The Tribal attorneys then participating in the case applied for Phase I fees in 1974. The question of whether they were entitled to fees was litigated at length, both in this court and in the Court of Appeals. This history is summarized at pages 5–7 of the Tribes' "Narrative of Phase I Litigation," filed November 27, 1981. Meanwhile, litigation of the merits of the case continued, leading to the Supreme Court decision in 1979. The Tribal attorneys renewed and supplemented their fees application in 1981, culminating in the present adjudication. In light of this histo-

ry, the Tribal attorneys have not been dilatory in seeking fees.

Adjustment of the award to compensate for the delay in payment bears no relation to whether the State was responsible for the delay. Whatever the cause of the delay in the award, today's dollars are worth less than dollars at the time the fees were earned; and the State has had use of the money in the meantime.

The Tribal attorneys are therefore entitled to an enhancement of the award to compensate for delay in payment. The more difficult question is, how this should be accomplished.

The Tribal attorneys urge the court to compute all fees on the basis of today's prevailing hourly rates ("current rates"), regardless when the services were performed. They further suggest that the hourly rate for each attorney be selected on the basis of his or her experience level in 1984, not at the time he or she performed the services. For example, if an attorney admitted to practice in 1974 performed services in 1975, they contend he should be compensated at the rate prevailing in 1984 for an attorney with ten years' experience, not at the 1975 rate for an attorney with one years' experience.

In support of these contentions, the Tribal attorneys argue the delay in payment of their fees has damaged them in two distinct ways: (a) the value of the award has been eroded by substantial inflation; and (b) they have lost the opportunity for use of the funds in the interim. They contend the award should be enhanced to compensate for both factors—i.e., more than would simply be required to reflect the effects of inflation.

In awarding fees for Phase II, Judge Orrick used current rates. His opinion provides very limited discussion of the issue. "Phase II Fees Opinion," *supra* at p. 1448.

The parties have cited no controlling Ninth Circuit authority on this issue. But appellate decisions from other circuits reflect a wide range of approaches. In a number of cases, the Courts of Appeals have upheld awards based upon current, not historic rates. Examples include *Gautreaux v. Chicago Housing Authority*, 690 F.2d 601, 612–613 (7th Cir.1982) *cert. denied* 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *Graves v. Barnes*, 700 F.2d 220, 224 (5th Cir.1983); and *Ramos v. Lamm*, 713 F.2d 546, 555 (10th Cir.1983).

By contrast, the Second Circuit reversed an award based on current rates in *New York State Ass'n. for Retarded Children v. Carey*, 711 F.2d 1136, 1152–3 (2d Cir. 1983). The court noted that while neither historic nor current rates are ideal, use of current rates in that case gave plaintiffs a considerable windfall, because billing rates grew much faster than inflation in the period in question. The court held:

"We conclude that historic rates should be used for both profit-making firms and non-profit law offices in setting fee awards in multi-year cases. While not a perfect solution, the use of historic rates at least conforms to Congress' instruction to avoid windfall awards."

711 F.2d at 1153. The court then directed the use of rates calculated by adjusting prevailing rates to reflect changes in price levels.

Finally, in *Morgado v. Birmingham-Jefferson County Civil Defense Corps.*, 706 F.2d 1184, 1193–4 (11th Cir.1983), *cert. denied*, 464 U.S. 1045, 104 S.Ct. 715, 79 L.Ed.2d 178 (1984), the court held that where an award is based on historic rates, "... a percentage adjustment to reflect the delay in receipt of payment is appropriate." 706 F.2d at 1194.

If any generalizations are possible from these and other cases, they appear to be that the district court should make an inflation/delay adjustment; but how it does so rests in the sound discretion of the court.

For the reasons discussed below, it is recommended that this court use historic rates, adjusted for effects of inflation, in computing Phase I fees. With all due respect, this represents the only major recommended departure from the conclusions reached by Judge Orrick in Phase II. A

number of decisions on the issue, such as that of the Second Circuit in *New York State Ass'n. For Retarded Children, supra,* and that of the Eleventh Circuit in *Morgado, supra,* have been published since Judge Orrick's decision. In addition, the Phase I fees application covers 13 years, a much longer span than the Phase II application, and a claim for about five times as many hours. While current rates might have produced roughly fair results in Phase II, they are much less satisfactory in Phase I.

Accordingly, it is recommended that the court should use historic rates, with each adjusted to reflect the intervening change in the Consumer Price Index. For example, for services performed in 1975, an attorney should be compensated at an hourly rate computed as follows:

$$\text{Compensation Rate} = (1975 \text{ rate}) \times \frac{1984 \text{ C.P.I.}}{1975 \text{ C.P.I.}}$$

The basic advantage in the use of historic rates is that it provides, as a starting point, the rate prevailing at the time the services were performed. As in the purchase of any goods or services, the appropriate price presumptively is the one prevailing at the time of the purchase. The client could expect to be billed at that rate, not at the rate prevailing today, perhaps 12 years later. Similarly, that rate should at least be the starting point for calculating the fee the opposing party is required to pay on behalf of the prevailing client.

The Tribal attorneys urge that use of current rates is the fairest way to compensate for both inflation and "lost opportunity cost." But they have not persuasively argued that they are entitled to an adjustment above that required to offset inflation. The cases they cite do not hold a prevailing party is entitled to such a "double-barrelled" enhancement of the award. While an adjustment for inflation is proper, this court should decline to make a further adjustment for "lost opportunity costs."

If the objective is to compensate for inflation, use of the Consumer Price Index is a much more appropriate tool than use of current hourly rates. The movement in current rates might, fortuitously, mirror the movement in price levels generally. But the C.P.I. is, itself, the most widely accepted measure of those price levels. In fact it appears that prevailing billing rates in Seattle have increased faster than inflation generally.[71] Use of current rates would therefore provide a windfall for the Tribal attorneys, and be unfair to the State and its taxpayers. This parallels the observations of the Second Circuit in *New York State Ass'n. For Retarded Children, supra.*

In determining which historic rate to use, the court should consider the experience level of the attorney at the time he or she performed the services—not the experience level in 1984.

### B. *What Are The Historic Rates?*

The next task, therefore, is to determine the proper hourly rates for services by the Tribal attorneys in each of the years from 1970 through 1982, inclusive.

The basic guides to these rates are the prevailing rates charged at the same time by private attorneys in this community for similar work under similar circumstances. Two related threshold issues merit discussion. First, non-profit legal organizations, such as Evergreen Legal Services and Native American Rights Fund ("NARF"), are entitled to fees calculated on the same basis as private attorneys. The Supreme Court in *Blum* put to rest any issue in this respect raised by earlier cases. Secondly, Tribal attorneys are entitled to have their fees calculated in accordance with prevailing community rates, even if a lower rate is prescribed in a contract executed by their client and approved by the Bureau of Indian Affairs. Judge Orrick so held in Phase II. "Phase II Fees Opinion," *supra* at p. 1451. The Ninth

---

**71.** Mr. William H. Ferguson, in an affidavit discussed more fully below, indicated that prevailing rates doubled between 1975 and 1981. Attachment F to Plaintiff's Memorandum submitted November 25, 1981, at pages 10, 11, and 13–14.

Circuit approved a similar holding recently in *White v. City of Richmond*, 713 F.2d 458, 461 (9th Cir.1983).

We turn, therefore, to determining prevailing historic rates. This could be an immensely complex task, as 29 different lawyers, eight *Johnson/Kerr* factors, and 13 different years must be considered.

Fortunately, the problem is simplified by the fact that the Tribal attorneys have made a factual showing as to the prevailing rates, and the State has presented virtually nothing in opposition.

The Tribal attorneys filed, first in the Phase II fee proceedings and then here, a comprehensive affidavit of William H. Ferguson. Mr. Ferguson was a highly respected member of the Seattle bar, with extensive experience in the litigation of complex cases in the United States District Court for this district until his recent death. As senior partner in his law firm, he was fully familiar with billing rates for work in this court, both for his own firm and for others. In his affidavit, he presented a schedule of historic rates, and explained how, in preparing the schedule, he took into account not only the prevailing rates, but also all of the following factors:

(1) The complexity of the litigation, as reflected by his review of the pleadings and opinion in Phase II, and the material relating to the fee request;

(2) The length of the case;

(3) Its novelty;

(4) The complexity of the factual and legal issues;

(5) The skill of opposing counsel;

(6) The preclusion of other employment for Tribal attorneys;

(7) The risks to the Tribal attorneys, because their clients paid minimal fees;

(8) The great amount at stake in Phase II;

(9) The unpopularity of the position taken by the Tribal attorneys; and

(10) Their experience, reputation and ability.

The Tribal attorneys urge that Mr. Ferguson's observations in Phase II apply with roughly equal force in Phase I, and that the court should adopt his recommended fee schedule. The State has offered little or nothing in opposition.

Mr. Ferguson's affidavit is careful, comprehensive and persuasive. His observations on the factors listed above are basically accurate for Phase I as well. The court should therefore adopt his recommended schedule of fees.

Mr. Ferguson discusses several of the *Johnson/Kerr* factors in his affidavit. These include the customary or prevailing billing rates in this area, the experience, reputation and ability of the Tribal attorneys, the preclusion of other employment, and the undesirability of the case. He also discusses his experience with awards in other cases. Mr. Ferguson took all of these factors into account in developing his schedule of fees. Thus, by adopting and applying that schedule, the court implements, *inter alia*, the third, fourth, fifth, ninth, tenth and twelfth *Johnson/Kerr* factors.

To determine an hourly rate from Mr. Ferguson's schedule, it is necessary to identify (a) the year in which the services were performed, and (b) the experience level of the attorney at that time. The rates do not vary with other individual characteristics of the attorney in question. The factors listed by Mr. Ferguson (complexity of the case, skill levels, etc.) were incorporated into the schedule itself. This is less precise than an attorney-by-attorney analysis of the kind done by Judge Orrick in Phase II. But it works a generally fair result, and is a much more manageable approach where 29 attorneys and 13 years are involved.

Mr. Ferguson's schedule does not, however, provide all the historic rates needed in Phase I, as earlier years and a wider range of experience levels are involved. In addition to Mr. Ferguson's affidavit, the Phase I record includes the showing as to prevailing rates made by the Tribal attorneys in

1974. Furthermore, the affidavit of Greg Dallaire, Director of Evergreen Legal Services, indicates the rates applicable for attorneys in that agency in 1974 and earlier. Finally, the Tribal attorneys have used the "Minimum Fee Schedule" in effect in Seattle through 1973, and have "interpolated" any additional rates necessary to provide a comprehensive schedule of historic rates.

Such a schedule appears at page 36 of the Memorandum submitted November 27, 1981 by the Tribal attorneys (docket no. 7973). The State has offered no persuasive opposition to it; and the rates in the schedule seem fairly and properly derived. The court should adopt it, as correctly reflecting historic rates.

That table must be refined in three further respects before the court and the parties can use it in calculating fees. First, as to two entries in the schedule, Mr. Ferguson indicated a $5 range in prevailing rates. As he was the Tribes' witness, the court should interpret the affidavit in favor of the State, and use the figure at the low end of the range.

Secondly, the schedule (filed in 1981) did not reflect prevailing 1982 rates. But rates for attorneys at each experience level increased $10 from 1979 to 1980, and another $10 from 1980 to 1981. A similar $10 increase to 1982 would appear fair.

With these two refinements, the applicable schedule of historic rates is as follows:

| Work Done In | Admitted to Bar Before 1960 | Admitted to Bar Before 1970 | Admitted 70—72 | Admitted 73—76 | Admitted 77—present |
|---|---|---|---|---|---|
| 1970 | $ 40 | $ 40 | $ 35 | | |
| 1971 | $ 40 | $ 40 | $ 35 | | |
| 1972 | $ 40 | $ 40 | $ 35 | | |
| 1973 | $ 40 | $ 40 | $ 35 | $ 35 | |
| 1974 | $ 40 | $ 40 | $ 40 | $ 35 | |
| 1975 | $ 65 | $ 55 | $ 50 | $ 40 | |
| 1976 | $ 75 | $ 65 | $ 55 | $ 45 | |
| 1977 | $ 80 | $ 70 | $ 60 | $ 55 | $ 45 |
| 1978 | $ 90 | $ 80 | $ 70 | $ 60 | $ 50 |
| 1979 | $100 | $ 90 | $ 80 | $ 70 | $ 55 |
| 1980 | $110 | $100 | $ 90 | $ 80 | $ 65 |
| 1981 | $120 | $110 | $100 | $ 90 | $ 75 |
| 1982 | $130 | $120 | $110 | $100 | $ 85 |

The third necessary refinement to the fee schedule is the enhancement of the rates to compensate for inflation, as discussed above. This will be done by the parties, prior to submission of the Second Report and Recommendation.

C. *Travel Hours.*

The final issue relating to hourly rates concerns compensation for approximately 400 hours spent in travel. In Phase II, Judge Orrick held:

"The Court will not compensate counsel at their full rate for hours expended in travel to hearings, meetings of counsel, and client meetings because these hours, while reasonably expended, did not involve any legal ability or experience which is the basis for counsel's lodestar rate. *See In re Equity Funding Corp. of America Securities Litigation,* 438 F.Supp. 1303, 1330, 1343 (C.D.Cal.1977). To the extent that counsel did perform legal services while in transit, the hourly rate should be reduced to reflect the lesser efficiency that necessarily accompanies such efforts. *See Keyes v. School District No. 1, Denver, Colorado,* 439 F.Supp. 393, 409 (D.Colo.1977). For these reasons, the Court will compensate

all travel time at the rate of $40 per hour."

"Phase II Fees Opinion," *supra* at p. 1447, n. 23.

Judge Orrick's conclusions are sound and this court should adopt a similar course in computing Phase I fees. Two relatively minor changes are in order, however.

First, instead of compensating travel at the same dollar rate for all attorneys, the court should apply in each instance half of the rate otherwise applicable.[72] A major factor in compensating travel time at all is that the attorney is precluded from performing work for other clients. Fair compensation therefore varies among attorneys, depending upon the value of their time.

Secondly, the Ziontz firm attorneys apparently have claimed all daytime travel at full hourly rates, but have submitted no claim for their after-hours travel. The court should grant their request to revise their claim to include after-hours travel.

## VI. MULTIPLIER

These determinations will enable the parties to compute the compensable hours and hourly rates. This, in turn, determines the "lodestar" amount of the fee award.

The Tribal attorneys claim, however, that the court should increase the lodestar amount by application of a "multiplier." Prior to the decision of the Supreme Court in *Blum*, district courts had used multipliers with relative frequency tó enhance fee awards to prevailing Civil Rights Act plaintiffs. On occasion, multipliers of 3.0 or higher were used, resulting in fee awards of triple the lodestar amount or more. In making these awards, the district courts cited a wide variety of factors, and sometimes offered little if any analysis of the basis for applying a specific multiplier.

The decision in *Blum* reversed a fee award which included a 50% "bonus" (i.e.

used a 1.5 multiplier). The court first held that where the number of compensable hours and the hourly rate are shown to be reasonable, "... the resulting product is presumed to be the reasonable fee contemplated by § 1988." *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548. This figure is subject to enhancement only under very limited circumstances (discussed more fully below). The court rejected use of multipliers under circumstances previously relied upon by some district courts, such as novelty and complexity of the issues, the special skill and experience of counsel, the results obtained in the litigation, or the number of persons benefitted by the outcome.

In light of the *Blum* decision and earlier cases, the Tribal attorneys have substantially trimmed back their multiplier request from the version originally presented. They now ask the court, if it uses historic hourly rates, to apply a multiplier of 1.75 to those portions of the award which meet two tests:

(a) The award is for time devoted to matters of the most significant risk, difficulty and importance. In this category they would include,

"... the trial, the central appeals, the subsequent enforcement proceedings before the magistrate and district court and in the Ninth Circuit and Supreme Court appeals...." Memorandum re Recalculation of Tribes' Multiplier, filed June 30, 1984, at p. 3.

(b) The multiplier would only be used for attorneys with 300 or more hours in the litigation. Fourteen of the Tribal attorneys so qualify.

Applying the holding of *Blum* to the circumstances of this case, however, it is recommended that the court not apply any multiplier to the lodestar amount in computing the final award.

This result would follow and conform with the decision of Judge Orrick in Phase II, declining to enhance the award by application of a multiplier.

---

72. For ease of computation, the Tribal attorneys might prefer to reduce the *number* of travel

hours by half, and bill them at the full rate.

Writing in December of 1981, Judge Orrick anticipated many of the holdings of the Supreme Court in *Blum* over two years later. For example, he held that because the rates of compensation for tribal counsel already reflect a high level of skill and sophistication in the specialized area of Indian rights, a multiplier adjustment on this basis would be inappropriate. "Phase II Fees Opinion," *supra* at pp. 1448–1449.

The Supreme Court's clear directions in *Blum* only serve to confirm the correctness of Judge Orrick's determination. The court identified a single situation in which an upward adjustment might be justified. The district court in *Blum* had based its multiplier adjustment, in part, upon the "high quality of representation." The Supreme Court held this can be the basis of an upward adjustment only in rare cases:

> "The 'quality of representation,' however generally is reflected in the reasonable hourly rate. It, therefore, may justify an upward adjustment only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was 'exceptional.'"

465 U.S. at 899, 104 S.Ct. at 1549.

The Tribes achieved exceptional success in this case. And the quality of representation was extremely high. But the Tribal attorneys have failed to establish, by "specific evidence" or otherwise, the hourly rates recommended above fail to compensate them fairly for the quality of that representation. Indeed, these hourly rates are the ones proposed by the Tribal attorneys. The court should therefore regard with healthy skepticism their present claim that those rates are unfairly low.

The Supreme Court majority left partially open one other door to a possible multiplier adjustment. District courts have commonly adjusted fee awards upward in cases where the recovery of any fee at all was contingent upon a successful result. The *Kerr* and *Johnson* cases recognized "whether the fee is fixed or contingent" as the sixth of the twelve relevant factors in setting a fee.

The district court in *Blum* included among its reasons for an upward adjustment a statement that, "The issues presented were novel, and the undertaking therefore risky." *Stenson v. Blum*, 512 F.Supp. 680, 685 (S.D.N.Y., 1981). But the Supreme Court rejected this as a basis for an adjustment in that case, finding nothing in the record to establish the contingent nature of the litigation. Indeed, the majority of the court reserved the question of whether an attorney can *ever* be entitled to an upward adjustment because his compensation is entirely contingent upon prevailing and recovering a fee under § 1988. 465 U.S. at 901 n. 17, 104 S.Ct. at 1550 n. 17.

This case is similar to *Blum* in these respects, and is controlled by its holding. None of the Tribal attorneys represented his or her client on a contingent fee basis. Most, if not all, of the private attorneys contracted for, and were paid, fees which were not conditioned upon a successful result. It is true that the non-profit legal organizations will receive fees only because their clients were prevailing parties. But this is not the type of "contingent fee" contemplated by those cases awarding upward adjustments. Private attorneys receive an enhanced award in contingent fee cases in part because all of their contingent fee Civil Rights Act cases must be financed by their successful ones. If a private attorney could not expect an enhanced fee in the successful cases, he or she might well hesitate to take any such cases for indigent clients. This is not true, however, for the non-profit organizations, which look to foundations, charitable organizations and other sources to fund all of their activities. None of the Tribal attorneys, therefore, is entitled to an upward adjustment because the litigation was contingent in nature.

The Supreme Court did not expressly hold in *Blum* that the foregoing were the only two situations in which an upward adjustment might be appropriate. Future cases might define others. But the ques-

tion of whether other special circumstances might justify use of a multiplier is academic for purposes of this case. In their post-*Blum* submissions, the Tribal attorneys have relied entirely upon quality of representation and contingency of the litigation in seeking the use of a multiplier here. Because this case qualifies under neither of those criteria, the court should follow the decision of Judge Orrick and decline to apply a multiplier to the lodestar amounts.

## VII. COSTS, INTEREST AND REFUNDS

*Costs.* The court has held that the Tribes are entitled, under § 1988, to recover the costs they have incurred in Phase I. By order filed February 4, 1983, pursuant to the stipulation of the parties, the court has also referred this aspect of the case to the magistrate for recommended findings.

The Tribal attorneys submitted on April 19, 1982 a detailed claim for costs totalling $87,883.19. Although the State initially opposed the claim in several respects, the parties negotiated and eventually reached a constructive stipulation. The essence of that stipulation is as follows. The claim for costs will be reduced in the same proportion as the court's reduction in the number of compensable attorney hours. In other words, if in fixing the fee award, the court disallows one-fourth of the hours claimed by the attorneys, the court will also reduce the cost award by one-fourth. The State will not oppose an award of costs determined in this manner.

The holdings set forth in this First Report and Recommendation will enable the parties to calculate the number of compensable hours, and therefore to compute the cost award as well. Those specific amounts will then accompany the Second Report and Recommendation.

The Tribes have already reimbursed their attorneys for, or have paid directly, many of the costs covered by the court's award. The Tribal attorneys and all of their clients should be directed, therefore, to negotiate a written agreement as to the appropriate division of the court's award of costs. Each Tribal attorney and each Tribe must enter into the agreement, which is to be filed with the court and served upon the State. The court should enter its award of ·

costs promptly after the filing of the agreement in proper form.

*Interest.* The court should provide that its orders awarding fees and costs shall constitute judgments entered in the United States District Court, and the awards shall bear interest at the rate(s) applicable to such judgments. Interest on an award shall accrue from the date the order is filed until the date actually paid. This would forestall any future litigation of the question of how counsel should be compensated for further delays in payment. This would be identical to the course of Judge Orrick, who entered a judgment on his Phase II attorneys fee awards on October 16, 1982, and provided that the awards would bear "interest at the legal rate from the date of judgment."

*Refunds of Attorneys' Fees.* Many of the Tribes have already paid fees to their attorneys. When the State pays the fee awards, the Tribes will accordingly be entitled to refunds. Those refunds should be in the amount of fees actually paid, adjusted upward to reflect inflation to the date of the award, in the same manner as the fee award itself. The refunds shall bear interest after the award until paid by the Tribal attorneys at the same rate(s) as the awards. The court should direct the Tribal attorneys to pay these refunds within 30 days after the State pays the fee awards. The court should direct that, in the event of a dispute between a Tribal attorney and his or her client as to the proper refund of fees, the Tribal attorney shall present the matter to the court for resolution within 60 days after the State pays the fee award.

## VIII. CONCLUSION

The foregoing recommendations should provide the parties the basis for calculating the awards of attorneys fees and costs, if the court adopts the recommendations. Accordingly, the parties are directed to cooperate in an attempt to develop an agreed summary of such awards. That summary shall be filed as promptly as possible after filing of this First Report and Recommendation. If in good faith the parties are unable to reach agreement, they shall notify the United States Magistrate for scheduling of a conference or hearing.

This summary of specific recommended awards will permit the preparation of a Second Report and Recommendation.

The period for objections to the foregoing recommendations is suspended until submission of the Second Report and Recommendation.

## MAGISTRATE'S SECOND REPORT AND RECOMMENDATION ON PHASE I ATTORNEYS' FEES

(December 12, 1984)

JOHN L. WEINBERG, United States Magistrate.

The Tribal attorneys have calculated the awards of attorneys' fees and cost which would result if the court adopts all of the recommendations contained in the "First Report and Recommendation on Phase I Attorneys' Fees." They filed the schedules of those awards, and various supporting documents, on December 3, 1984.

Counsel for defendants ("the State") has indicated by letter dated December 10, 1984 that the State has no objection to the computations submitted by the Tribal attorneys to implement the determinations suggested in the First Report and Recommendation.

Both parties have reserved their rights, however, to challenge the correctness of those recommended determinations.

I have not attempted to review the various calculations underlying the December 3 filing of the Tribal attorneys, relying instead upon the defendants to bring any errors to the attention of the court. I have generally reviewed the submissions, however, and they appear in all respects accurately to implement the First Report and Recommendation.

The Tribes themselves have paid a portion of the costs which are covered by the court's award. Thus in several instances, the cost award must be apportioned between the Tribes and their attorneys. The First Report and Recommendation suggested the court approve the cost award only after the Tribes and their attorneys enter into written agreements as to the appropriate division. The Tribal attorneys, however, suggest this is a cumbersome process and might unduly delay the balance of the award. They therefore propose that, where a division of an award will be required, the entire award be placed in the attorney's trust account until the agreement is signed and approved by the court. I recommend the court find this a satisfactory solution. The proposed order which accompanies this Second Report and Recommendation includes language to that effect.

I therefore recommend the court award attorneys' fees and costs, for the Phase I proceedings covered by this application, in favor of the recipients, against the State of Washington, and in the amounts listed below:

| Recipient | Attorneys' Fees | Costs | Total Award |
|---|---|---|---|
| Evergreen Legal Services | $ 959,832.96 | | $ 959,832.96 |
| Native American Rights Fund | 330,224.14 | $12,535.73 | 342,759.87 |
| Ziontz, Pirtle Law Firm | 606,718.75 | 60,247.89 | 666,966.64 |
| James Hovis | 145,991.73 | 6,214.58 | 152,206.31 |
| John H. Bell (Clinebell) | 141,654.85 | | 141,654.85 |
| Bell & Ingram (for services of Lewis Bell, deceased) | 37,888.48 | | 37,888.48 |
| Michael R. Thorp | 3,164.31 | | 3,164.31 |
| Susan Kay Hvalsoe | 12,476.54 | | 12,476.54 |
| Total | $2,237,951.76 | $78,998.20 | $2,316,949.96 |

A proposed Order accompanies this Second Report and Recommendation.

By agreement of the parties, both sides may file and serve objections within 30 days after the filing of this Second Report and Recommendation. Both sides may file and serve replies within 14 days thereafter. The matter will then be ready for disposition by the court.

## MANAGEMENT PLANS RE: SAC ROE HERRING FISHERY

The Order for Interim Plan for Management of Herring Fisheries set out in 459

F.Supp. 1020 at 1063–1066 provides that modification of or refinements to the plan for managing herring fisheries may be agreed to by the affected parties. When filed with the court, they become effective without further action or approval of the court. *Id.* at 1064. Several such modifications have been filed for specific year's fisheries. These are not published here.

## ORDER ADOPTING NEW PUGET SOUND SALMON MANAGEMENT PLAN

### (October 15, 1985)

CRAIG, District Judge.

On August 31, 1977, this court approved a Puget Sound Salmon Management Plan that had been jointly developed by the affected parties. 459 F.Supp. at 1107, subsequently modified October 11, 1978. The plan was to be periodically reviewed by the parties, and commencing in May, 1982, the parties or any of them could propose modifications to the court. On June 1, 1982, the court granted a motion continuing the plan until further order of the court so as to give the parties more time to develop a replacement plan.

The Puget Sound Tribes and the Washington Department of Fisheries have reached agreement on a new plan for managing the Puget Sound salmon runs. The new plan is based upon the experience the parties have had in managing Puget Sound Fisheries since the 1977 plan was enacted. The new plan includes provisions for continued annual review and possible modifications as well as provisions for the development of more detailed regional plans by agreement of the affected parties.

The State of Washington, the Puget Sound Area tribes and the United States have asked this court to approve the new plan and incorporate its provisions as an order of the court.

The court has received and reviewed the proposed new plan. After a review of the plan, the court has amended paragraph 11.-1.4 thereof by adding the following sentence:

"However, nothing herein is to be construed as relieving any party of any obligation under any law or any administrative or judicial order to timely furnish any information or data to any state, federal, or international governmental body or officer."

The court adopts the May 15, 1985 Puget Sound Salmon Management Plan, as amended by the court, as an order of this court to replace the Memorandum Adopting Salmon Management Plan, set out at 459 F.Supp. 1107–1113. The parties are directed to implement the plan consistent with the Pacific Salmon Treaty and its implementing legislation (P.L. 99–5) and the Salmon and Steelhead Conservation and Enactment Act, 16 U.S.C. 3301 *et seq.* Other previous orders of this court are changed only to the extent they are explicitly modified by the terms of the attached Plan and then only with respect to their application to runs covered by this Plan.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RE TULALIP TRIBES' REQUEST FOR DETERMINATION OF USUAL AND ACCUSTOMED FISHING PLACES

### (December 31, 1985)

CRAIG, District Judge.

The Court has reviewed the Special Master's Report and Recommendations re: Tulalip Tribes' Request for Determination of Usual and Accustomed Fishing Places, the relevant evidence of record in this case and the argument of counsel. This Court has adopted and here applies the sequential numbering system for the findings of fact and conclusions of law that follow.

### FINDINGS OF FACT

359. The Tulalip Tribe is composed largely of people who are descendants of one or more of the groups commonly referred to today as the Snohomish, Snoqualmie and Skykomish tribes, although many variants of those names have been used in treaty-time and subsequent writings. These groups used and occupied territories along the Snohomish-Snoqualmie-Skykomish river systems and on adjacent islands including Whidbey Island and Camano Island and were parties to the Treaty of Pt. Elliott, FF 255, 459 F.Supp. 1020, 1039; Exh. USA–92 (T–M–12); Exh. USA–103 (T–M–14); Exh. USA–104 (T–M–13).

360. The fishing areas used by western Washington Indians at treaty times were basically of five kinds: (1) freshwater lakes; (2) freshwater streams and creeks draining into the various inlets; (3) shallow bays and estuaries; (4) the inlets and Puget Sound; and (5) the straits and ocean. Customary use rights varied according to the type of locale and the gear being used. Winter villages were located along the salmon streams, at the heads of inlets near the mouth of such streams, and on protected coves and bays. During the winter season, if people went out for fresh food stores, they used the fishing areas in closest proximity to their villages. During the spring, summer and fall, people moved about to fish at more distant fishing grounds. (Exh. USA–20, p. 16).

361. The freshwater fisheries were controlled by the locally resident population. Certain visitors might have use rights because they were related to local residents. Others might request permission to fish. Such permission was normally extended if amicable relations existed between the local people and the visitors. (Exh. USA–20, pp. 16–17).

362. The situation with regard to saltwater fisheries appears to have been slightly more complicated. Shallow bays where salmon, flounder, and other fish were speared were often gathering places for people from a wider area. This was especially true if shellfish beds were present. In the deeper waters of the bays, huge flotillas of canoes would gather to troll for salmon as they converged in the bays just before their entry into the rivers. People living upriver on a given drainage system would normally come to the saltwater areas at the mouth of the river to obtain fish and shellfish. At some of the major fishing locations people from other drainage systems would also congregate to join in the fishing. (Exh. USA–20, p. 17).

363. The deeper saltwater areas, the sound, the straits, and the open sea, served as public thoroughfares, and as such, were used as fishing areas by anyone traveling through such waters. Exh. USA–20, p. 18; Lane, TR April 9, 1975, 49–50; Lane, TR July 18, 1983, 647–648). These areas appeared to have been open to all with whom the neighboring tribes were not at war. (Exh. G–4, pp. 186–187).

364. Constricted waters like Deception Pass, Swinomish Slough, and Holmes Har-

bor were likely controlled by the resident groups in whose territories those waters were located. (Exh. USA–74, p. 29; Lane, TR July 18, 1983, 648–649).

365. Both within the straits and off the west coast in the open sea there were halibut banks known to the Indians, used by them, and claimed as private property. Private property rights were also recognized at reefnet locations in the straits and northern Puget Sound. (Exh. USA–20, p. 18).

366. The straits and sound were traditional highways used in common by all Indians of the region and most saltwater fisheries traditionally were free access areas. While it is useful for certain purposes to speak of waters or territory in terms of a particular adjacent tribe, this by no means implies exclusive rights by that group. That these Indians traveled widely and frequently throughout the waters of the sound and straits is commented on by numerous early observers. (Exh. USA–30, p. 25; Lane, TR July 18, 1983, 647–648).

367. There are greater difficulties in specifying or delineating marine areas used by one or another Indian group than is the case with river areas. Similarly, it is easier to specify particular relatively stable locations in marine waters, such as reefnet locations or halibut banks, than it is to delineate trolling areas or areas where herring may have been raked. (Exh. USA–74, p. 27; Lane, TR April 9, 1975, 23).

368. As a general matter, there is very little treaty-time documentation or direct evidence or fishing in open marine areas, and such occasional references as exist are extremely fragmentary and just happenstance. (Lane, TR July 18, 1983, 646–647). It is only by chance that documents dating from treaty times note the presence of specific Indians at a given freshwater site. (Exh. USA–104 (T–M–13), p. 37). For later periods it is well documented that Indians from both north and south of the Fraser River from places as far away as Port Madison and Seattle went to the Fraser River to engage in the salmon fisheries. (Lane, TR April 9, 1975, 55–56).

369. Fort Langley was established by the Hudson Bay Company on the Fraser River in what is now British Columbia, Canada, in 1827 as the center of its operations for its trading posts up and down the coast. Its location was chosen because of the enormous salmon supplies which re-

turned to that river. Many of these salmon passed through the Strait of Juan de Fuca and the San Juan Islands. The salmon business was a major part of that fort's operation from the outset. Salmon that were collected by the Indians and then traded to the fort were used to provision that fort and all of the fur brigades that the company sent out from the Langley area and from the interior forts and those up the coast. Salmon were even exported from Langley down to Nisqually, which was basically a farming operation, and to England, the Hawaiian Islands and other places. Ft. Langley was the major salmon trading and processing establishment of the Hudson Bay Company. (Lane, TR July 18, 1983, 643–644; Lane, TR April 9, 1975, 54).

370. Fort Victoria was established by the Hudson Bay Company where there was a good port for ships to call. When the company discovered that there were no sockeye in the vicinity, they established a buying station at Cattle Point on the southeastern tip of San Juan Island where the salmon banks are. The sockeye went by the southern end of San Juan Island, and the Indians were able to get them there. (Lane, TR July 18, 1983, 644). There was a huge salmon bank there and Indians from other tribes often came and joined in the fishery (*Id.* 678–679).

371. The precise details of Indian claims in the San Juan Islands and their accuracy may be impossible to specify with precision at this time. Many different Indian groups moved out into the islands for spring and summer fishing. Apparently at treaty times, few Indians were living in the San Juan Islands on a year-round basis. However, large numbers of Indians maintained fishing villages there. The Songhees and Saanich of Vancouver Island held territories and reefnet locations in the San Juans. Lummi, Samish, Swinomish and Clallam and possibly others regularly resorted to the islands for spring and summer fishing. Information respecting specific areas of use by particular groups at treaty times is incomplete and sometimes conflicting. (Exh. USA–74, p. 27; Snyder TR July 14, 1983, 444–476). Central and northern Puget Sound Tribes outside of the San Juans had also utilized its fisheries resources during the pre-treaty period. The Snohomish Tribe was among a number of tribes who fished and clammed in those areas. (Snyder, July 14, 1983, pp. 456–461, 467).

372. At treaty times the Snohomish, in common with other shoreline people, were accustomed to traveling widely in their canoes and to harvesting such fish as were accessible to them. While it is not feasible to document the marine fisheries of the Snohomish at treaty times, it is clear that Tulalip predecessors traveled widely and frequently throughout most of the waters of Puget Sound, at least those from Seattle northward, as did other Indians of the area. Absence of documentary evidence of traditional fisheries of Tulalip predecessors in open marine waters is similar to that for other tribes. (Lane, Exh. USA–92 (T–M–12), p. 29; Lane, TR July 18, 1983, 646–650).

373. The documentation of the presence of Snohomish Indians at Fort Langley during pre-treaty times is spotty and generally happenstance, but it would indicate that the Snohomish frequently traveled to the Fraser River for trading of both salmon and furs. (Lane, TR of April 9, 1975, 55–56; Lane, TR July 15, 1985, 545, 550–551).

374. A round trip to the Fraser River from the mouth of the Snohomish River would normally have taken from two to four weeks (Snyder, TR July 15, 1983, 551–552). During such travels they would have harvested salmon accessible to them. (Lane, TR July 18, 1983, 649–650).

375. It is difficult to establish the range and extent of the usual and accustomed marine fisheries engaged in by Snoqualmie fishermen at treaty times and to ascertain the regularity with which the Snoqualmie may have visited freshwater sites adjacent to their territory for fishing purposes. It seems reasonable that they would have joined with neighboring people, especially if they were inter-married with them, to harvest fish in the larger lakes. (Exh. USA 104 (T–M–13), p. 37).

376. The major salmon runs of Puget Sound area passed through the open waters of the Strait of Juan de Fuca and northward through and alongside the San Juan Islands.

377. It was normal for all of the Indians in western Washington to travel extensively either harvesting resources or visiting in-laws, because they were intermarried widely among different groups. They would visit for social occasions such as potlatches, weddings, feasts of one sort or another, or inter-community ceremonials or celebrations. (Lane, TR April 9, 1975, 48).

The widespread intermarriage among the tribes surrounding Puget Sound would indicate that travel through its marine waters occurred frequently and on a regular basis. (Lane, TR July 18, 1983, 634–635, 674, 705; Lane, TR July 30, 1975, 83–84; Lane, TR April 9, 1975, 57–58; Snyder, TR July 14, 1983, 498–499, 574–578; Dover, TR July 30, 1975, 113–115).

378. An example of inter-marriage was the village at Hat Slough which had people who were of mixed ancestry. This was true of every village in the Puget Sound area. People had relatives in other communities, and throughout the entire case area there was a great deal of exogomy. Although it wasn't a disgrace to marry someone within your own community, there was a great deal of out-marriage. (Lane, TR July 18, 1983, 634–635).

379. The expert testimony in this case indicates that in some cases a particular tribe or tribes exercised preemptive territorial fishing control at the mouths of rivers near the location of its villages as well as over certain nearby narrow or constricted waterways, bays or channels or at specific reefnet or beach seine sites and halibut banks. Such control would limit any other tribe's use of those areas to an invitational or permissive use. (USA–20, pp. 17–18; USA–74, p. 29; Lane, TR July 18, 1983, 648–649, 680–681, 689–690). (The rights stemming from such control are herein referred to as primary rights.) Examples of such areas are Swinomish Slough, Deception Pass, Holmes Harbor and Hale Passage off Lummi Island (*Id.*)

*Area by Area Findings*

380. There is sufficient specific documentation and evidence to establish usual and accustomed fishing by Tulalip predecessors at the following locations:

(a) Admiralty Inlet, including its Whidbey Island bays; Saratoga Passage, Penn Cove and Holmes Harbor; Possession Sound and Puget Sound south of Whidbey Island to the present West Point Lighthouse, including Tulalip Bay and Port Gardiner. (Lane, TR July 18, 1983, 635–637, 651–653, 683; Dover Deposition 18, 26–28).

(b) Waterman recorded Snohomish place names for locations on the eastern shore of the Puget Sound in the vicinity of Pt. Edwards and Pt. Wells, named Stu-bus and Ile'i-s-tu-bus. (Exh. USA–103 (T–M–14), Appendix 1)). Hudson Bay Company records refer to encounters with Snohomish at Murden Cove at Bainbridge Island (Exh. T–M–26, entry for July 7, 1827).

(c) The entire Port Susan inlet except close to the mouths of the Stillaguamish River (Lane, TR July 18, 1983, 634, 691, 704–705; Lane, TR July 30, 1975, 80, 93).

(d) The waters off the west coast of the Whidbey Island including those northerly and westerly from the West Beach shoreline from Deception Pass to Pt. Partridge. (Lane, TR July 18, 1983, 692).

381. In addition to the above, the evidence as a whole, when applied consistently with this court's prior Findings of Fact, notably Nos. 10, 13, 14, 26, and 28 (384 F.Supp. 312, 352–357), and its prior legal holdings set out in 384 F.Supp. at 332 and 459 F.Supp. 1020, 1059, is sufficient to establish (subject to the limitation set out in Finding No. 383, below), that at treaty times the precedessor Indian groups to the Tulalip Tribes customarily fished in the following marine areas and that such areas were therefore usual and accustomed fishing grounds of those groups in common with other groups:

(a) Point Roberts, Birch Bay and adjacent waters now designated WDF Area 7A.[73]

(b) The waters of the San Juan Archipelago, Haro Strait and Rosario Strait and the portion of the Strait of Juan de Fuca northeasterly of a line drawn from Trial Island (in Canada) to Protection Island.

(c) The waters of WDF Area 10.

382. The freshwater usual and accustomed fishing area of the Tulalip predecessors includes the Snohomish-Snoqualamie-Skykomish River drainage area including its freshwater lakes. (Dover Deposition 21). They also were permitted to fish on the Stillaguamish River only with the permission and at the invitation of the Stillaguamish Tribe.

383. The Tulalip Tribes have entered into, and this court has approved, stipu-

---

**73.** As used in these findings and conclusions, "WDF Areas" means the Washington Department of Fisheries' Puget Sound Commercial Salmon Management and Catch Reporting Areas, as those areas are delineated as of June 23, 1985, in WAC 220–22–030. The appended maps are omitted here.

lated settlement agreements with the Suquamish, Muckleshoot, Swinomish, Lower Elwha Clallam, Jamestown Klallam, Port Gamble Klallam, Skokomish, Puyallup, Nisqually and Stillaguamish Tribes (the latter ten of which are hereinafter called "stipulating tribes") concerning fishing in waters initially claimed by the Tulalip Tribes in this proceeding.* Pursuant to those agreements the stipulating tribes, with a single limited exception, did not participate in the adversarial proceedings of this dispute and thus had no opportunity to present evidence of their own, to cross-examine Tulalip witnesses or to challenge Tulalip evidence. Some of the evidence offered by the Tulalip Tribes dealt with activities, persons or events in areas which are of concern to the stipulating tribes. It should therefore be stressed that the findings of fact and conclusions of law which are adopted in this proceeding are not to be cited or relied upon in any manner against or to the prejudice of the stipulating tribes in this or any other judicial or other proceeding, *provided* that this shall not prevent the independent establishment of the same fact or conclusion in a future proceeding.

In the event that any of the foregoing findings of fact should be considered conclusions of law, they should be so considered.

## CONCLUSIONS OF LAW

■ 94. Except for those areas for which the Tulalip Tribes have specifically withdrawn their claims in the settlement agreements previously approved by the court in this proceeding,* the claim of the Tulalip Tribes for a determination of its usual and accustomed fishing places in any of the remaining waters claimed in this proceeding is not barred by *res judicata*. Part C of this court's Order of September 10, 1975, as amended, 459 F.Supp. at 1060.

■ 95. Either direct evidence or reasonable inferences from documentary exhibits, expert witness reports and other testimony as to the probable location and extent of usual and accustomed treaty fishing areas may be sufficient to support a legal determination of the areas involved. Stringent proof standards are not the appli-

cable limiting basis for such determinations. *United States v. Washington,* 730 F.2d 1314, 1317–18 (9th Cir.1984) (approving 459 F.Supp. 1020, 1058–60).

■ 96. Open marine waters that were not transited or resorted to by a tribe on a regular and frequent basis in which fishing was one of the purposes of such use are not usual and accustomed fishing grounds of that tribe within the meaning of the Stevens treaties.

■ 97. The determination of any area as a usual and accustomed fishing ground or station of a particular tribe must consider all of the factors relevant to (1) use of that area as a usual or regular fishing area, (2) any treaty-time exercise or recognition of paramount or preemptive fisheries control (primary right control) by a particular tribe, and (3) the petitioning tribe's (or its predecessors') regular and frequent treaty-time use of that area for fishing purposes. *United States v. Washington,* 384 F.Supp. at 332, 459 F.Supp. at 1059.

■ 98. The only areas so considered in this determination are those described in the Tulalip Tribes' written closing argument as follows:

"[T]he open marine waters of the following areas: (a) adjacent to the San Juan Islands including Rosario Strait (excluding reefnet sites and certain enclosed areas), (b) the eastern portion of the Strait of Juan de Fuca, (c) Admiralty Inlet and the environs of Whidbey Island, (d) Possession Sound, Saratoga Passage and Port Susan, (e) the central area of Puget Sound; and (f) the freshwater areas of the Snohomish-Snoqualmie-Skykomish river drainage system * * *."

together with the Stillaguamish River system. The only tribe whose extent of use of any of those areas was considered in this determination was the Tulalip Tribes and its predecessor entities.

99. The record of this case adequately supports a determination that Indian custom and practice at the time of the treaties recognized a right of Tulalip predecessor groups to fish in common with other tribes in the open marine waters of the Puget Sound Area to the extent specified in the findings herein.

100. (a) Subject to the limitations elsewhere expressed in these findings and con-

* See pp. 1471 to 1483, *supra.*

* See p. 1471, *supra.*

clusions the Tulalip Tribes' in-common fishing right area includes the open marine waters northerly from a true east-west line passing through the Pt. Vashon light (the present southern boundary of WDF Area 10) to the Canadian border and westward into that portion of the United States' waters of the Strait of Juan de Fuca that is easterly of a line extending northwesterly from the northernmost tip of Protection Island to Trial Island (in Canada).

(b) Excluded from this Tulalip in-common fishing right area are the following areas: [74]

 i. Any waters included in the reservation of another tribe.

 ii. That portion of WDF Area 8 north-easterly of a line drawn between Strawberry Point on Whidbey Island and Brown Point on Camano Island, including Swinomish Channel (a.k.a. Swinomish Slough), Deception Pass, Hale Passage (off Lummi Island) and WDF Area 7D, *provided*, that with respect to any other area of the types referred to in Finding of Fact No. 379 that heretofore has been, or may hereafter be, found by this court, or agreed to by the affected tribes, to be a primary right area of another tribe, the Tulalip fishing right is subordinate to the primary right of such other tribe.

 iii. Those areas within which the Tulalip Tribes has contracted not to claim a non-permissive fishing right in the stipulated agreements identified in Finding of Fact No. 383 herein. The areas specifically withdrawn from the Tulalip Tribes' claim pursuant to those negotiated settlements are:

 1. The portions of WDF Areas 6 and 6B southerly and westerly of a line drawn from Point Wilson westerly to McCurdy Point, thence westerly to the northernmost tip of Protection Island and thence northwesterly to Trial Island and all of WDF Area 6D.

 2. WDF Areas 7B and 7C.

 3. Those portions of WDF Area 10 easterly of a line drawn from Alki Point to West Point thence to Meadow Point (all in Seattle) and all of WDF Areas 10A, 10C, 10D, 10F and 10G (formerly 10B);

 4. All waters south of a true east-west line passing through the Pt. Vashon light;

 5. Those portions of WDF Area 10 westerly of a line drawn from Point Monroe on Bainbridge Island to Point Jefferson on the Kitsap Peninsula and all of WDF Area 10E;

 6. Those portions of WDF Area 9 south and west of a line drawn from Foulweather Bluff to Kinney Point, on the southernmost tip of Marrowstone Island, and south and west of a line drawn from Marrowstone Point, on the northernmost tip of Marrowstone Island, to Point Wilson, including Kilisut Harbor, and all of WDF Area 9A;

 7. All waters southwesterly of the northern boundary of WDF Area 12; and

 8. All freshwaters draining into the waters described in this part 7(b) iii.

 iv. Any other area to which a particular tribe or tribes hereafter establishes that it historically exercised paramount or preemptive fisheries control (primary right control) at treaty time.

101. The freshwater areas described in Finding of Fact No. 382 herein are usual and accustomed fishing grounds of the Tulalip Tribes, subject to the limitations specified therein, the settlement agreements referred to in Finding No. 383 and this court's orders approving those agreements.

102. None of the Findings of Fact or Conclusions of Law contained herein shall be binding on the stipulating tribes named in Finding of Fact No. 383, *supra*, or have any presumptive, persuasive, prima facie or other force or effect against any such stipulating tribes in this or any other judicial or other proceeding. The findings and conclusions herein, and the judgment thereon, do not affect the terms or enforcement of the settlement agreements previously approved by this court or the orders approving them and do not form any basis or cause for modifying, vacating or terminating those agreements or orders.

In the event that any of the foregoing conclusions of law should be more properly considered findings of fact, they should be so considered.

## JUDGMENT

IT IS ORDERED that judgment shall be entered in accordance with the Findings of Fact and Conclusions of Law entered this date.

---

**74.** The area remaining after these exclusions is shown on Appendix C, which is omitted here.